## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. _____

CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

      Plaintiffs,

v.

CHARIF SOUKI,

      Defendant.

---

## COMPLAINT

---

Plaintiffs Christopher Parker and Red Mango Enterprises Limited ("Red Mango"), by and through their undersigned counsel, allege as follows:

### INTRODUCTION

1.      Since early 2017, Christopher Parker, individually and through Red Mango, has invested millions of dollars in the publicly-traded shares of a company called Tellurian Inc. ("Tellurian"), with the encouragement of one of Tellurian's founders and its Executive Chairman, defendant Charif Souki.

2.      Soon after Parker and Red Mango began investing in the company, Tellurian's share price began to drop.  Souki nonetheless encouraged Parker to hold, and even increase, his position, blaming the drop on an aggressive short-selling campaign rather than the fundamentals of Tellurian's business.

3.      By the summer of 2019, however, Tellurian's share price had not recovered, and Parker informed Souki that he (on his own behalf, and through Red Mango) intended to sell his shares.

4.      Upon hearing this, Souki embarked on a plan to fraudulently induce Parker into not selling his shares in Tellurian in order to try to save the company's stock price from dropping even further.

5.      Souki induced Parker to delay selling any shares in Tellurian by offering—unprompted—to indemnify Parker, individually and on behalf of Red Mango, against any losses through the end of 2020.  But Souki was lying, and never planned to fulfill his promise.  Among other things, Souki never even told his bank—from which he had taken out loans including loans secured by Souki's own Tellurian stock and/or options—that Souki had any liability outstanding to Parker and Red Mango.

6.      In August 2019, Parker and Souki exchanged text messages memorializing their agreement.  Souki asked for information about Parker's holdings, and then wrote to Parker:  "Please keep this text.  I will guaranty your capital by dec. 2020 [*sic*].  I'll make up any capital deficiency you have at that date.  Thanks for your help and confidence."

7.      In early 2020, Tellurian's share price dropped dramatically, losing approximately 90% of its value in the span of about two months.  The drop resulted in Souki himself being forced (by his bank) to sell tens of millions of shares of Tellurian.  But Parker, on his own behalf and Red Mango, honored his agreement with Souki and maintained his position.

8.      As the maturity date on Souki's guarantee neared, in August 2020, Parker's executive assistant sent Souki a detailed breakdown of Parker's and Red Mango's holdings in Tellurian, including the number of shares owned and the average cost per share, so that Souki's obligation was clear.  Souki acknowledged the information.

9.      When December 2020 came around and Tellurian's share price had still not recovered, Parker asked Souki to perform his part of the agreement: to indemnify him and Red Mango for their losses.  Souki refused, even as he (falsely) told Parker that he intended to honor his commitment.  Instead, Souki again attempted to delay Parker from going through with the sale and asked Parker to extend their agreement through the end of 2021.

10.     Parker, on behalf of himself and Red Mango, met with Souki in person in Aspen, Colorado in February 2021 to discuss extending the agreement.  Parker presented Souki with a written agreement that would have extended the term of the original agreement to December 31, 2021, and provided for interest at the rate of LIBOR plus 0.167%.  Souki agreed to the new terms but refused to sign the agreement, stating that he could not execute such an agreement in writing because he had taken bank loans and had not disclosed his liability to Parker and Red Mango to his bank.  Because Parker and Souki had a long history, Parker accepted Souki's explanation and agreed not to sell his or Red Mango's shares throughout 2021 in exchange for the revised terms.

11.     As of October 2021, Tellurian's share price still had not recovered and Parker informed Souki that he needed "to fix a firm date to close out the guarantee."  Souki

confirmed that he and Parker had "talked in aspen," but did not otherwise commit to paying Parker or fulfilling his contractual obligation.

12.     Parker, on behalf of himself and Red Mango, has demanded Souki make the payment required of him but Souki has refused to do so.

## THE PARTIES

13.     Christopher Parker is domiciled and resides in Los Angeles, California, and is also a citizen of Grenada.  As of the filing of this Complaint, Parker personally owns approximately 3.3 million shares of Tellurian.

14.     Red Mango is a private company that was incorporated in 2011 in the British Virgin Islands, with a registered office located at Mill Mall, Suite 6, Wickhams Cay 1, P.O. Box 3085 Road Town, Tortola, British Virgin Islands.  As of the filing of this Complaint, Red Mango owns more than eight million shares of Tellurian.

15.     Charif Souki is domiciled and resides in Aspen, Colorado, and on information and belief is also a citizen of Lebanon.  Souki co-founded Tellurian Inc. and serves as the Executive Chairman of the Board.

