UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00165-WJM-NYW

CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

      Plaintiffs,

  v.

CHARIF SOUKI,

      Defendant.

---

### CHARIF SOUKI'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)

---

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant Charif Souki respectfully requests the Court to dismiss Plaintiffs' Complaint (Dkt. #1) and shows the Court as follows:

### CERTIFICATE OF CONFERRAL

Pursuant to WJM Revised Practice Standard III.D.1, on March 11, 2022, counsel for Defendant emailed counsel for Plaintiffs, detailing the pleading deficiencies identified herein. The parties then discussed these deficiencies during a March 18 conference call to determine whether they could be corrected by amendment. Counsel for Plaintiffs oppose the relief sought herein.

### INTRODUCTION

Christopher Parker and Charif Souki are sophisticated businessmen. By his own account, Plaintiff Christopher Parker is a multi-millionaire investor. He enjoys dual citizenship in a known tax-haven, transacts business internationally, and counts board members of publicly traded companies among his friends. Souki is often credited as being the founder of the liquified natural

gas ("LNG") export business model. In sum, neither Parker nor Souki is or was a stranger to commercial transactions and their requirements.

In recent years, Parker became a shareholder investor in Tellurian Inc., a publicly-traded company pursuing LNG opportunities; Souki holds executive and management positions at Tellurian. When Tellurian stock floundered, Souki sought to reassure Parker about its prospects, based on public information. Parker, though, wanted something more—in particular, he wanted a pledge from Souki that Souki would reimburse any losses Parker suffered.

As experienced businessmen, Parker and Souki know how to create legally binding contractual relationships. That is particularly true of a contract potentially involving tens of millions of dollars, like the one alleged here. Sophisticated businessmen do not create valid, enforceable contracts through unsigned text messages that omit essential terms such as the identity of the parties, the nature and extent of the obligation, the method of payment, and who is to benefit from performance. Here, all of those terms were left to guesswork, such that it cannot be said there was a meeting of the minds between Parker and Souki. The terms of any such alleged "deal" are even more speculative as to Red Mango, who never entered the parties' discussions.

Accordingly, Plaintiffs fail to state a claim as a matter of law, because they have not adequately pleaded any definite or certain terms so as to create a valid contract or promise—much less statements sufficiently specific to meet the heightened requirements for fraud. Because Plaintiffs fail to state plausible claims, the Court should dismiss the Complaint in its entirety.

## FACTUAL BACKGROUND

Defendant Souki is a co-founder and shareholder of Tellurian, Inc., an oil and gas exploration company headquartered in Texas and incorporated in Delaware. (Compl. ¶1)

According to the Complaint, Souki is domiciled and resides in Aspen, Colorado, a fact that Souki denies, but accepts as true for purposes of this Motion only.[1] (*Id.* ¶15)

Like Souki, Plaintiffs Christopher Parker and Red Mango Enterprises Limited ("Red Mango") are also Tellurian shareholders. (*Id.* ¶1) Together, Plaintiffs claim to own over eleven million shares in Tellurian, representing 2% of Tellurian's outstanding common stock. (*Id.* ¶21) While the Complaint repeatedly asserts that Parker acts on behalf of Red Mango, it discloses no information concerning the legal or factual basis for such a relationship, or any information about Red Mango's real or beneficial owners. Plaintiffs also never assert that Parker disclosed the nature of his relationship with Red Mango to Souki.

Plaintiffs claim that by August 2019, Parker had become concerned about his sizeable investment in Tellurian after a decrease in its share price. (*Id.* ¶23) While Plaintiffs conclusorily allege Parker "informed Souki that he was resolved to sell his and Red Mango's shares," Plaintiffs do not identify any actual facts as to how Parker allegedly conveyed this information to Souki, or when. (*See id.* ¶¶ 24-25) Nevertheless, Plaintiffs allege that Souki aimed to "trick" Parker into not selling by blaming short-sellers and by explaining to Parker that Tellurian had favorable prospects as reflected in publicly disclosed information. (*Id.* ¶25) Plaintiffs do not allege any of this information purportedly conveyed by Souki was false.

