**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 1:22-cv-00165-WJM-NYW

CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

  Plaintiffs,

v.

CHARIF SOUKI,

  Defendant.

---

**AMENDED COMPLAINT**

---

  Plaintiffs Christopher Parker and Red Mango Enterprises Limited ("Red Mango"), by and through their undersigned counsel, allege as follows:

**<u>INTRODUCTION</u>**

  1. Since early 2017, Christopher Parker, individually and through Red Mango, has invested millions of dollars in the publicly-traded shares of a company called Tellurian Inc. ("Tellurian"), with the encouragement of one of Tellurian's founders and its Executive Chairman, defendant Charif Souki.

  2. Soon after Parker and Red Mango began investing in the company, Tellurian's share price began to drop. Souki nonetheless encouraged Parker to hold, and even increase, his position, blaming the drop on an aggressive short-selling campaign rather than the fundamentals of Tellurian's business.

3.      By the summer of 2019, however, Tellurian's share price had not recovered, and Parker informed Souki that he (on his own behalf, and through Red Mango) intended to sell his shares.

4.      Upon hearing this, Souki embarked on a plan to fraudulently induce Parker into retaining his shares of Tellurian and those owned by Red Mango to try to save the company's stock price from dropping even further—something Souki cared deeply about given that he owned over 22% of Tellurian's stock.  Further, at the same time, Tellurian was seeking to finalize critical agreements related to its multi-billion dollar liquefied natural gas ("LNG") production and export infrastructure project, which includes constructing a LNG export facility in Louisiana and an associated pipeline (known as the "Driftwood LNG Project").

5.      Souki induced Parker to delay selling any shares in Tellurian by offering—unprompted—to indemnify Parker, individually and on behalf of Red Mango, against any losses through the end of 2020.  But Souki was lying, and never planned to fulfill his promise.  Among other things, Souki never even told his bank—from which he had taken out loans secured by Souki's own Tellurian stock and/or options—that Souki had any liability outstanding to Parker and Red Mango.

6.      In August 2019, Parker and Souki exchanged text messages memorializing their agreement.  Souki asked for information about Parker and Red Mango's holdings, and then wrote to Parker:  "Please keep this text.  I will guaranty [*sic*] your capital by dec. 2020 [*sic*].  I'll make up any capital deficiency you have at that date.  Thanks for your help and confidence."

7.      In early 2020, Tellurian's share price dropped dramatically, losing approximately 90% of its value in the span of about two months.  As a result, Souki's own bank forced him to sell tens of millions of shares of Tellurian.  But Parker, on his own behalf and Red Mango, honored his agreement with Souki and maintained his position.

8.      In August 2020, as the maturity date on Souki's guarantee neared, Souki asked Parker to email him a breakdown of his holdings in Tellurian in preparation to close out the guarantee.  In response, Parker's executive assistant sent Souki a detailed account of Parker's and Red Mango's holdings in Tellurian, including the number of shares owned and the average cost per share, so that Souki's obligation was clear.  Souki acknowledged receipt of the information and thanked Parker for it.

9.      When November 2020 came around and Tellurian's share price had still not recovered, Parker asked Souki to perform his part of the agreement:  to indemnify him and Red Mango for their losses.   Souki refused, even as he (falsely) told Parker that he intended to honor his commitment, because he wanted to ensure that the stock price would recover for his own personal benefit.   At this point in time, Souki was the Executive Chairman of Tellurian, getting paid millions of dollars in the form of Tellurian stock.  He was also given a stock option grant as of December 15, 2020 that is only exercisable if the stock price reaches certain thresholds.  Therefore, Souki again attempted to delay Parker from going through with the sale and asked him to enter into a new agreement in order to avoid a further decline in Tellurian's stock price.

