IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00165-WJM-MDB

CHRISTOPHER PARKER, and

RED MANGO ENTERPRISES LTD.,

Plaintiffs,

v.

CHARIF SOUKI,

Defendant.

## DEFENDANT CHARIF SOUKI'S MOTION FOR PROTECTIVE ORDER

Defendant Charif Souki ("Souki") for good cause shown moves pursuant to Federal Rule 26 for a protective order limiting the requests for production propounded by Plaintiffs Red Mango Enterprises Limited ("Red Mango") and Chris Parker ("Parker," collectively "Plaintiffs").

## CONFERRAL PURSUANT TO D.C.COLO.L.CIV.R. 7.1

Undersigned counsel conferred with Plaintiffs' counsel regarding the relief requested in this motion by conference call on March 10, 2023. Plaintiffs oppose the motion.

## INTRODUCTION

Plaintiffs are an international online gambling magnate and one of his shell companies ███ ████████████████████████ Plaintiffs claim that they entered into two agreements with Souki – one by vague text messages and the other orally – whereby Souki would guarantee their millions of dollars in losses if they refrained from selling his company's stock. They also claim he fraudulently induced them into those agreements, which they nevertheless seek to enforce.

These claims suffer from several fundamental defects, not the least of which are: (a) the alleged agreements do not contain all material terms necessary for an agreement of this kind, (b) neither alleged agreement is signed, so the claims fail under the statute of frauds, and (c) Red Mango has no claim related to the alleged August 2019 agreement because Parker never disclosed the existence of Red Mango in the text messages in August 2019. For these reasons and others, Souki moved to dismiss Plaintiffs' claims; that motion remains pending. *See* Docket No. 24.

The parties have conducted written discovery while awaiting a decision on the motion. This discovery further confirms that Plaintiffs' claims lack any merit. ***First***, Plaintiffs have not produced a single communication that confirms Plaintiffs had an agreement with Souki. One would think that if Souki had actually agreed to guarantee $50 million in losses by Plaintiffs, they would have said something to someone about it, but they did not. ***Second***, in the text messages that allegedly form the August 2019 agreement, Parker blatantly lied to Souki. Specifically, Parker claimed to own more than 5 million shares of stock in the company Souki co-founded, Tellurian, Inc. ("Tellurian"). In reality, however, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ***Third***, Red Mango, a shell company set up by Parker and whose existence Parker never disclosed to Souki until Plaintiffs' counsel threatened litigation in late 2021, could not have had an agreement with Souki in February 2021. The only person purportedly negotiating with Souki on behalf of Red Mango was Parker, but in February 2021, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Despite the foregoing, these Plaintiffs have asked this Court to condone a wide-ranging fishing expedition into Souki's personal finances and his children's trust. This discovery sought by these Plaintiffs cannot be countenanced, for at least the following reasons:

1.     Souki's private financial information has no bearing whatsoever on whether or not he entered either alleged agreement with Plaintiffs. The Court will make that determination based on the text messages and alleged oral statements that Plaintiffs claim demonstrate a meeting of the minds between the parties.

2.     Discovery of Souki's private financial is absolutely not proportional to the needs of the case. While Plaintiffs contend this discovery is necessary to demonstrate Souki's intent not to perform the alleged agreements as part of their fraud claim, ***Souki has repeatedly stated he is willing to stipulate that he had no such intention***. As such, the purpose of conducting a fishing expedition into his private financial information would be to confirm a fact to which Souki has already stipulated. Therefore, the importance of this discovery to the resolution of the case is extremely low, if not zero. Plus, Souki's net worth, liquidity, personal loans, and children's trust is highly sensitive information for which Souki, who is a very public figure, has a reasonable expectation of privacy, particularly as it relates to deceitful Plaintiffs who operate in unregulated industries abroad.

3.     Finally, much of the information sought – particularly details of trades of Tellurian shares that Souki directly or beneficially owned – is a matter of public record through filings with the Securities Exchange Commission ("SEC"). Thus, the only purpose to wade into Souki's highly sensitive financial information would be to harass him.