16.     Non-party Tellurian, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Tellurian, which was founded by Souki and Martin Houston, is an oil and gas exploration and production company that seeks to deliver natural gas to customers worldwide.  After its merger with Magellan Petroleum Corporation, Tellurian traded on the NASDAQ exchange.  As of November 2021, and through the present, Tellurian is traded on the New York Stock Exchange American under the ticker symbol "TELL."

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the controversy exceeds the sum value of $75,000 and is between citizens of different States.

18.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2) because Souki resides in Aspen, Colorado, and events giving rise to Parker and Red Mango's claims occurred in this District.  Among other things, and as set forth more fully below, relevant meetings between the parties took place in Aspen, Colorado.  Further, on information and belief, Souki was present in this District when he sent relevant communications, including text messages, to Parker.

19.     This Court has personal jurisdiction over Souki under Colo. Rev. Stat. § 13-1-124 because he transacted business within the state, committed tortious acts in the state that form the basis for this action, and/or purposefully availed himself of the privileges of doing business in the state, as fully set forth herein.

## FACTUAL ALLEGATIONS

**A.      Parker and Red Mango Acquire Millions of Shares in Tellurian.**

20.     Several years ago, Parker became interested in learning more about Tellurian after a friend, whose wife sits on Tellurian's board, mentioned that he should take a look at the company.  Parker's friend mentioned that Tellurian would be a good investment over the next few years since it would be undertaking a new project.  With his interest piqued, Parker flew to Aspen, Colorado to meet with Souki—the co-founder of

Tellurian—and learn more about the company.  The two enjoyed a few social dinners together and began a positive working relationship.

21.     Over the course of the next few years, Parker started to build his holding in Tellurian, ultimately acquiring (personally and via Red Mango) more than eleven million shares, representing approximately 2% of the outstanding common stock of Tellurian.

**B.     Souki Induces Parker not to Sell His or Red Mango's Shares by Promising to Indemnify Parker Against Any Losses.**

22.     In early 2017, Tellurian's share price reached as high as $20.47 per share. But by August 2019, it had dropped to just more than $5 per share.

23.     Parker grew concerned about his sizeable investment, and in August 2019, he informed Souki as a courtesy that he intended to sell his and Red Mango's shares in light of Tellurian's poor performance.

24.     After Parker told Souki that he intended to sell, Souki embarked on a plan to trick Parker into not selling in order to try to save the company's stock price from dropping even further.

25.     Souki first sought to convince Parker not to sell by blaming the drop in share price on an aggressive short-selling campaign (which would be exacerbated by Parker selling his and Red Mango's shares), and by explaining that Tellurian had certain (publicly-disclosed) business prospects that would boost the share price once finalized.  But Parker informed Souki that he was resolved to sell his and Red Mango's shares.

26.     Souki then induced Parker to delay selling any shares in Tellurian by agreeing to indemnify Parker, individually and on behalf of Red Mango, against any losses through the end of 2020.

27.     Specifically, on August 17, 2019, Parker exchanged text messages with Souki in which Souki asked Parker, "How much stock do you have and what is your [cost] basis?"  Parker, who indicated he was "not at [his] computer," estimated that he and Red Mango owned "5.5m shares and [his] net is circa 8[.]30 now."

28.     Souki replied:  "Ok.  Please keep this text.  I will guaranty your capital by dec 2020 [*sic.*].  I'll make up any capital deficiency you have at that date.  Thanks for your help and confidence."

29.     Because Parker believed what Souki had told him about Tellurian, and in reliance on Souki's offer to indemnify him from any losses, Parker agreed to refrain from selling any shares, telling Souki:  "Ok pal I got confidence in you, always here to lend an ear or advice if needed, let's catch up in sept [*sic*] for dinner."

30.     In early 2020, Tellurian's share price dropped sharply, falling to under $1 per share in mid-March 2020.  Souki himself was forced to liquidate approximately 21,989,816 shares of Tellurian he beneficially owned in a series of transactions in late February and early March 2020.  According to a Form 13D filed with the Securities and Exchange Commission on or about March 5, 2020, this "was an involuntary sale effected by a lender to satisfy certain loan requirements," in connection with which a trust beneficially owned by Souki had pledged 26 million shares of Tellurian stock.  According to the same SEC filing, Souki personally "pledged 25,000,000 [additional] shares of Common Stock as part of a collateral package to secure a loan for certain real estate investments."

31.     Despite these large sales of stock, Souki continued to minimize any concerns about Tellurian and its declining share price.  In a text to Parker on or about March 1, 2020, Souki confirmed news about the trust's sales, as well as substantial sales by the company's co-founder, Martin Houston, but reassured Parker, "I'm not selling."