Plaintiffs further claim that Parker later affirmed his intent to sell and that Souki resorted to a backup plan to somehow trick Parker into not selling. Of course, Souki denies that he and Parker ever discussed Parker potentially selling his Tellurian stock, much less that he tried to

---

[1]   Souki is domiciled and resides in Texas.

somehow trick Parker—nor do Plaintiffs sufficiently plead facts in support of this theory. In fact, the text messages quoted in the Complaint prove there was no such discussion. According to Plaintiffs, Parker and Souki exchanged the following text messages on August 17, 2019:

- Souki wrote to Parker, "How much stock do you have and what is your [cost] basis?" (*Id.* ¶27)

- Parker responded by text that he estimated ownership of "5.5m shares and [his] net is circa 8[.]30 now." (*Id.*)

- Souki then replied: "Ok. Please keep this text. I will guaranty your capital by dec. 2020. I'll make up any deficiency you have at that date. Thanks for your help and confidence." (*Id.* ¶28)

- In response, Parker simply said: "Ok pal I got confidence in you, always here to lend an ear or advice if needed, let's catch up in sept for dinner." (*Id.* ¶29)

There is <u>no</u> discussion in these messages of Parker selling or potentially selling his Tellurian stock; there is no request by Souki that Parker not sell his stock; and there is no promise by Parker not to sell his shares. Nor do the messages contain a specific amount owed, the number of shares attributable to Red Mango, or specify what Parker paid for his own shares. The texts also do not bear signatures and never use the word "indemnify." And the messages only refer vaguely to "you" and "your;" they never mention Red Mango. In sum, there is no valid, enforceable exchange of an offer or acceptance—the cornerstone requirements of a binding contract.

Nevertheless, on the basis of this text message exchange, Plaintiffs claim that Souki entered into a multi-million-dollar agreement whereby both Parker and Red Mango agreed not to sell their Tellurian stock and, in exchange, Souki would "indemnify" both for their losses in Tellurian stock.

After the exchange of text messages by Parker and Souki in August 2019, the price of Tellurian stock did not recover. (*Id.* ¶30) According to Plaintiffs, Parker and Souki then engaged in additional discussions at a February 2021 meeting about an extension of the alleged

4

arrangement. (*Id.* ¶37) Unlike the bare-bones August 2019 text messages, Parker presented a formal written document to Souki at their February 2021 meeting. (*Id.*) According to Parker, that document provided for an extension of the payment period until December 31, 2021, and for the payment of interest. (*Id.*) Although acknowledging that Souki refused to sign the document, Plaintiffs claim he somehow simultaneously assented to its terms. (*Id.* ¶38)

On October 12, 2021, Parker texted Souki asking for a "firm date to close out the guarantee." (¶41) When Souki declined to make payment, Plaintiffs brought this suit.

## LEGAL STANDARD

To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir. 2007). A plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ARGUMENT

Plaintiffs' Complaint alleges four causes of action: (1) Breach of Contract; (2) Fraudulent Inducement; (3) Promissory Estoppel; and (4) Unjust Enrichment. All four claims fail.[2]

### A. Plaintiffs' Breach of Contract Claim (Count I) Should Be Dismissed.

1. <u>Plaintiffs' Alleged Contract(s) Are Invalid Because They Lack Certainty</u>.

---

[2] A choice-of-law analysis is not required for this motion, as the laws of the states with the most significant relationship to this dispute—Colorado, Texas, and California—do not materially differ for purposes of this motion. For convenience, Souki refers to Colorado law herein.