10.     Parker, on behalf of himself and Red Mango, met with Souki in person in Aspen, Colorado in February 2021 to discuss entering into a new agreement.  Parker first

presented Souki with a written agreement, but Souki refused to sign it, stating that he could not execute such an agreement in writing because he had taken bank loans and had not disclosed his liability to Parker and Red Mango to his bank.  But Souki assured Parker that he was "good for the guarantee" and orally agreed to new terms:  Souki agreed to indemnify Parker and Red Mango for their losses in Tellurian through December 31, 2021, and to pay interest.  Because Parker and Souki had a long history, Parker accepted Souki's explanation and agreed not to sell his or Red Mango's shares throughout 2021 in exchange for the new terms.

11.     As of October 2021, Tellurian's share price still had not recovered and Parker informed Souki that he needed "to fix a firm date to close out the guarantee" and suggested "jan 1st 2022 to make good the difference."  Souki confirmed that he and Parker had "talked in aspen," but did not otherwise commit to paying Parker or fulfilling his contractual obligation.

12.     Parker, on behalf of himself and Red Mango, has demanded Souki make the payment required of him but Souki has refused to do so.

<u>**THE PARTIES**</u>

13.     Christopher Parker is domiciled and resides in Los Angeles, California, and is also a citizen of Grenada.  As of the filing of the original complaint, Parker personally owns approximately 3.3 million shares of Tellurian.

14.     Red Mango is a private company that was incorporated in 2011 in the British Virgin Islands, with a registered office located at Mill Mall, Suite 6, Wickhams Cay 1, P.O. Box 3085 Road Town, Tortola, British Virgin Islands.  Upon its formation, Parker was Red

Mango's sole shareholder and a Director.   In 2019, Red Mango Holdings Limited, a company incorporated in the Bahamas, became Red Mango's sole shareholder, and since December 2019, Red Mango's shares have been held in the Christopher Parker Irrevocable Trust.  As of the filing of the original complaint, Red Mango owns more than eight million shares of Tellurian.

15.     Charif Souki is domiciled and resides in Aspen, Colorado, and on information and belief is also a citizen of Lebanon.  Souki co-founded Tellurian Inc. and serves as the company's Executive Chairman.

16.     Non-party Tellurian Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Tellurian, which was founded by Souki and Martin Houston, is an oil and gas exploration and production company that seeks to deliver natural gas to customers worldwide.   After its merger with Magellan Petroleum Corporation, Tellurian traded on the NASDAQ exchange.   As of November 2021, and through the present, Tellurian is traded on the New York Stock Exchange American under the ticker symbol "TELL."

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the controversy exceeds the sum value of $75,000 and is between citizens of different States.

18.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(1) and 1391(b)(2) because Souki resides in Aspen, Colorado, and events giving rise to Parker and Red Mango's claims occurred in this District.   Among

other things, and as set forth more fully below, relevant meetings between the parties took place in Aspen, Colorado.  Further, on information and belief, Souki was present in this District when he sent relevant communications, including text messages, to Parker.

19.     This Court has personal jurisdiction over Souki under Colo. Rev. Stat. § 13-1-124 because he transacted business within the state, committed tortious acts in the state that form the basis for this action, and/or purposefully availed himself of the privileges of doing business in the state, as fully set forth herein.

## **FACTUAL ALLEGATIONS**

**A.     Parker and Red Mango Acquire Millions of Shares in Tellurian.**

20.     Several years ago, Parker became interested in learning more about Tellurian after a friend, whose wife sits on Tellurian's board, mentioned the company. Parker's friend indicated that Tellurian would be a good investment over the next few years since it would be undertaking a new project (what would become the Driftwood LNG Project).  With his interest piqued, Parker flew to Aspen, Colorado to meet with Souki— the co-founder of Tellurian—and learn more about the company.  The two enjoyed a few social dinners together and began a positive working relationship.

21.     Over the course of the next few years, Parker built his holding in Tellurian, ultimately acquiring (personally and via Red Mango) more than eleven million shares, representing approximately 2% of the outstanding common stock of Tellurian.

22.     During that time, Parker and Souki corresponded frequently by text message and met from time to time to discuss business, including Tellurian, socialized together, and spent time with each other's families.