Under these circumstances, it would be inappropriate to require Souki to turn over his and his children's trust's extremely sensitive, and irrelevant, financial information to these Plaintiffs. Accordingly, Souki requests that the Court enter a protective order that rejects Plaintiffs' attempts to seek this unnecessary and invasive discovery.

## BACKGROUND

### A. Souki is a well-known and well-regarded executive in the oil and gas industry.

Souki is the Executive Chairman of Tellurian Inc. ("Tellurian"), a publicly traded, liquefied natural gas ("LNG") company headquartered in Houston, Texas. Before co-founding Tellurian in 2016, Souki previously founded Cheniere Energy, Inc. in 1996 and served as its Chairman and Chief Executive Officer until he left the company in 2015. In these roles, Souki has been and continues to be one of the most prominent figures in the LNG industry. He is also the public face of Tellurian, a company that is attempting to secure billions of dollars in financing to move forward with its $28 billion LNG project along the Gulf Coast of Louisiana.[1]

At all times relevant to this lawsuit, Souki individually owned millions of shares of Tellurian stock. To the extent Souki ever acquired or disposed of shares of Tellurian stock, the details of those activities – including the volumes traded, the prices at which they were traded, and the dates of the trades – are well-documented in filings with the SEC due to Souki's insider status at Tellurian. Equally accessible in SEC filings is Souki's compensation (including stock grants) at Cheniere and Tellurian. Souki, however, has rightfully gone to great lengths to shield his personal

---

[1] Jake Bittle, *How One Restaurateur Transformed America's Energy Industry*, N.Y. TIMES, July 6, 2022, https://www.nytimes.com/2022/07/06/magazine/us-export-liquid-natural-gas.html.

financial picture from the public, and it would be extremely harmful to him and his family, including his children, if such information became publicly available.[2]

**B.     *Parker is a wealthy online gambling magnate and Red Mango is his shell company.***

Parker has become a multi-millionaire by starting, owning, and operating an online gambling platform based in Asia.[3] The industry in which he operates is unregulated and the subject of much scrutiny.

Like Souki, Parker has gone to great lengths to keep his personal finances out of the public eye. In fact, in documents that he has produced in this case, Parker has redacted information related to investments other than those in Tellurian.[4] Moreover, once he learned that his bank, ███ had produced documents that reflect Parker's personal net worth in response to a subpoena from Souki, Plaintiffs' counsel took steps to claw that information back.[5] Parker clearly expects to maintain the privacy of his private finances.

As late as ████████, Parker was a citizen of the ████████ and a resident of ██████.[6] Now, according to the Amended Complaint, he is a citizen of Grenada in the Caribbean. Docket No. 15 at ¶ 13. Additionally, ████████████████, Parker became a resident of the United States (he owns two large homes in Los Angeles, California) and took steps to ████████████████████████████████████

---

[2] Ex. 1 (Affidavit of C. Souki) at ¶¶ 2-5.

[3] *See* Ex. 2 (████████████████████████).

[4] *E.g.,* Ex. 3 (████████ Parker's Statement of Assets) at PLAINTIFFS_00000175, *et seq.*

[5] Ex. 4 (Feb. 2023 email correspondence with ███ & Boies Schiller).

[6] Ex. 5 (Red Mango Register of Directors) at PLAINTIFFS_00000768.

████ .[7] On ████████ , several months after the alleged August 2019 agreement, Parker set up the CP Irrevocable Trust ("Parker Trust") ████████ and contributed his investment portfolio – including his ownership interest in Red Mango – to the Parker Trust.[8] ████

████████████████████████████████████

████████ Nevertheless, discovery has confirmed Parker ████████████

████████████████████ .

Red Mango is a British Virgin Islands ("BVI") corporation whose ████████

████████████████ "[9] Parker was ████████████

████████████████████████████████

████████████████ .[10] Nevertheless, discovery confirms that the ████████████████████████████ .[11]

## C.    The August 2019 agreement isn't one.

In 2018, Parker and Souki initiated a text thread punctuated by occasional messages across three years. In that time, Souki never mentioned an "agreement," a "contract," an "indemnity," or any other binding promise to Parker, much less Red Mango.[12]

---

[7] Ex. 6 (████ Email from ████ Private Wealth Advisor to Parker).