32.     By August 2020—a year after the parties' agreement—Tellurian shares were still trading at under $1 per share.  On or about August 25, 2020, therefore, Parker's executive assistant sent Souki a detailed breakdown of Parker and Red Mango's holdings in Tellurian, including the dates and average price per share for various transactions, in contemplation of Souki making good on his promise.  Souki acknowledged receipt of the e-mail the next day.

33.     Pursuant to these text message and e-mail exchanges, Parker and Souki agreed that Parker would not sell his or Red Mango's shares in Tellurian between August 2019 and through December 2020, and that at the end of the year 2020, Souki would pay Parker for any losses (personally or through Red Mango) as a result of a decline in stock price.  That is, Souki agreed to pay Parker the difference between Tellurian's share price at the end of 2020 and the amount of Parker and Red Mango's initial investment (*i.e.*, their cost basis).

34.     This promise was a lie and Souki never in fact intended to follow through with his promise.

**C.      Souki Breaches His Agreement with Parker and Red Mango.**

35.      At the end of 2020, Tellurian's stock price had not recovered and Parker remained determined to sell his and Red Mango's interest in the company.  As of the close of trading on December 31, 2020, Tellurian was trading at $1.28 per share.

36.      Parker asked Souki to perform his part of the agreement—to indemnify him and Red Mango for their losses—but Souki refused, and instead attempted again to delay Parker from going through with the sale.  This time, Souki asked Parker to extend their arrangement for another year—until the end of 2021—explaining that he anticipated the stock price to recover.  Parker was potentially interested in Souki's offer to extend the arrangement for another year, but told Souki he would only agree to it if Souki paid interest for the additional period.  Additionally, Parker wanted to execute any amendment to the original agreement in writing.

37.      Therefore, in February 2021, Parker (on behalf of himself and Red Mango) and Souki met in person in Aspen, Colorado.  At the meeting, Parker presented Souki with a written agreement that would have extended the term of the original agreement to December 31, 2021, and provided for interest at the rate of LIBOR plus 0.167%.

38.      At the meeting, Souki agreed to the new terms but refused to sign the agreement.  He told Parker that he agreed to the terms but could not execute an agreement in writing because he had taken bank loans and had not disclosed his liability to Parker and Red Mango to his bank—further indication that Souki never intended to indemnify them for their losses and knew that such a promise was false when made.

9

39.     Because Parker and Souki had a long history and Parker remained a believer in Tellurian's core business model, Parker accepted Souki's explanation.  As a result, Parker and Souki agreed that Parker would not sell his or Red Mango's interest in Tellurian throughout 2021 so that Souki had more time to turn around the company's sagging share price.

40.     Throughout 2021, Tellurian's share price remained low.  As of October 2021, the share price hovered just above $3 per share.  Therefore, Parker informed Souki that he needed to close out his position and that Souki had to cover his losses pursuant to their agreement.

41.     On October 12, 2021, Parker texted Souki that he needed "to fix a firm date to close out the guarantee."  He reminded Souki that he "extended this on now past a year," and while Parker was Souki's "number one supporter, . . . it can't keep going on."

42.     Souki confirmed that he and Parker had "talked in aspen," and that there was no need to revisit the topic, but did not otherwise commit to paying Parker or fulfilling his obligation.

43.     Since that date, Parker, on behalf of himself and Red Mango, has demanded that Souki make the payments required of him under the contract.  However, Souki has failed to do so in breach of his agreement.

44.     As of the close of trading on December 31, 2021, Tellurian was trading at $3.08 per share.

45.     As of the close of trading the day before this complaint was filed, Wednesday, January 19, 2022, the share price of Tellurian was $2.98 per share.

10

46.     As a result of holding their Tellurian shares in reliance on Souki's promises, Parker and Red Mango sustained tens of millions of dollars in losses.

## COUNT ONE
### Breach of Contract

47.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

48.     Souki entered into a valid, binding contract with Parker, on behalf of himself and Red Mango.

49.     Parker, on behalf of himself and Red Mango, has performed all of the material obligations under the agreement in that neither Parker nor Red Mango sold their shares in Tellurian during the relevant time period.

50.     Souki breached the agreement because he failed to indemnify Parker, on behalf of himself and Red Mango, for his losses.

51.     As an actual and proximate result of Souki's breaches, Parker and Red Mango suffered injury in an amount to be determined at trial.