Courts "routinely" interpret contracts at the motion to dismiss stage to assess the plausibility of a breach theory. *See FirsTier Bank, Kimball, Neb. v. F.D.I.C.*, 935 F. Supp. 2d 1109, 1126 n.25 (D. Colo. 2013). To state a claim for a breach of contract, a plaintiff must allege (1) the existence of a contract; (2) performance by the plaintiff or some justification for non-performance; (3) failure to perform the contract by the defendant; and (4) damages. *See W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). In order to meet the first prong, a plaintiff must allege "the existence of a <u>valid</u> contract." *LS3 Inc. v. Cherokee Fed. Solutions, LLC*, 2021 WL 4459053, *4 (D. Colo. Sept. 29, 2021) (emphasis added). "If the parties fail to agree to sufficiently definite and certain terms, there is no meeting of the minds, and, hence, no valid contract." *Schmidt v. Frankewich*, 819 P.2d 1074, 1077 (Colo. App. 1991).

Here, the skeletal text messages relied upon by Plaintiffs as a basis for what they varyingly call a "contract," "guarantee," "indemnity," and "arrangement" (*see e.g.,* Compl. ¶¶ 8, 9, 11, 32, 36), do not demonstrate the existence of a contract as a matter of law, because they are not sufficiently "definite and certain." *Schmidt*, 819 P.2d at 1077. If Souki owed an obligation of the type claimed by Plaintiffs, to be sufficiently "definite and certain," the alleged promise would have specified the parties, the nature and extent of the obligation, how the obligation was satisfied, and reflected the requirements of offer and acceptance. Not one of these prerequisites is present here.

To begin with, Souki's text that stands as the basis of Plaintiffs' claim ("Ok. Please keep this text. I will guaranty your capital by dec. 2020. I'll make up any deficiency you have at that date. Thanks for your help and confidence.") does not mention "Red Mango." (Compl. ¶ 28) Instead, Souki references only "you" and "your capital" in his text. (*Id.*; *see also id.* ¶ 27 ("How much stock do *you* have and what is *your* [cost] basis?") (emph. added).) Notably, Plaintiffs

6

likewise do not quote any direct language from Parker's text to Souki mentioning Red Mango. Thus, the identity of whose shares would be subject to the agreement claimed by Plaintiffs—whether Parker, Red Mango, or some other entity—cannot be determined. This missing, unagreed-upon term shows there was never a "meeting of the minds." *See, e.g.*, *West Maui Properties, LLC v. Deutsche Bank Trust Co.*, 2016 WL 10518587, at *2 (D. Colo. Dec. 22, 2016) (dismissing breach claim because complaint failed to allege "agreement as to essential contractual terms").

The messages exchanged by Parker and Souki are missing other essential terms which also belie any valid contract. For example, neither Parker nor Souki specified the exact number of shares subject to the alleged undertaking, with Parker admitting that he had "estimated" the number he provided. (Compl. ¶ 27) Nor did the parties agree upon a method of payment or other means of satisfying the purported guarantee, a highly material term in an obligation that Plaintiffs now claim involves tens of millions of dollars. (*Id.* ¶ 46) And the text messages are neither signed nor addressed to anyone. Because Plaintiffs have not identified "essential contract terms," the Court must dismiss Plaintiffs' breach claim. *West Maui Properties, LLC*, 2016 WL 10518587, at *2.

Moreover, even if Souki's text message could be construed as an offer, Parker never accepted it by agreeing to take any specified action with respect to his shares (whether to refrain from selling or otherwise), but instead affirmed his "confidence" in Souki and offered "to lend an ear or advice if needed," neither of which Souki had requested. (Compl. ¶ 29) Plaintiffs' failure to allege a binding acceptance is fatal to their breach claim. *See Carnation Bldg. Servs. v. City & Cnty. of Denver*, 2011 WL 6940474, at *5 (D. Colo. Dec. 29, 2011) (dismissing breach claim "[b]ecause no valid contract existed" where the alleged contract was unsigned and unapproved).

Subsequent communications between Souki and Parker do not cure these deficiencies.