**B.      Souki Induces Parker not to Sell His or Red Mango's Shares by Promising to Indemnify Parker Against Any Losses.**

23.      In early 2017, Tellurian's share price reached as high as $20.47 per share. But by the summer of 2019, the stock was steadily declining and in August 2019, it had dropped to just more than $5 per share.

24.      Parker grew concerned about his sizeable investment, and he met with Souki in St. Tropez on or around June 13, 2019 to discuss his and Red Mango's investments in Tellurian.  But in August 2019, he informed Souki as a courtesy that he intended to sell his and Red Mango's shares in light of Tellurian's poor performance.

25.      After Parker told Souki that he intended to sell, Souki embarked on a plan to trick Parker into not selling in order to try to save the company's stock price from dropping even further.

26.      Souki emphasized that Tellurian had certain (publicly-disclosed) business prospects that would boost the share price once finalized.  For example, in July 2019, Tellurian finalized an agreement with Total Delaware, Inc. ("Total") and Total Gas & Power North America, Inc. ("Total Gas & Power") for Total Gas & Power to purchase one million tonnes per annum of LNG from the Driftwood LNG Project terminal that Tellurian planned to construct, and for Total to invest $500 million in Driftwood Holdings LP—Tellurian's subsidiary responsible for developing the LNG terminal.[1]  Tellurian and Total also executed a common stock purchase agreement pursuant to which Total would purchase

---

[1] *Total and Tellurian Finalize Driftwood Equity Investment and LNG Purchase Agreements* (July 10, 2019), https://ir.tellurianinc.com/press-releases/detail/217/total-and-tellurian-finalize-driftwood-equity-investment

$200 million dollars' worth of Tellurian stock, and have certain anti-dilution rights that would entitle Total to purchase additional shares.[2]

27.     But Souki mostly focused on convincing Parker not to sell by blaming the drop in share price on an aggressive short-selling campaign, which would be exacerbated by the sale of Parker's and Red Mango's shares.  Souki also asked Parker to take other steps to support Tellurian's share price.  For example, on or around August 4, 2019, Souki asked Parker to submit "a bid for 200,000 shares at $6.00."  Souki explained that the bid would not be successful (presumably because there was insufficient availability for a purchase of that size), but that the bid itself would be a strong signal to the market.  That is, Souki asked Parker to make a bid to purchase Tellurian stock for the purpose of supporting a higher price.  Parker continued to believe in his friend's company, and therefore, told Souki that he would "put that in," with the intention of actually acquiring additional Tellurian shares.  In the weeks that followed, Souki remained in contact with Parker to understand how many additional shares he had purchased.

28.     Despite Souki's attempt to combat the short-selling campaign, the share price declined further, and Parker remained resolved to sell his and Red Mango's shares.  But Souki fraudulently induced Parker to delay selling any shares in Tellurian by agreeing to indemnify Parker, individually and on behalf of Red Mango, against any losses through the end of 2020.

---

[2] *Id.*; *see also* Tellurian Inc., Proxy Statement (DEF 14A) at 60 (May 14, 2020). https://www.sec.gov/Archives/edgar/data/0000061398/000110465920061601/tm202168d2_def14a.htm.

29.     Souki exchanged text messages with Parker on August 17, 2019, in which he asked Parker, "Chris, How much stock do you have and what is your [cost] basis?" Parker, who indicated he was "not at [his] computer," estimated that he and Red Mango owned "5.5m shares and [his] net is circa 8[.]30 now."

30.     Souki replied:  "Ok.  Please keep this text.  I will guaranty [*sic*] your capital by dec 2020 [*sic*.].  I'll make up any capital deficiency you have at that date.  Thanks for your help and confidence."

31.     Parker believed what Souki had told him about Tellurian, and in reliance on Souki's offer to indemnify him for any losses, Parker agreed to refrain from selling any shares, telling Souki:  "Ok pal I got confidence in you, always here to lend an ear or advice if needed, let's catch up in sept [*sic*] for dinner."