[8] Ex. 7 (Jan. 27, 2021 Letter Re: CP Irrevocable Trust) at PLAINTIFFS_00000446-447.

[9] Ex. 8 (Red Mango's Articles of Association) at ¶ 54.

[10] Ex. 5 (Red Mango Register of Directors) at PLAINTIFFS_00000768.

[11] *See* Ex. 9 (████████████████████████████ ; Ex. 10 ████████████████████████████████████

[12] Ex. 1 (Affidavit of C. Souki) at ¶ 10.

On August 7, 2019, Parker told Souki in a text that he purchased "200 [Tellurian shares] other day on top of the 5m I already have[.]"[13] In fact, at that time, Parker actually owned ███ shares of Tellurian stock.[14] It wasn't until ███████ that he first purchased Tellurian shares.[15] At no time (and in none of the text messages) did Parker tell Souki that the represented 5.2 million shares belonged to *Red Mango*. Nor did he tell Souki about the existence of Red Mango or that it would be a party to an alleged agreement with Souki.[16]

Nevertheless, Plaintiffs claim that this string of text messages forms an agreement whereby Souki agreed to guarantee potentially tens of millions of dollars of losses. And Plaintiffs claim they allegedly relied on this promise of a guarantee to refrain from selling stock that they thought might experience significant losses. Yet, there is no discussion in the text messages or any other document of Souki's ability to cover an alleged guarantee of that magnitude. There is no request by Parker, for example, for financial statements, exactly the type of due diligence a shrewd businessman like Parker would conduct before entering into this kind of agreement.

**D.** ***In early 2020, the Souki Family Trust was forced to sell some of its Tellurian stock and Souki resigned as a Trustee soon thereafter.***

Souki's children's trust, the Souki Family 2016 Trust ("Souki Trust"), owned millions of shares of Tellurian stock separate and apart from the shares Souki owned individually. ***The Souki Trust is not and never has been a party to this case***. Prior to March 2020, Souki was a Trustee of

---

[13] Ex. 11 (Text messages between Parker and Mr. Souki) at PLAINTIFFS_00000022.

[14] Ex. 3 (███████, Parker's Statement of Assets) at PLAINTIFFS_00000177.

[15] Ex. 12 (███████ Stock Exchange Note).

[16] Ex. 1 (Affidavit of C. Souki) at ¶¶ 9-10.

the Souki Trust. As a result, he was deemed for SEC purposes to be the beneficial owner of the Souki Trust's Tellurian Shares.[17] In February and March 2020, a bank forced the Souki Trust to sell a significant portion of its Tellurian shares.[18]

Plaintiffs contend that these forced sales somehow show that Souki defrauded them when he previously assured Plaintiffs that he wasn't going to sell Tellurian stock and they are therefore entitled to discovery related to the sales. The details of those trades, however, are publicly available since Souki was a beneficial owner of the Trust's Tellurian shares at that time. As a result, Souki had to file a Form 4 with the SEC alerting investors to the sales. And, as he also disclosed in those filings, it was not Souki who was forced to sell; it was the Trust.[19]

Shortly after these forced sales, Souki resigned from the Trust and, unlike Parker's continued role with the Parker Trust, Souki has not had any authority over or been a Trustee or beneficiary of the Trust since then. As such, Souki has no ability to compel the Souki Trust to produce any documents even if they were somehow relevant to this case.[20]

### E.    The alleged February 2021 "agreement" is not an agreement.

Plaintiffs claim that Souki renewed the alleged August 2019 agreement at a meeting with Parker in February 2021. As evidence of this, Plaintiffs point to a draft "Put Option Agreement" that Parker handed Souki at the meeting and that *Souki refused to sign*. If anything, this fact proves Souki's point: you can't have an agreement of this kind unless it's in a signed, written document.

---

[17] Ex. 1 (Affidavit of C. Souki) at ¶ 5.

[18] Ex. 13 (March 5, 2020 Form 13D).

[19] Ex. 14 (Feb. 28, 2020 Form 4); Ex. 13 (March 5, 2020 Form 13D).

[20] Ex. 1 (Affidavit of C. Souki) at ¶ 7.