## COUNT TWO
### Fraudulent Inducement

52.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

53.     During the negotiations leading up to the agreement whereby Parker, on behalf of himself and Red Mango, agreed not to sell his or Red Mango's shares in exchange for Souki's agreement to indemnify Parker for his and Red Mango's losses, Souki made a material false misrepresentation of fact to Parker.

54.     Specifically, Souki told Parker that if Parker refrained from selling his and

11

Red Mango's shares of Tellurian, Souki would indemnify him for his losses.

55.     Further, Souki continued to placate Parker's concerns about Tellurian's declining share price by assuring him that Souki was "not selling," despite the fact that the other co-founder of the company, Martin Houston, was selling off millions of shares, and a trust had sold 17 million shares beneficially owned by Souki.

56.     Souki made the material misrepresentation that he would indemnify Parker for his losses with the intent to induce Parker to rely on his assurances so that Parker would not sell his or Red Mango's shares in Tellurian.  As a result, Souki would get the windfall of the company's share price not dropping further than it already had, which benefited Souki both professionally (as Tellurian's co-founder and Executive Chairman) and financially (as Souki both owned substantial holdings in Tellurian and had borrowed against his interest in Tellurian and risked further margin or collateral calls if the share price continued to drop).

57.     Souki's misrepresentation that he would pay Parker for his losses was material, and Souki knew that the misrepresentation was false at the time he made it.

58.     Parker, who had long supported Souki's success in Tellurian, justifiably relied on Souki's misrepresentation given the relationship that the two had developed over many years, and subsequently entered into, and then extended, a contract with Souki and agreed not to sell his or Red Mango's shares.

59.     As a direct and proximate cause of Souki's fraud and Parker and Red Mango's reliance on Souki's misrepresentation, Parker and Red Mango suffered damages in an amount to be determined at trial.

## COUNT THREE
**Promissory Estoppel**

60.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

61.     Souki promised Parker that he would indemnify Parker for his and Red Mango's losses in exchange for Parker's agreement not to sell his or Red Mango's shares in Tellurian.

62.     Souki should have reasonably expected that his promise to indemnify Parker for his and Red Mango's losses would induce Parker to not sell his or Red Mango's shares in Tellurian during the relevant time period.

63.     Parker, who had long supported Souki's success in Tellurian, reasonably relied on Souki's promise given the relationship that the two had developed over many years, and subsequently refrained from not selling his or Red Mango's shares during the relevant time period.

64.     As a direct and proximate result, Parker and Red Mango suffered injury in an amount to be determined at trial, and therefore, Souki's promise must be enforced to prevent injustice.

## COUNT FOUR
**Unjust Enrichment [in the Alternative]**

65.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

66.     Souki made a material false misrepresentation of fact to Parker when he told Parker he would indemnify him, on behalf of himself and Red Mango, for his losses

but had no intent on doing so. Further, Souki continued to placate Parker's concerns about the declining share price by assuring him that Souki was "not selling," despite the fact that the other co-founder of the company, Martin Houston, was selling off millions of shares, and a trust had sold 17 million shares beneficially owned by Souki.

67.    Parker would not have refrained from selling his or Red Mango's shares in Tellurian had he been aware that Souki was not going to indemnify him.

68.    Souki inadvertently, negligently, or recklessly made such misrepresentation and failed to disclose material facts that were available to him.

69.    As a result, Souki was unjustly enriched when he prevented Parker from selling his or Red Mango's shares in Tellurian, both professionally (as Tellurian's co-founder and Executive Chairman) and financially (as Souki both owned substantial holdings in Tellurian and had borrowed against his interest in Tellurian and risked further margin or collateral calls if the share price continued to drop).

## DEMAND FOR JURY TRIAL

Parker and Red Mango demand a jury trial on all claims for which trial by jury is available.

## DEMAND FOR RELIEF

WHEREFORE, Parker and Red Mango demand the Court enter judgment as follows:

A.    For compensatory damages in an amount to be determined at trial;

B.    For punitive damages against Souki at least equal to compensatory damages, in an amount to be determined at trial;

C.      For pre-and-post judgment interest as appropriate;

D.      For all costs and fees incurred in prosecuting this Complaint; and

E.      For such other and further relief as this Court deems just and proper.


Dated:      January 20, 2022

Respectfully Submitted,

BOIES SCHILLER FLEXNER LLP

By:      /s/ Matthew L. Schwartz
         Jonathan D. Schiller*
         Matthew L. Schwartz
         Lauren M. Goldman*
         55 Hudson Yards
         New York, New York 10001
         Telephone: (212) 446-2300
         Facsimile: (212) 446-2350
         jschiller@bsfllp.com
         mlschwartz@bsfllp.com
         lgoldman@bsfllp.com

         * Application for admission forthcoming