Plaintiffs' allegation that after a trust beneficially owned by Souki sold its shares, Souki then told Parker in March 2021 that "I'm not selling" does not supply essential contract terms. (Compl. ¶31) Nor do Plaintiffs allege that Souki's statement was false. And the only other written communication Plaintiffs identified—an August 2020 email containing a "breakdown" of shares—was sent, as Plaintiffs admit, "a year after" the purported agreement. (*Id.* ¶ 32) Its purpose, according to Plaintiffs, was not to create a contract, but was instead sent "in contemplation of Souki making good" on the text messages sent a year earlier. (*Id.*)

For these reasons, Plaintiffs have not plausibly alleged a valid contract, and the Court should dismiss their breach claim on this ground alone. *See, e.g.*, *West Maui Properties*, 2016 WL 10518587, at *2 (dismissing breach claim for failure to plead a sufficiently definite contract).

        2.     The Statute of Frauds Bars Enforcement of Plaintiffs' Alleged Contracts.

Plaintiffs' contract claim must also be dismissed as a matter of law for a separate and distinct reason—it is barred by the statute of frauds.

An agreement that cannot be performed within one year after its making is void under the statue of frauds, unless "such agreement or some note or memorandum thereof is *in writing and subscribed by the party charged therewith*." C.R.S.A. § 38-10-112(1)(a) (emph. added). The statute of frauds applies here because according to Plaintiffs, their agreement with Souki, as described in their August 2019 text messages, was to be performed at an unspecified date in December 2020, more than one year later.

No exception to the statute applies because the text messages are not a "writing subscribed by" Souki. Colorado courts have long recognized that for purposes of the statute of frauds, the term "subscribed" is a substitute for the term "signed." *Coon v. Rigden*, 4 Colo. 257, 282 (1878).

8

While Colorado courts do not appear to have addressed the "signature" requirement for text messages, decisions from other jurisdictions hold that like all other types of writings, a signature to a text message is required to satisfy the statute of frauds. *See Craig v. B. Riley FBR, Inc.*, 2020 WL 6889018, at *10 n.8 (N.D. Tex. Nov. 23, 2020) (unsigned text messages "do not satisfy the Texas statute of fraud"); *Tayyib Bosque, Corp. v. Emily Realty, LLC*, 2019 WL 2502494, at *6 (S.D.N.Y. June 17, 2019), *aff'd* 813 F. Appx. 628 (2d Cir. 2020) (under New Jersey law, "[t]he Statute of Frauds requires Bosque to prove that LaFrieda signed the text messages . . .")

Here, Plaintiffs do not allege that any of the August 2019 text messages were "subscribed," must less "signed," by Souki. As described by Plaintiffs, none of the texts identify Souki or Parker at all. Because Plaintiffs cannot allege "all facts necessary to establish an entitlement to relief" for breach of contract—namely, a "writing subscribed by" Souki sufficient to satisfy the statute of frauds—their breach claim should be dismissed for this additional reason.

   3.  <u>There is No Contract on the Basis of the February 2021 Meeting.</u>

As a fallback position, Plaintiffs allege that Souki agreed to an extension of the purported agreement at a February 2021 meeting in Aspen. (Compl. ¶ 38) According to Plaintiffs, pursuant to the terms of the extension, Souki would now indemnify them on December 31, 2021.

As Plaintiffs acknowledge, though, Souki refused to sign the pre-prepared agreement Parker brought with him to the meeting. (*Id.*) And while Plaintiffs allege Souki orally agreed to the contract's terms (while refusing to sign it), *see id.*, the new oral "contract" attributed to Souki fails for the same reasons: the alleged parties to the " amended agreement" were not identified; the number of shares subject to the "amended agreement" was not specified; no method of payment was provided; and those entities or individuals whose shares are subject to the "amended

9

agreement" are not known. *See, e.g.*, *West Maui Properties, LLC*, 2016 WL 10518587, at *4. Moreover, void contracts that are without force (like the one based on the August 2019 texts) cannot be renewed. *Winslow v. Baltimore & Ohio R.R. Co.*, 188 U.S. 646, 657-59 (1903).