32.     As the co-founder of Tellurian, Souki had a financial and reputational stake in assuring that the share price of Tellurian did not decline any further.  Specifically, as of April 26, 2019, Souki owned 54,598,728 shares of Tellurian common stock, or 22.6% of the company's stock either individually or through Souki's family trust, over which he acted as trustee.[3]   For his services in 2019, Tellurian paid Souki $195,713 in total compensation—$192,206 of that was in the form of stock awards.[4]  Also as of April 26, 2019, Souki had pledged 25,000,000 shares of Tellurian common stock as part of a

---

[3] Tellurian Inc., Proxy Statement (DEF 14A) at 56 (Apr. 29, 2019).
https://www.sec.gov/Archives/edgar/data/0000061398/000110465919024522/a19-8557_1def14a.htm
[4] Tellurian Inc., Proxy Statement (DEF 14A) at 47 (May 14, 2020).
https://www.sec.gov/Archives/edgar/data/0000061398/000110465920061601/tm202168d2_def14a.htm

collateral package to secure a loan for certain real estate investments, and the Souki family trust had pledged another 23,000,000 shares of Tellurian common stock as part of a collateral package to secure financing for various investments.[5]

33.    Tellurian was also at that time in the process of funding its Driftwood LNG Project, as evidenced by the deal it had just struck with Total in July 2019.  As of September 2019, Tellurian also announced that it signed a Memorandum of Understanding with Petronet LNG Limited India for it to buy into the Driftwood LNG Project for $7.5 billion.  Therefore, Souki sought to ensure that the stock price was kept artificially high for his own personal and professional benefit.

34.    Over the next six months, Parker and Souki consistently checked in with each other about Tellurian, including meeting again in St. Tropez in October 2019 and in Los Angeles in January and February 2020.

35.    In early 2020, Tellurian's share price dropped sharply, falling to under $1 per share in mid-March 2020.  Souki was forced to liquidate approximately 21,989,816 shares of Tellurian he beneficially owned in a series of transactions in late February and early March 2020.  According to a Form 13D filed with the Securities and Exchange Commission on or about March 5, 2020, this "was an involuntary sale effected by a lender to satisfy certain loan requirements," in connection with which a trust beneficially owned by Souki had pledged 26 million shares of Tellurian stock.[6]  According to the same SEC filing, Souki

_____

[5] Tellurian Inc., Proxy Statement (DEF 14A) at 56–57 (Apr. 29, 2019). https://www.sec.gov/Archives/edgar/data/0000061398/000110465919024522/a19-8557_1def14a.htm
[6] Tellurian Inc., General Statement of Acquisition of Beneficial Ownership (Form 13D) at

personally "pledged 25,000,000 [additional] shares of Common Stock as part of a collateral package to secure a loan for certain real estate investments."[7]  As of May 2020, after this involuntary sale, Souki owned 10.7% of Tellurian.[8]

36.     Despite these large sales of stock, Souki continued to minimize any concerns about Tellurian and its declining share price.  In a text to Parker on or about March 1, 2020, Souki confirmed news about the trust's sales, as well as substantial sales by the company's co-founder, Martin Houston, but reassured Parker, "I'm not selling."

37.     Parker remained concerned about Tellurian's poor performance, and on or around May 13, 2020, he sent a text to Souki asking to "make a plan to meet in June to go over the company and the guarantee in place for the stock."  Souki responded that he was "happy to catch up and talk."  In addition to this call, Parker and Souki met in Aspen, Colorado on or around July 25, 2020, to discuss the state of Tellurian, including Parker and Red Mango's investments.

38.     By August 2020—a year after the parties' agreement—Tellurian shares were still trading at under $1 per share.  As the maturity date on Souki's guarantee neared, Souki asked Parker to email him a breakdown of his and Red Mango's holdings in Tellurian, and on or about August 21, 2020, Souki texted Parker his email address.  Parker responded, "Thanks I will send it over this weekend."