Why else would Parker have asked Souki to execute a written agreement? Moreover, the proposed agreement said nothing about an alleged indemnity or guarantee agreement from August 2019, nor did it mention Parker.[21] These events confirm no August 2019 agreement existed and Plaintiffs were unable to persuade Souki to enter into an agreement in February 2021.

To avoid these inconvenient facts and ignoring the statute of frauds, Plaintiffs allege Souki and Parker "orally agreed to certain new terms." Docket No. 15 at ¶ 49. But in February 2021, Parker ███████████████████████████████████████████.[22] Red Mango's shareholders and Directors – who could actually contract for Red Mango – never held a meeting to discuss the alleged agreement.[23] Therefore, even if there was an oral agreement, Red Mango certainly could not have been a party.

<b><u>SUMMARY OF DISCOVERY AGREEMENTS AND DISPUTES</u></b>

For the reasons set forth herein and in previous joint status reports, Souki is at an impasse with Plaintiffs with respect to seven of Plaintiffs' twenty-two requests, which seek details of Souki's holdings, transactions, and pledges of Tellurian shares (Requests 3, 7, 9 and 21), his net worth and liquidity (Requests 19 and 20), and the Souki Trust (Request 18). Souki has consistently argued these requests are not relevant or proportional to the needs of the case, also emphasizing his and his family's privacy interests. *See* Docket No. 45 at 5. Plaintiffs argue the requests are relevant to Souki's motive to enter and induce Plaintiffs to enter the alleged agreements.

---

[21] Ex. 15 (Draft Put Option Agreement) at PLAINTIFFS_00000238.

[22] Ex. 5 (Red Mango Register of Directors) at PLAINTIFFS_00000768.

[23] *See* Ex. 16 (Red Mango's Interrogatory Responses) at 13.

Noting the overbreadth and invasiveness of Plaintiffs' requests, the Court encouraged Plaintiffs to serve requests for admission that Souki did not intend to perform the alleged agreements and to determine if Souki's net worth and liquidity would have enabled him to perform the alleged agreement.[24] Plaintiffs initially declined,[25] but several weeks later ultimately served one request that asked Souki to admit that he did not intend to pay Plaintiffs for any alleged losses; of course, Souki admitted this fact because he never agreed to any such obligation.[26] But Plaintiffs still wanted more. So, in one final attempt to compromise, Souki produced his personal financial statement from third quarter 2019, the period in which Plaintiffs claim he defrauded them. But Plaintiffs still want more. Souki is unwilling to produce irrelevant, private financial data to Plaintiffs who have misled and tried to bully him into agreements and whose claims lack merit and do not depend in any way on Souki's personal finances.

## LEGAL STANDARD

"The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including an order "forbidding the disclosure or discovery" or "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters[.]" Fed. R. Civ. P. 26(c)(1)(A), (C), (D). "[T]he party seeking a protective order must show that disclosure will result in a clearly defined and serious injury to that moving party." *Klesch & Co. Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 524

---

[24] Ex. 17 (Nov. 8, 2022 Hearing Transcript) at 19:5-20:8.

[25] Ex. 18 (Oct. 26, 2022 letter correspondence from Plaintiffs' counsel).

[26] Ex. 19 (Mr. Souki's Response to Plaintiffs' First Set of Requests for Admission) at 8-9.

(D. Colo. 2003) (citing *Exum v. U.S. Olympic Comm.,* 209 F.R.D. 201, 206 (D. Colo. 2002)). Ultimately, "[t]he decision to issue a protective order rests within the sound discretion of the trial court." *Lambland, Inc. v. Heartland Biogas, LLC*, No. 18-CV-01060-RM-KLM, 2018 WL 7825202, at *5 (D. Colo. Nov. 29, 2018) (citing *Wang v. Hsu*, 919 F.2d 130, 130 (10th Cir. 1990)).