Parker's later conduct also betrays Plaintiffs. Recognizing that Souki had not agreed to an extension or even a new contract in February 2021, Parker contacted Souki later that year asking Souki "to fix a firm date to close out the guarantee." (Compl. ¶ 41) Thus, through their own Complaint, Plaintiffs acknowledge that Souki had not agreed to an extension to December 31, 2021 date—or any other contract term—as they now claim.

**B.   Plaintiffs' Fraudulent Inducement Claim (Count II) Should Be Dismissed.**

Plaintiffs rely on the same allegations to reassert their breach of contract claim in the guise of a fraudulent inducement claim. Fraudulent inducement claims, like all fraud claims, must be pleaded with heightened specificity. *See, e.g.*, *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 776 (2nd Cir. 1991); *see also United States ex rel. Simpson v. Lepino Foods Dairy Prod. Co.*, 2018 WL 1375792, at *2 (D. Colo. Mar. 19, 2018). Thus, to plead a fraudulent inducement claim, Plaintiffs must allege <u>facts</u> showing that: (1) Souki made a "knowing misrepresentation of a material fact;" (2) Plaintiffs justifiably relied on the misrepresentation; and (3) damages. *See Clancy Sys. Int'l, Inc. v. Image Sensing Sys., Inc.*, 2017 WL 3086624, at *4 (D. Colo. Jan. 30, 2017). Plaintiffs fail to sufficiently plead any of these prongs, much less with the heightened particularly Rule 9(b) requires.

    1.   <u>Plaintiffs Fail to Allege a Knowing Misrepresentation of Material Fact</u>.

Plaintiffs' fraudulent inducement claim is premised on two alleged misrepresentations: (1) that Souki would indemnify Parker if Parker and Red Mango refrained from selling Tellurian

10

shares and (2) Souki was not selling his own shares. (Compl. ¶¶ 53-55) Plaintiffs never allege, however, that the second statement was false, and for this reason alone, to the extent their fraud claim is so premised, it fails. *See Clancy Sys. Int'l, Inc.*, 2017 WL 3086624, at *4 (plaintiff must plead a misrepresentation for fraudulent inducement claim).

Further, the alleged "indemnity" promise is not a misstatement of a material fact, because Plaintiffs fail to allege facts showing that "at the time of the promise" the defendant "consciously harbored a present intention not to perform the promised act." *Frank v. Wells Fargo Bank, N.A.*, 2016 WL 6212524, *6 (D. Colo. Oct. 11, 2016). There are no facts pleaded indicating that, during the text message exchange in August 2019, Souki "consciously harbored" an intention not to perform. (*See, e.g.*, Compl. ¶¶ 27-29) Thus, to the extent Plaintiffs' fraudulent inducement claim is premised on the August 2019 text messages, it also fails. *See Clancy Sys. Int'l, Inc.*, 2017 WL 3086624, at *5 (dismissing fraudulent inducement claim because complaint lacked allegations that, at the time, defendant did not intend to fulfill its promises).

Plaintiffs' other alleged "contract"—the February 2021 meeting, in which Plaintiffs allege the parties amended or extended their existing agreement—fares even worse. According to Plaintiffs, Souki's alleged fraudulent state of mind at the meeting is shown by his *disclosure* of his bank's concern over his "liability" to Plaintiffs. But such a statement, even if true, cannot show that Souki "consciously harbored" an intention not to perform, since as Plaintiffs admit, it was fully known to Parker, who made no objection. (Compl. ¶¶38-39)[3]

---

[3] Otherwise, Plaintiffs offer just make bald, conclusory allegations that Souki "was lying" (Compl. ¶ 5); that he "never planned to fulfill his promise" (*id.*); that his purported promise was "a lie" (*id.* ¶ 34); that he never "intended to follow through with his promise" (*id.*); and that he "knew that the misrepresentation was false at the time he made it." (*id.* ¶ 57). None of

11

Moreover, Plaintiffs' "fraudulent inducement" fails because under their theory, the parties had <u>already</u> entered into an agreement by February 2021. (*See, e.g.*, Compl. ¶¶ 37-39) Thus, while styled as a "fraudulent inducement claim," Plaintiffs' claim is at best one for "fraud relating to performance of the contract"—a claim this Court has held is "generally redressable only through a breach of contract claim if it leads only to the damages one would expect from a breach." *McNees v. Ocwen Loan Serv., LLC*, 2019 WL 1762947 at *11 (D. Colo. Apr. 22, 2019) (Martinez, J.). Because Plaintiffs do not have distinct damages, but rather "damages that would one expect from a breach of those contracts," the Court should dismiss their "fraudulent inducement" claim.