---

4 (Mar. 5, 2020).
https://www.sec.gov/Archives/edgar/data/0000061398/000119312520062140/d813594d
sc13da.htm
[7] *Id.*
[8] Tellurian Inc., Proxy Statement (DEF 14A) at 62 (May 14, 2020).
https://www.sec.gov/Archives/edgar/data/0000061398/000110465920061601/tm202168
d2_def14a.htm

39.     On or about August 25, 2020, therefore, Parker's executive assistant emailed Souki a detailed breakdown of Parker and Red Mango's holdings in Tellurian, including the dates and average price per share for various transactions, in contemplation of Souki making good on his promise.  Souki acknowledged receipt of the e-mail the next day and thanked Parker for the information, demonstrating his understanding of the obligation owed to Parker and Red Mango.

40.     As reflected in the aforementioned text message and e-mail exchanges, Parker and Souki agreed that:  (1) Parker would not sell his or Red Mango's shares in Tellurian between August 2019 and December 2020; and (2) at the end of the year 2020, Souki would owe Parker for any losses (personally or through Red Mango) as a result of a decline in stock price.  That is, Souki agreed to pay Parker the difference between Tellurian's share price at the end of 2020 and the amount of Parker and Red Mango's initial investment (*i.e.*, their cost basis).

41.     This promise was a lie and Souki never in fact intended to follow through with his promise.  Rather, with his personal and professional motivations in mind, Souki made Parker an empty promise in the hope that if Parker did not sell his and Red Mango's shares, the short-selling campaign would end and the stock price would recover at least up to Parker and Red Mango's cost basis.  Souki in particular was aware, and explained to Parker, that there was relatively little Tellurian stock available on the open market to cover the short sellers' positions, forcing them into risky "naked" shorts.  In asking Parker and Red mango to refrain from selling their shares, Souki sought to force the short sellers to take that risk, with the goal of weakening their positions and supporting Tellurian's share

price.  In the event the stock price remained low, Souki knew he could not follow through on his promise to Parker and Red Mango because doing so would require Souki and his family trust to liquidate their shares in Tellurian, (many of which were tied up as collateral to other investments), at what he believed was a depressed price, and cause Tellurian's share price to drop even further—something Souki was determined to avoid by any means necessary.

**C.    Souki Breaches The Agreement with Parker and Red Mango, and The Parties Enter Into A Second Agreement.**

42.    At the end of 2020, Tellurian's stock price had not recovered and Parker remained determined to sell his and Red Mango's interest in the company.  As of the close of trading on December 31, 2020, Tellurian was trading at $1.28 per share.

43.    As the term of the original agreement came to an end, Parker asked Souki to perform his part of the agreement—to indemnify him and Red Mango for their losses— but Souki refused, thereby breaching the agreement they had reached in August 2019. Instead, Souki attempted again to delay Parker from going through with a sale.

44.    In November 2020, Parker and Souki discussed when Souki would send payment to Parker for the guarantee.  On or around November 21, 2020, Parker sent the following text to Souki:  "Good chatting yesterday, I confirm I'm in agreement to hold of [*sic*] the guarantee payment til first week jan when we can sit and discuss."

45.    Souki again wanted to prevent Parker from selling his and Red Mango's shares to ensure that the stock price would recover for his own personal benefit.  At this point in time, Souki was the Executive Chairman of Tellurian.  For the year ending 2020, Tellurian had paid Souki a total of $8,129,559 in compensation—$196,226 of that was in

stock awards, and $7,033,333 was in stock option awards.  Further, on December 15, 2020, Souki was awarded a stock option grant covering 10 million shares of Tellurian common stock.  The stock option has a term of 5 years, and is divided into three equal tranches having exercise prices of $3.50, $4.50, and $5.50 per share, respectively, meaning that the options are essentially worthless to Souki unless Tellurian's share price exceeds those thresholds.  According to Tellurian's 2021 Proxy Statement filed with the SEC, these exercise prices were explicitly higher as "compared to the $1.27 closing price of [Tellurian's] common stock as of the date of grant."[9]  And each tranche would only become exercisable if, among other things, the Tellurian stock price was equal to or greater than the applicable exercise price for each tranche for 10 consecutive trading days.  Therefore, Souki could not access any of the 10 million shares in his stock option unless Tellurian's stock price went up above at least $3.50 and stayed there for at least two weeks.