**ARGUMENT AND AUTHORITIES**

**A.      The materials Plaintiffs seek from Souki are not relevant to Plaintiffs' claims.**

Discovery "is not boundless." *Meeker v. Life Care Centers of Am., Inc.*, No. 14-CV-02101-WYD-NYW, 2016 WL 11693708, at *6 (D. Colo. Aug. 26, 2016). When a discovery request "is overly broad on its face or when relevancy is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request." *Strating v. Abound Solar, Inc.*, No. 10-CV-02344-LTB-MEH, 2012 WL 882407, at *3 (D. Colo. Mar. 15, 2012) (quotation omitted). Even if the party seeking the discovery can show the discovery is of "marginal relevance," the court may deny the discovery if "the harm in producing the information outweighs the presumption in favor of broad disclosure." *Id.*

Here, Plaintiffs claim Souki breached two agreements – one allegedly formed by text message and one allegedly the result of oral promises. To succeed, Plaintiffs must prove the existence of a meeting of the mind on all material terms. Under Colorado law, the "requisite meeting of the minds is established by the parties' acts, conduct, and words, along with the attendant circumstances, and not by any subjective, unexpressed intent by either party." *Richan v. AGEISS, Inc.*, No. 22-CV-01060-NYW-MEH, 2022 WL 3716524, at *5 (D. Colo. Aug. 29, 2022), *appeal dismissed*, 2022 WL 18936144 (10th Cir. Dec. 13, 2022) (quoting *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022)). Souki's financial position and his children's trust

11

have no bearing on whether the August 2019 text messages or the alleged oral promises in February 2021 contained all material terms or satisfy the statute of frauds.

Plaintiffs have also underscored an allegedly related motive to keep Tellurian stock prices high.[27] In the analogous context of securities-fraud cases, "alleged motives, which are generalized motives shared by all companies and which are not specifically and uniquely related to [defendant] in particular, are unavailing" to show an intent to defraud. *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1258-63 (10th Cir. 2001). This makes intuitive sense: Souki, like most business leaders, wanted to make money, but motivation for business success is not a relevance bridge to wide-ranging discovery. So, even if marginal relevance is imaginable, "the harm in producing the information outweighs the presumption in favor of broad disclosure." *See Strating*, 2012 WL 882407, at *3 (D. Colo. Mar. 15, 2012).

**B.      Discovery of Souki's financial documents is not proportional to the needs of the case.**

"The proper scope of discovery has long been bounded by the principles of proportionality." *Adams v. Womble*, No. 14-CV-01431-RM-NYW, 2016 WL 11692349, at *1 (D. Colo. June 28, 2016) (citing Fed. R. Civ. P. 26(b)(1)). Proportionality requires consideration of "the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

---

[27] Ex. 20 (Aug. 15, 2022 Letter from L. Goldman to T. Young) at 4.

While Souki's intent to perform is an element of Plaintiffs' fraud claim, Souki openly admits he did not intend to perform any agreement with Plaintiffs.[28] Fishing through Souki's most sensitive files to establish a fact which Souki has already admitted is therefore not important in resolving the case. *See, e.g., Huckels v. Safeway Inc.*, No. 16-CV-00595-MJW, 2018 WL 6243317, at *4 (D. Colo. Apr. 17, 2018) ("the best course of action is for Plaintiff to take the deposition" and then move for "further discovery on [the relevant] issue").

The nature of the materials further tips the scales of proportionality in Souki's favor. "In evaluating whether a party may assert a right to privacy on information sought through discovery, a court considers: (1) whether the information is relevant; (2) whether there is a reasonable expectation of privacy; (3) if so, whether there is a compelling need for the information; and (4) if so, whether the information can be derived from other less-intrusive sources." *Cope v. Auto-Owners Ins. Co.*, No. 18-CV-0051-WJM-SKC, 2021 WL 3464266, at *2 (D. Colo. Aug. 6, 2021) (Martínez, J.). People have a reasonable expectation of privacy in private financial summaries. *Gordon v. Rice*, No. 13-CV-00514-RBJ-MEH, 2014 WL 903205, at *7 (D. Colo. Mar. 7, 2014); *see also In re Dist. Ct., City & Cnty. of Denver,* 256 P.3d 687, 691 (Colo. 2011) (en banc).

Every factor of the test counsels in favor of nondisclosure of the requested documents. ***First***, as argued above, *supra* § A, they are not relevant to Plaintiffs' breach of contract allegations and related claims. ***Second***, as argued above, *supra* § A, Plaintiffs lack a compelling need for the information as it is, at best, only marginally relevant, particularly since their stated purpose is to prove Souki had no intention to perform and he's stipulated that he had no intention to perform.