        2.    <u>Plaintiffs Cannot Establish Justifiable Reliance</u>.

Plaintiffs' fraudulent inducement claim fails for the independent reason that they fail to establish justifiable reliance on any allegedly fraudulent statement. To state a claim for fraudulent misrepresentation, a plaintiff must show that its reliance was both "reasonable and justifiable." *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1238 (10th Cir. 2010); *see also Clancy Sys. Int'l, Inc.*, 2017 WL 3086624, at *4 (plaintiff must plead justifiable reliance for fraudulent inducement claim to withstand motion to dismiss). Plaintiffs fail this standard.

According to Plaintiffs, based on Souki's representations, they "entered into, and then extended, a contract with Souki." Compl. ¶ 58). But Plaintiffs' reliance was unjustified, as there never was "a meeting of the minds" and therefore no enforceable contract. As described above, the exchange of text messages that form the basis of Plaintiffs' claims are so lacking in material

---

these are well-pleaded facts that can form the basis of a fraudulent inducement claim.

terms that any purported promise was illusory. (*See, e.g.*, Compl. ¶¶ 27, 28, 31, 37, 38) Plaintiffs could not have relied on those terms, much less reasonably and justifiably, and could not have believed a contract was created. *See Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177 (complaint must state "enough facts to state a claim to relief that is plausible on its face"). For this reason as well, Plaintiffs' fraudulent inducement claim should be dismissed.

   3. <u>Plaintiffs Cannot Establish Damages</u>.

To succeed on their fraudulent inducement claim, Plaintiffs must show a "proximate connection or relationship" between the acts attributed to Souki and Plaintiffs' damages. *Beck v. Integra Telecom Holdings, Inc.*, 2015 WL 1884332, at *6 (D. Colo. Apr. 24, 2015). But based on the facts as alleged by Plaintiffs, their unjustified and unreasonable reliance on a series of incomplete and fragmented communications with Souki severs any "proximate connection" with their damages. "In short, the [alleged] tort did not result in injury or cause damages." *Id.* at *8.

  **C.** **Plaintiffs' Claim for Promissory Estoppel (Claim III) Should Be Dismissed.**

Plaintiffs' promissory estoppel claim cannot succeed for many of the same reasons their other claims fail. To state a claim for promissory estoppel, a plaintiff must establish: (1) a promise; (2) that the promisor should have reasonably expected would induce action or forbearance by the promisee or the third party; (3) on which the promisee or third party reasonably and detrimentally relied; (4) and that must be enforced to prevent injustice. *Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1221 (Colo. 2016). A "promise" for purposes of the promissory estoppel doctrine must be "clear and unambiguous." *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994). "It must also be sufficiently definite to allow a court to understand the nature of the obligation." *G&A Land, LLC v. Cty. of Brighton*, 233 P.3d 701, 704 (Colo. App. 2010).

The purported "promise" is none of these things. As alleged by Plaintiffs, it fails to identify the parties to the "promise," omits the precise number of shares involved, how the obligation was to be satisfied, or even whose shares were subject to the purported promise. (*See, e.g.*, Compl. ¶¶ 27-29) Just as any alleged promises are "not sufficiently specific to be enforced" with Plaintiffs' breach claim, so too does their promissory estoppel claim fail. *Butler v. Int'l Bank*, 2021 WL 1700850, at *4 (D. Colo. Apr. 8, 2021) (statements that Plaintiff "would receive annual bonuses of stock" were not actionable for a promissory estoppel claim because they did not "specify the amount of stock that would be provided in bonuses" or "how or when such stock would be issued"), *report and recommendation adopted* 2021 WL 1697514 (D. Colo. Apr. 29, 2021).