46.     Souki did not want to strain his liquidity by indemnifying Parker but he also needed to prevent Parker from selling any Tellurian shares, which would have continued to drive the stock price down and fueled the short sellers about which Souki was so concerned.  Faced with this dilemma, Souki asked Parker to enter into a new agreement that would last through the end of 2021, explaining that he anticipated the stock price to recover.  December 2021 was also the earliest time at which Souki could exercise his own newly granted stock options if the price of Tellurian stock had recovered to at least $3.50.

---

[9] Tellurian Inc., Proxy Statement (DEF 14A) at 41 (Apr. 29, 2021). https://www.sec.gov/Archives/edgar/data/0000061398/000110465921057583/tm212506 d1_def14a.htm

47.     Parker was potentially interested in Souki's offer to enter into a new agreement, but told Souki he would only agree to it if Souki paid interest for the new period. Additionally, Parker wanted to execute the new agreement in writing.

48.     Therefore, in February 2021, Parker and Souki met in person in Aspen, Colorado.  At the meeting, Parker first presented Souki with a written agreement drafted as between Red Mango and Souki, but Souki refused to sign the agreement.  He told Parker he could not execute an agreement in writing because he had taken bank loans and had not disclosed his liability to Parker and Red Mango to his bank—further indication, in hindsight, that Souki never intended to indemnify them for their losses and knew that such a promise was false when made.

49.     Rather, Souki assured Parker that he was "good for the guarantee" and orally agreed to certain new terms:  Souki agreed to indemnify Parker and Red Mango for their losses through December 31, 2021, and to pay interest.

50.     Because Parker and Souki had a long history and Parker remained a believer in Tellurian's core business model, Parker accepted Souki's explanation.  As a result, Parker and Souki agreed that Parker would not sell his or Red Mango's shares in Tellurian throughout 2021 so that Souki had more time to turn around the company's sagging share price.

**D.      Souki Breaches His Second Agreement with Parker and Red Mango.**

51.     Throughout 2021, Tellurian's share price increased incrementally but overall remained low.  However, Tellurian continued to press forward with its Driftwood LNG

Project and closed a public offering of 35 million shares of its common stock on August 9, 2021 thereby raising approximately $100.7 million.

52.     As of October 2021, the share price hovered just above $3 per share. Therefore, as the term of the agreement was coming to an end, Parker contacted Souki with regard to closing out his position and demanded that Souki cover his losses plus interest, pursuant to their February 2021 agreement.

53.     On or around October 6, 2021, Parker texted Souki that he needed "to fix a firm date to close out the guarantee" and suggested "jan 1st 2022 to make good the difference."  He reminded Souki that he "extended this on now past a year," and while Parker was Souki's "number one supporter, . . . it can't keep going on."

54.     Souki confirmed that he and Parker had "talked in aspen," and that there was no need to revisit the topic, but did not otherwise commit to paying Parker or fulfilling his obligation.  He told Parker:  "I told you I would let you know as soon as I have some time.  I will."

55.     Since that date, Parker, on behalf of himself and Red Mango, has demanded that Souki make the payments required of him under the contract.  However, Souki has failed to do so in breach of his agreement.

56.     As of the close of trading on December 31, 2021, Tellurian was trading at $3.08 per share.

57.     As of the close of trading the day before the original complaint in this action was filed, Wednesday, January 19, 2022, the share price of Tellurian was $2.98 per share.

58.     As a result of holding their Tellurian shares in reliance on Souki's promises, Parker and Red Mango sustained tens of millions of dollars in losses.

## COUNT ONE
### Breach of Contract – August 2019 Agreement

59.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

60.     In August 2019, Souki entered into a valid, binding contract with Parker, on behalf of himself and Red Mango.

61.     Parker, on behalf of himself and Red Mango, has performed all of the material obligations under the agreement in that neither Parker nor Red Mango sold their shares in Tellurian during the relevant time period.