---

[28] Ex. 1 (Affidavit of C. Souki) at ¶ 9.

***Third***, both by the common-sense test and under the case law, Souki has a reasonable expectation of privacy with respect to the requested documents. *See Gordon*, 2014 WL 903205, at \*7. And ***fourth***, as observed above, the requested information has already been more easily obtained through Souki's stipulation, his response to Plaintiffs' request for admission, and the personal financial statement he has now produced.

## C.      Plaintiffs have access to documents satisfying Requests 3 and 7.

In Request 3, Plaintiffs seek documents sufficient to show all transactions of Tellurian stock that Souki personally or beneficially owned. As a Tellurian insider, Souki's dealings in Tellurian stock "are or will be publicly available in filings with the Securities Exchange Commission."[29] Where, as here, "SEC filings themselves are publicly available," discovery should be limited accordingly. *See Crocs, Inc. v. Effervescent, Inc.*, No. 06-CV-00605-PAB-KMT, 2017 WL 1325344, at \*5 (D. Colo. Jan. 3, 2017), objections overruled, 2017 WL 1325171 (D. Colo. Feb. 24, 2017); *Ayyad v.* Holder, No. 05-CV-02342-WYD-MJW, 2014 WL 4084165, at \*1 (D. Colo. Aug. 19, 2014) ("discovery . . . is not required of documents of public records which are equally accessible to all parties") (collecting cases).

Request 7 seeks all documents and communications relating to the sale of any Tellurian shares after March 2020, including the sale of over 21,000,000 shares as described in the Form 13D filed with the Securities and Exchange Commission on or about March 5, 2020. As an initial matter, this request makes no sense. In the first clause, it requests documents related to sales that occurred ***after*** March 2020, but in the second clause, it seeks documents related to a sale that

---

[29] Ex. 22 (Souki's Interrogatory Responses) at 5.

occurred *in* March 2020. In any case, Souki's sales of Tellurian shares are a matter of public record in filings with the SEC, and those filings demonstrate that Souki did not sell any of his Tellurian shares after March 2020 or anytime prior to the filing of this lawsuit. Therefore, there are no responsive documents in that regard.

To the extent Request 7 seeks documents related to the Souki Trust's sales of its Tellurian shares, those materials are even more irrelevant than Souki's – the Trust is not a party to this case and Souki has not been a Trustee in the period at issue in the request. And the March 5 sales described in the second clause of Request 7 reflect nothing about Souki's alleged motivations because Souki (as Trustee) did not choose to sell those shares; the trust's bank did.

## D.     Requests 9 and 21.

These requests seek all documents and communications relating to Souki's pledges of Tellurian common stock as part of collateral packages to secure loans for certain real estate investments. In addition to the relevancy and proportionality arguments above, the fact and details of the pledge is a matter of public record (Plaintiffs even cited the relevant SEC filing in the Request itself). Nevertheless, to the extent Plaintiffs need additional details of the pledge, Souki recently filed a lawsuit in New York state court against his lenders, and that lawsuit details the loans and the pledges of collateral that were made.[30]

**<u>CONCLUSION</u>**

For all the foregoing reasons, Defendant Charif Souki requests that the Court grant this Motion and bar Plaintiffs from seeking documents responsive to Requests 3, 7, 9, and 18-21.

---

[30] *See* Ex. 21 (Complaint – NY Sup. Ct.).

Dated: March 14, 2023

Respectfully submitted,

/s/ Timothy S. McConn
Timothy S. McConn
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: 713.632.8000
Email: tmcconn@yettercoleman.com

and

Michael L. O'Donnell
Marissa S. Ronk
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:    303.244.1800
Facsimile:    303.244.1879
Email: odonnell@wtotrial.com
           ronk@wtotrial.com

Attorneys for Defendant Charif Souki

## CERTIFICATE OF SERVICE (CM/ECF)

I certify that a true and correct copy of the foregoing has been electronically served on all counsel of record on March 14, 2023.

/s/ Timothy S. McConn
Timothy S. McConn