Likewise, Plaintiffs cannot show that they "reasonably" relied on a purported "promise" that was illusory. "Reasonable reliance is generally conduct or actions that that would be reasonable for a prudent person to do or take under the circumstances." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). Reliance on "mere noncommittal" statements do not satisfy this standard. *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 522 (Colo. App. 2006) (non-committal statements insufficient to show reasonable reliance for equitable estoppel defense); *see also Ames v. Sundance State Bank*, 850 P.2d 607, 610 (Wyo. 1993) (promises to "stick with" or "fund [borrower's] operation" too vague to support promissory estoppel claim). Considered either together or in isolation, the non-committal and non-specific statements attributed to Souki would not have been relied upon by a reasonable person and fail to state a promissory estoppel claim.

**D.      Plaintiffs' Claim for Unjust Enrichment (Claim IV) Should Be Dismissed.**

Finally, Plaintiffs' unjust enrichment claim fails, too. A party claiming unjust enrichment

14

must prove that (1) "the defendant received a benefit"; (2) "at the plaintiff's expense"; and (3) "under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2008). Plaintiffs fail to satisfy any of these requirements.

Plaintiffs cannot show that Souki "received a benefit" as a result of their decision to refrain from selling their Tellurian shares or that any such "benefit" was "at Plaintiffs' expense." According to Plaintiffs, Souki was unjustly enriched "professionally" as Tellurian's co-founder and chairman and "financially" due to his stockholdings and the risk of margin calls. (Compl. ¶69) But Plaintiffs do not explain how Souki benefitted "professionally," and in particular do not claim that Souki benefitted by selling shares to their detriment. Further, while Plaintiffs claim that Souki faced the risk of margin calls if Tellurian stock price dropped, this is conjecture by Plaintiffs, who offer no supporting specifics. And in the absence of any benefit to Souki, Plaintiffs cannot satisfy the third requirement—that there is "any injustice" that requires "commensurate compensation."

Rule 12(b)(6) requires more than speculation. *See Ridge at Red Hawk, L.L.C.*, 493 F.3d at 1177 (complaint must state "enough facts to state a claim to relief that is plausible on its face"). Without facts that establish the plausibility of their unjust enrichment claim, Plaintiffs' claim should be dismissed. *See Robinson v. Oil Shale Corp.*, 2018 WL 1256512, *5 (D. Colo. Mar. 12, 2018) (factual allegations did not plausibly establish "how" defendant benefited or was enriched).

## CONCLUSION

For all the foregoing reasons, Defendant Souki requests that the Court grant this Motion, dismiss Plaintiff's claims, and grant him such other relief as the Court deems just and appropriate.

| | |
|---|---|
| Dated: March 22, 2022 | */s/ Marissa S. Ronk* |
| | Michael L. O'Donnell |
| | Marissa S. Ronk |
| | Wheeler Trigg O'Donnell LLP |
| | 370 Seventeenth Street, Suite 4500 |
| | Denver, CO  80202-5647 |
| | Telephone:     303.244.1800 |
| | Facsimile:      303.244.1879 |
| | Email: odonnell@wtotrial.com |
| |        ronk@wtotrial.com |
| | |
| | and |
| | |
| | Timothy S. McConn |
| | Texas State Bar No. 24032713 |
| | Yetter Coleman LLP |
| | 811 Main Street, Suite 4100 |
| | Houston, TX 77002 |
| | Telephone:     713.632.8000 |
| | Email: tmcconn@yettercoleman.com |
| | |
| | Attorneys for Defendant, Charif Souki |

## CERTIFICATE OF SERVICE (CM/ECF)

I certify that a true and correct copy of the foregoing has been electronically served on all counsel of record on March 22, 2022.

                                                             */s/ Timothy S. McConn*
                                                             Timothy S. McConn