62.     Souki breached the agreement because he failed to indemnify Parker, on behalf of himself and Red Mango, for his losses.

63.     As an actual and proximate result of Souki's breach, Parker and Red Mango suffered injury in an amount to be determined at trial.

## COUNT TWO
### Breach of Contract – February 2021 Agreement

64.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

65.     In February 2021, Souki entered into a valid, binding contract with Parker, on behalf of himself and Red Mango.

66.     Parker, on behalf of himself and Red Mango, has performed all of the material obligations under the agreement in that neither Parker nor Red Mango sold their shares in Tellurian during the relevant time period.

67.     Souki breached the agreement because he failed to indemnify Parker, on behalf of himself and Red Mango, for his losses.

68.     As an actual and proximate result of Souki's breach, Parker and Red Mango suffered injury in an amount to be determined at trial.

**COUNT THREE**
**Fraudulent Inducement**

69.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

70.     During the negotiations leading up to the agreements whereby Parker, on behalf of himself and Red Mango, agreed not to sell his or Red Mango's shares in exchange for Souki's agreement to indemnify Parker for his and Red Mango's losses, Souki made a material false misrepresentation of fact to Parker.

71.     Specifically, Souki told Parker that if Parker refrained from selling his and Red Mango's shares of Tellurian, Souki would indemnify him for his losses.

72.     Further, Souki continued to placate Parker's concerns about Tellurian's declining share price by assuring him that Souki was "not selling," despite the fact that the other co-founder of the company, Martin Houston, was selling off millions of shares, and a trust had sold 17 million shares beneficially owned by Souki.

73.     Souki made the material misrepresentation that he would indemnify Parker for his losses with the intent to induce Parker to rely on his assurances so that Parker would not sell his or Red Mango's shares in Tellurian.  Souki sought to keep Tellurian's stock price artificially high, and prevent the share price from dropping further than it already had, which benefited Souki both professionally (as co-founder and Executive Chairman of Tellurian, which was, and still is, in the process of executing its multi-billion dollar Driftwood

LNG Project) and financially (as Souki owned substantial holdings in Tellurian, had stock options that depended on the stock price increasing, and had borrowed against his interest in Tellurian and risked further margin or collateral calls if the share price continued to drop). With these motivations in mind, Souki made Parker empty promises to indemnify him for his and Red Mango's losses knowing that he did not intend to fulfill them.  Rather, Souki hoped that if Parker did not sell his and Red Mango's shares, the short-selling campaign would end and the stock price would recover at least up to Parker and Red Mango's cost basis.  And, in the event the stock price remained low, Souki knew he could not follow through on his promises to Parker and Red Mango because doing so would require Souki and his family trust to liquidate their shares in Tellurian, (many of which were tied up as collateral to other investments), at what he believed was a depressed price, and cause Tellurian's share price to drop even further—something Souki was determined to avoid by any means necessary.

74.     Souki's misrepresentation that he would pay Parker for his losses was material, and Souki knew that the misrepresentation was false at the time he made it.

75.     Parker, who had long supported Souki's success in Tellurian, justifiably relied on Souki's misrepresentation given the relationship that the two had developed over many years, and subsequently entered into contracts with Souki and agreed not to sell his or Red Mango's shares.

76.     As a direct and proximate cause of Souki's fraud and Parker and Red Mango's reliance on Souki's misrepresentation, Parker and Red Mango suffered damages in an amount to be determined at trial.

### COUNT FOUR
### Promissory Estoppel – August 2019 Agreement [in the Alternative]

77.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

78.     In August 2019, Souki promised Parker that he would indemnify Parker for his and Red Mango's losses in exchange for Parker's agreement not to sell his or Red Mango's shares in Tellurian.

79.     Given the longstanding business relationship and mutual trust between Parker and Souki, Souki should have reasonably expected that his promise to indemnify Parker for his and Red Mango's losses would induce Parker to not sell his or Red Mango's shares in Tellurian during the relevant time period.

80.     Parker, who had long supported Souki's success in Tellurian, reasonably relied on Souki's promise given the relationship that the two had developed, and subsequently refrained from not selling his or Red Mango's shares during the relevant time period.

81.     As a direct and proximate result, Parker and Red Mango suffered injury in an amount to be determined at trial, and therefore, Souki's promise must be enforced to prevent injustice.

### COUNT FIVE
### Promissory Estoppel – February 2021 Agreement [in the Alternative]

82.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

83.     In February 2021, Souki promised Parker that he would indemnify Parker for his and Red Mango's losses in exchange for Parker's agreement not to sell his or Red Mango's shares in Tellurian.

84.     Given the longstanding business relationship and mutual trust between Parker and Souki, Souki should have reasonably expected that his promise to indemnify Parker for his and Red Mango's losses would induce Parker to not sell his or Red Mango's shares in Tellurian during the relevant time period.

85.     Parker, who had long supported Souki's success in Tellurian, reasonably relied on Souki's promise given the relationship that the two had developed over many years, and subsequently refrained from not selling his or Red Mango's shares during the relevant time period.

86.     As a direct and proximate result, Parker and Red Mango suffered injury in an amount to be determined at trial, and therefore, Souki's promise must be enforced to prevent injustice.

<u>**COUNT SIX**</u>
**Unjust Enrichment [in the Alternative]**

87.     Plaintiffs repeat and reallege the allegations above, as if fully restated herein.

88.     Souki made a material false misrepresentation of fact to Parker when he told Parker he would indemnify him, on behalf of himself and Red Mango, for his losses but had no intent to do so.  Further, Souki continued to placate Parker's concerns about the declining share price by assuring him that Souki was "not selling," despite the fact that the other co-founder of the company, Martin Houston, was selling off millions of shares, and a trust had sold 17 million shares beneficially owned by Souki.

89.     Parker would not have refrained from selling his or Red Mango's shares in Tellurian had he been aware that Souki was not going to indemnify him.

90.     Souki inadvertently, negligently, or recklessly made such misrepresentation and failed to disclose material facts that were available to him.

91.     As a result, Souki was unjustly enriched when he prevented Parker from selling his or Red Mango's shares in Tellurian both professionally (as co-founder and Executive Chairman of Tellurian, which was, and still is, in the process of executing its multi-billion dollar Driftwood LNG Project) and financially (as Souki owned substantial holdings in Tellurian, had stock options that depended on the stock price increasing, and had borrowed against his interest in Tellurian and risked further margin or collateral calls if the share price continued to drop).  Specifically, because Parker refrained from selling his shares, Tellurian's stock remained artificially high (even at the fairly low price of the stock at various periods of time) and Souki retained excess personal wealth, and Tellurian was able to continue to execute on the Driftwood LNG Project by, for example, raising hundreds of millions of dollars in equity.

## **DEMAND FOR JURY TRIAL**

Parker and Red Mango demand a jury trial on all claims for which trial by jury is available.

## **DEMAND FOR RELIEF**

WHEREFORE, Parker and Red Mango demand the Court enter judgment as follows:

A.      For compensatory damages in an amount to be determined at trial;

B.      For punitive damages against Souki at least equal to compensatory damages, in an amount to be determined at trial;

C.      For pre-and-post judgment interest as appropriate;

D.      For all costs and fees incurred in prosecuting this Complaint; and

E.      For such other and further relief as this Court deems just and proper.


Dated:      April 12, 2022

                              Respectfully Submitted,

                              BOIES SCHILLER FLEXNER LLP

                      By:      /s/ Matthew L. Schwartz
                              Jonathan D. Schiller
                              Matthew L. Schwartz
                              Lauren M. Goldman
                              55 Hudson Yards
                              New York, New York 10001
                              Telephone: (212) 446-2300
                              Facsimile: (212) 446-2350
                              jschiller@bsfllp.com
                              mlschwartz@bsfllp.com
                              lgoldman@bsfllp.com