# EXHIBIT 17

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

CHRISTOPHER PARKER and          .  Case No. 22-cv-00165-WJM-MDB
RED MANGO ENTERPRISES, LTC.,    .
                                .
          Plaintiffs,           .
                                .  United States Courthouse
vs.                             .  212 North Wahsatch Avenue
                                .  Colorado Springs, CO  80203
CHARIF SOUKI,                   .
                                .
          Defendant.            .
                                .  November 8, 2022
. . . . . . . . . . . . . . . .    1:40 p.m.


**TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE
HONORABLE MARITZA DOMINGUEZ BRASWELL,
UNITED STATES MAGISTRATE JUDGE**


APPEARANCES:

For the Plaintiffs:          Boies Schiller Flexner, LLP
                             By:  Lauren M. Goldman*
                             By:  Jeffrey Waldron*
                             55 Hudson Yards
                             21st Floor
                             New York, NY  10001
                             (212) 446-2300

For the Defendant:           Yetter Coleman, LLP
                             By:  Bonnie C. Fraase*
                             By:  Timothy S. McConn*
                             By:  Tyler P. Young*
                             811 Main Street
                             Suite 4100
                             Houston, TX  77002
                             (713) 632-8000

                             Wheeler Trigg O'Donnell, LLP
                             By:  Melissa L. Romero
                             370 17th Street
                             Suite 4500
                             Denver, CO  80202
                             (303) 244-1800

Appearances continued:

Court Recorder:                    Clerk's Office
                                   U.S. District Court
                                   212 North Wahsatch Avenue
                                   Colorado Springs, CO  80203

Transcription Service:             AB Litigation Services
                                   216 16th Street, Suite 600
                                   Denver, CO  80202
                                   (303) 296-0017

*All appearances video/telephonic.

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Time noted:  1:40 p.m.)

THE COURT CLERK:  Court is now in session.  The Honorable Magistrate Judge Dominguez Braswell presiding.

THE COURT:  I am sorry to keep the parties waiting.

Calling case number 22-cv-00165, in the matter of Christopher Parker and Red Mango versus Charif Souki.

Can I get appearance of counsel, starting with Plaintiffs, please?

MS. GOLDMAN:  Good afternoon, Your Honor.  This is Lauren Goldman and Jeffrey Waldron on behalf of the Plaintiffs.

MR. YOUNG:  Good afternoon, Your Honor.  This is Tyler Young from Yetter Coleman on behalf of Defendant Charif Souki.

And with me I have Tim McConn and Bonnie Fraase.

THE COURT:  Okay.  Ms. Goldman -- oh.  Go ahead.

MS. ROMERO:  Also appearing on behalf of Defendant is Melissa Romero from Wheeler Trigg O'Donnell.

THE COURT:  Okay.  And which counsel is taking lead today on behalf of Defendant, or are you all dealing with different pieces of this?

MR. YOUNG:  It will be largely me, Your Honor.

THE COURT:  Okay.  All right.  Ms. Goldman, just so you know, and I'm fine with this, but just so that you

know, because I always like to know how this shows up on camera, I can only see about half of your face. I think it's just because you're a little bit close to the camera.

MS. GOLDMAN: Okay. How about that?

THE COURT: That's better.

MS. GOLDMAN: Is that better?

THE COURT: Yes. Thank you.

MS. GOLDMAN: Okay. Thank you. So we worked for a while with Liz to try to get this to work beforehand, and I'm on my phone. It's the best we could do. So, thank you for letting me know how it looks.

THE COURT: No problem. No problem. Okay. I have reviewed the parties' joint status report, and can see that the parties have made some progress, but that some disputed issues still remain.

And so you will probably need some guidance from the Court, although I think the guidance that I gave you last time was probably all the guidance I can give you. And at this point, I just need to rule on some of these issues, so I'm going to do that today.

With respect to the first disputed issue, it seems that the concern here is with respect to timing. I am inclined to agree with the Defendant here that going past the date of the complaint doesn't seem to get you anything that's relevant, considering that what's at issue is the state of

mind at the time the issues or agreements made.

And so I'm going to hear from Plaintiffs' counsel to see if there is anything that you have to say with respect to that that would change my mind.

MS. GOLDMAN: Thank you, Your Honor. All that we would add to our papers, and I know you've already reviewed them, is that while state of mind at the moment in time, of course, is what is relevant.

Once Mr. Souki became away of the litigation, -- [audio issues] emails, you know, other people he's done these, you know, sorts of deals with them, he may have contacted a broker or somebody at his bank to discuss his liabilities, or perhaps something relevant to the matter, and it's reflecting his state of mind or even the existence of the agreements themselves.

And that would have only happened once the original complaint was filed, and those sorts of emails would not be privileged.

We understand that communications with counsel, you know, understandably would be privileged.

But those are the only sorts of emails we were trying to make sure we didn't send.

THE COURT: Okay. I understand that. I still think, though, that to the extent that he's having thoughts or conversations related to the litigation, that's not

relevant to the state of mind at the time of the transaction, which is really what's at issue in the litigation.

And, in fact, to the extent that he is having thoughts with respect to the litigation and he then, you know, communicates something that is concerning the litigation, I think it starts -- I know it's not involving necessarily counsel, but I think it starts to tread a little bit close to potential privileged material to the extent that that then forms the basis for requesting advice from counsel.

In any event, I really think the issue here is relevance, and I'm going to construe that statement made in the -- statement made on behalf of Plaintiff in the disputed discovery report to be a motion to compel documents within the date range between the amended complaint -- I'm sorry, between the original complaint and the amended complaint, and I'm going to deny that motion for the reasons that I have just stated on the record.

Going to dispute number 2. Actually, let's go to 3, because I think dispute number 2 is a little more involved.

The issue there is -- it sounds like the Defendant's net worth. And I think the requests are probably phrased a little bit differently, but that's the essence of it, is understanding or getting evidence to show the Defendant's net worth.

And I do remember that at the last conference, and I've reviewed the minutes, as well, I had instructed that -- perhaps I didn't direct you, but perhaps you might consider some RFAs. So tell me why that's not sufficient?

It seems to me that if all you're looking for is whether he was in a position to pay the debt that he was agreeing to take on, essentially, and I'm obviously paraphrasing, all you need to know is sort of a "yes" or "no" answer, and not information about his personal finances.

So explain to me why an RFA is insufficient.

MS. GOLDMAN: Sure, Your Honor. And we did take your guidance very seriously, and we actually began crafting RFAs. And we kind of just kept coming up to this roadblock, which was we didn't have actual facts to get admissions.

So, understanding what you're saying right now, we were all thinking the same thing. Could we ask "admit that you had $50 million dollars at this time," or "in a series of months?" And the answer could be "yes" and it could be "no."

The problem is it gives a lot of wiggle room for like what a "yes" or "no" means in that context. Does it mean $50 million dollars that's just sitting in his bank account? Does it mean it's all of his properties? It is tied up in loans or other securities?

And the other problem is that context matters. For example, if you had $50 million and $5.00 to your name,

the jury, if we were to present this, should know that it's unlikely that the Defendant is going to drain every penny to his name to pay this.

And so while we absolutely understand, you know, the efficiencies around an RFA, it just became evident that we couldn't actually get evidence, you know, and a "yes" or "no" wouldn't give us what we really needed.

THE COURT: But don't you supplement that with deposition questions? I mean, certainly you could ask him in deposition whether he intended to or could have liquidated everything, and that kind of goes to the second -- I think to the second discovery request at issue around liquidation.

I don't see why that's not appropriate for deposition. I'm concerned that you are -- I understand the relevance of the issues that you're trying to sort of pin down here, and so I don't necessarily see this as problematic from a relevance perspective.

But I am concerned about proportionality, and I'm concerned about privacy interests. And so in your effort to obtain this information, are you getting too much and potentially compromising his privacy interests?

I'm going to ask defense counsel to respond.

MR. YOUNG: Yes. I think that they're asking for too much, and potentially compromising the privacy interests.

I think that from the very beginning the

Defendant, Mr. Souki, has indicated a willingness to look at RFAs, and we've represented that again to counsel during the meet and confers that we had after your phone call.

And at one point, we're hopeful that we would at least get some to consider. But up to this point, we've not yet seen any.

I think that you're right, Your Honor, that any RFAs that they serve, we'd be happy to respond to them, and they can supplement them by asking him additional questions at his deposition about, you know, the context, whatever context they feel is necessary to understand those requests for admission, you know, once they've been answered.

But the fact of the matter is that the request, as they phrased it, even as modified in the joint filing that we made a couple of weeks ago, is for 18 months worth of net worth and liquidity, that information from the Defendant, including, you know, not just his, you know, cash, but holdings and the holdings of his personal -- or of his family's trust.

That's just extremely private, and it's disproportionate to any need that the Plaintiffs have here to establish, you know, a simple question, which is ability to pay, really is what it boils down to.

THE COURT: Right. Ms. Goldman, I have to agree with that. Is there a way for you to narrow what you're

asking for so that -- because, again, as you heard me, I am inclined to agree with you on the relevance point, and I understand why you're seeking this information.

Mr. Young, by the way, I also understand Ms. Goldman's argument about the problem with RFAs, right? It's very easy to sort of wiggle out of it, and you don't get a lot of information with just the "yes" or "no." So I understand that piece, too.

So, Ms. Goldman, is there a way for you to narrow this request so that you're not targeting? I mean, it is overly broad, in my mind. It's not proportional. It does implicate privacy interests. And I wouldn't be inclined to grant, to the extent I construe it as a motion to compel everything you've asked for in those requests, I would not be inclined to grant it.

So, can you think of a way to modify it, narrow it?

MS. GOLDMAN: So, in our initial proposal to the Defendant, we had proposed receiving financial records for various months, and working with them to protect privacy, you know, to redact certain things that, you know, they don't want us to see, as long as we kind of get the core information.

So I don't think that is a way forward. It would require production of records.

And then in terms of the time frame, the reason we kept it the length of time is because there is still motive that we are trying to prove, as well. So depending on the month and what's happening in his finances, there could be a different story to tell, depending upon what point in time we're at.

Which is another problem with the RFAs, because, you know, unless we can ask for every single month, which we can, you know, did he have this amount of money every month.

You know, we're trying to find a way to make sure we can solve the nexus that might come out in the evidence, which is that he had certain amounts of money at various points in time, or he didn't, and that could also go to his motive and intent to enter into the second agreement, which was February of 2021.

And that's where the length of -- you know, the time comes in.

There could be a way that we pinpoint different months and try to make it a little bit more narrow, but it just -- the problem becomes the story that we have to be able to see.

But I'd be willing to work with the Defendant and make sure that we are protecting information and only getting, you know, the months that are the most relevant, if you're not inclined to grant or construe the motion to compel

for all of the months that we've asked for.

THE COURT: Okay. You were cutting off a little bit, Ms. Goldman, but I think I got the -- some of what you were saying. And I appreciate your willingness to try to figure out a way to compromise here.

Mr. Young, you can hear that I'm inclined to grant something, right, to give her some -- to give the Plaintiff some ability to understand what financial motivations might have been behind the decisions at the time.

Ms. Goldman has proposed a way to narrow it. What's your response to that?

MR. YOUNG: I still haven't heard anything from Ms. Goldman, Your Honor, that explains why an RFA followed by a deposition would be insufficient.

And what I mean by that is: Yes, if the RFA is, you know, "did you have $50 million dollars," or "did you have $100 million dollars," you know, whatever amount they choose to sort of suss out what is, you know, the financial situation was at a particular time.

THE COURT: Yes, but you're having them take a shot in the dark, right? I mean, you're asking them, without any information at all, you're asking them to take a shot in the dark on some numerical value, which, frankly, could draw this out, and I don't think to the benefit of anyone, the parties or the Court.

And so I -- you may not have heard from Ms. Goldman why that's not satisfactory, but you can hear from me: That's not satisfactory. An RFA forces them to take a shot in the dark, taking a deposition without any records, I think potentially prolongs this because they're going to come back to the Court and say "well, we heard this, and now we need some other information, and we want to take the deposition again to follow-up on these documents that we now have."

I want to avoid that. So what do you propose that would allow them to have sufficient information to ask the questions that they need to ask about his finances at the time, and what motivations he may have had, but not so much that it compromises his privacy interests unnecessarily, I should say? Because anything -- I understand anything would obviously impact his privacy interests, but I'm trying to narrow it.

So what's your proposal?

MR. YOUNG: Understood, Your Honor. And I don't know that I have a specific proposal. Certainly we're willing to speak again with Ms. Goldman and consider what they feel they really need.

You know, our position is, again, without retreading things too much, is that, you know, in every breach of contract case at some level, you know, the -- at

some level of generality that the parties' relative financial positions is relevant to their decisions that they make with respect to --

THE COURT:  But this isn't just a breach of contract with respect to two parties, and, you know, a contract that's sort of separate from the parties' personal finances.

As I remember this, and correct me if I'm wrong, but wasn't there some sort of personal guarantee by your client here?  And isn't that why his personal finances are at issue?

MR. YOUNG:  The allegations are about a series of text messages that occurred in 2019 that the Plaintiffs allege are sufficient to essentially prove the existence of a contract.

And all of that is subject to a pending motion to dismiss that, you know, we're still waiting on.  I realize that doesn't, you know, stop discovery.

But the point -- those text messages, where the Defendant and the Plaintiff are talking about the stock, are the basis for the contract in which they allege that Mr. Souki said that he would somehow guarantee or make Mr. Parker good on his investment, and to lure him in.

Now, the details are a little bit vague about that, and that's sort of what's in the subject to the motion

to dismiss.

But, yes, I mean, it is a dispute about whether or not there was a guarantee made. You know, --

THE COURT: A personal guarantee, right? He was personally -- I mean, again, and I'm not trying to suggest here that I've made up my mind on the merits or that I have some, you know, sense of what the motion -- how the motion should turn out. In fact, I don't even know if that motion is before me or if it's before the Presiding Judge. I suspect it's before the Presiding Judge.

But my point is: That at issue, at least in the allegations and on the face of the complaint, is the alleged personal guarantee made by your client. Is that not right?

MR. YOUNG: That's correct.

THE COURT: Okay.

MR. YOUNG: And maybe with that in mind, I mean, it doesn't have to be a single request for admission. I mean, we would be open to request for admission about, you know, for instance, the month in which the guarantee was allegedly made or the month in which the second guarantee was allegedly made, and in the months in which those guarantees came due.

You know, I mean, if -- and I understand that it is -- would require, you know, multiple requests for admission, but that's something we'd be willing to look at.

The point is that we've not seen any request for admission or had the opportunity to go down that path at all.

THE COURT: Ms. Goldman?

MS. GOLDMAN: I really previewed exactly what we were thinking about with the request for admission, and I think Your Honor has already seen that it just involves so much wiggle room in terms of a potential response for a "yes" or a "no." Even in a series or sub-parts, you know, "admit that this month you had this much money," "admit this month you had this many properties."

Again, we don't know how many properties. What are you going to say? "Between zero and five." You know, I mean, "admit you had this property valuing at least this much money." I mean, it's very difficult to craft RFAs without the underlying facts.

So we are happy to work with the Defendant to craft RFAs, but we have really no records in this case.

And I will address just the deposition point really quickly. I can barely remember what I had in my bank account a month ago. So to know what you had, you know, for Mr. Souki to be able to know exactly what his finances were years ago at various points in time is just -- without any documents in front of him, is not -- I don't think very realistic.

So that's our main concern about asking deposition

questions, especially on follow-ons to RFAs that are just probably going to say "yes" or "no" to something.

THE COURT: Okay. All right. Well, I am inclined to grant a motion to compel some documents, but I'm not inclined to grant it as it is stated in your request for production currently, Ms. Goldman.

And so here's what I'll ask the parties to do: Confer. And, Mr. Young, see what you can agree to.

Ms. Goldman, I will caution you that although I'm inclined to grant something, I am concerned about privacy interests here, and I don't think you're entitled to, for example, dig into family trust information, and have this full blown picture of who he is financially at any given point in time.

So you should be thoughtful about how you narrow your requests.

Mr. Young, to the extent you can't agree on something, I am going to -- but the next time that we meet, I am going to grant whatever Ms. Goldman proposes. So you should come up with a proposal that makes sense.

If the parties can't come to agreement, then obviously we'll have to have another conference.

So, confer. See if you can come up with some agreement. Submit another report just on this issue, because I'm hoping we can resolve the third one here. Just on this

issue by November 14th, which is next Monday.

And I'm going to set a status conference again on November 15th the following day.

(Court confers with Court Clerk)

THE COURT: At 10:00 a.m.

(Pause)

THE COURT: Do you have questions about that?

MR. YOUNG: Just -- go ahead.

MS. GOLDMAN: You can go, Mr. Young. It's okay.

MR. YOUNG: I mean, just to get some preposition. We're certainly happy to work with Ms. Goldman, and I understand Your Honor's position. What they've requested is, you know, is largely in this report. And I'm sure that they'll confer in good faith and make that a little bit more narrow.

But I still -- we've not seen -- we haven't gone down the request for admissions road at all. And I think that, you know, we have a damages figure alleged in this case. We know how much money is at stake. It's not a shot in the dark in the sense of like what -- how much money would be needed to have satisfied this judgment. It's what they've alleged.

And so I guess I -- my concern is that based on the guidance that you've just given us, that we're not going to progress down the RFA road at all, and that this is just

going to inevitably lead to an impasse where Ms. Goldman is requesting documents that we believe could be, you know, just as efficiently and better handled through a request for admission that would protect Mr. Souki's privacy.

THE COURT: So I would like to not take RFAs off the table, so I'm glad you raised that, Mr. Young.

Ms. Goldman, I'm hoping you can come up with some agreement that allows you to serve some, you know, limited set of RFAs on this topic, and then potentially some documents that supplement that RFA, so that when you are asking the deposition questions you have a little more sense for what you're asking.

I'm asking the parties to work creatively to get to a better place here. And I do think that some combination of RFAs, documents, and deposition testimony, is the right approach.

So, Ms. Goldman, to be clear, Mr. Young suggested that you would potentially narrow your requests slightly. I expect you to narrow your requests significantly.

And I would like you to think hard about how you can do -- you know, it can be some combination of RFAs, deposition testimony, and limited documents.

I am concerned about the privacy interests here. I do take note of Mr. Young's point that there is a motion to dismiss pending. And this is a lot of discovery to ask for

when that hasn't been resolved yet, so just keep that in mind as you confer.

But, Mr. Young, I am convinced by Ms. Goldman's argument that an RFA is probably not enough here. So while we don't need to take that off the table, that's just not going to be enough. You'll need to confer with her in good faith on what documents you can produce that would make sense in this case.

MR. YOUNG: Understood, Your Honor.

THE COURT: Okay.

MS. GOLDMAN: And understood, Your Honor, as well. My only clarifying question is about the trust documents. And this also goes maybe to the next -- it might overlap a little bit.

The trust is only relevant from our perspective because it does contain Tellurian shares, or at least as far as we know from publicly available information. Mr. Souki was a beneficiary of the trust. He had a lot of shares of Tellurian stock in the trust.

So to the extent that trust documents -- I just wanted to clarify that trust documents could be relevant and responsive to not just these RFPs, but to number 18, which is in category number 2, which I think you're going to turn to next.

So I just wanted to clarify that that's what we

were looking with the trust documents.

THE COURT: Okay. So this family trust that Defendants have referenced is not really of -- there's at least some mix in there, personal and also related to the company at issue. Is that right?

MS. GOLDMAN: I mean, I can let Mr. Young answer. As far as I know, publicly available records show that he had a lot of Tellurian stock tied up within his trust.

THE COURT: Okay.

MR. YOUNG: So, Your Honor, I can't give you all of the details. I know that the trust -- there have been shares of Tellurian held within the trust. I don't know that Mr. Souki was the trustee of that trust, you know, throughout this time period, or, you know, at particular points during the time period.

But I think that this issue sort of raises a larger issue. The issues we have been talking about, 19 and 20, which are the liquidity and the net worth, with some of the other issues that are the ones that I think are in the second bucket, or the next things we were about to move on to, which is Mr. Souki's personal loan and the details of the trust.

From Mr. Souki's perspective, the details regarding his personal loan and the details regarding his family's trust are really in sort of the same ballpark as his

net worth and his liquidity. This is his personal private financial information that, you know, to the extent it is relevant to the case, it -- we feel that seeking it in the manner that Plaintiffs are seeking it is disproportional to the needs of the case, you know, particularly given our view that it's relevance is limited, you know, based on what you said at the last status conference.

And so I think that we -- we don't see this as entirely divorced from the discussion that we just had, but potentially RFAs or other means of getting at whatever, you know, limited things that Ms. Goldman might need, together with the -- you know, with the understanding that a lot of this information is already public, right, and that's why Ms. Goldman knows about it at all, is because when the trust did sell shares of Tellurian, that was something that was disclosed publicly.

And so I guess I just wanted to flag that, if we're moving on to the next request.

THE COURT: Okay. Well, let me just be really clear about the relevance piece.

I do believe that his personal -- or his ability to satisfy the alleged guarantee that he made is relevant to this case.

What I am trying to manage here is proportionality, and so as I'm asking you all to confer and

work through all of this, and as I'm making decisions on each of these issues, I just want to be very clear on where my head is.

The information is relevant, but I understand that there are privacy interests implicated. And, honestly, probably not even rise to privacy interests, particularly, as you mentioned, some of this stuff is publicly available. But at least privacy concerns.

And that, to me, is managed under the Court's discretion to ensure that discovery is proportional to the case.

So, Mr. Young, I say that because I think it's important for you as you're tailoring your arguments to understand that I'm not needing to be persuaded on relevance any more. We're sort of past that. It's really about proportionality here.

MR. YOUNG: Understood, Your Honor. And I suppose the only reason I mentioned relevance at all is my view of proportionality, I suppose, is affected by how relevant something is.

THE COURT: Sure, I understand.

MR. YOUNG: And so if the relevance is really hot, then perhaps, you know, that would merit an even greater proportion of discovery. And so that's the only reason I raised it.

THE COURT: I appreciate that.

MR. YOUNG: Certainly not to -- you know, to go against anything that you said in the last hearing, or today.

But our view is that all of this -- these issues in particular, right, his net worth, his liquidity, the details of his family trust, and the details of his personal loan arrangement, are all highly sensitive personal financial information that deserve, you know, some degree of protection, right.

And then even, you know, with what you've said about relevance, I think that to just get all documents and communications about those things is disproportionate to the needs of the case, you know, particularly given the pending motion to dismiss and the dispute about whether or not there was ever an agreement in the first place.

THE COURT: Right. Well, let me make two points in response to that.

One: Although I am sensitive to the fact that there is a motion to dismiss pending, discovery is not stayed in this case. And so I do need to move it forward in a way that allows the case to move forward.

Two: While I understand that there is personal information, and obviously you can hear the Court struggling in not granting Ms. Goldman free reign on all of this, it's really going to be incumbent upon you to come up with some

agreement with Ms. Goldman as to how you can protect that, because otherwise the Court is going to have to order discovery in a way that's probably more fulsome than you might want.

I have already determined that this type of information is relevant, in light of the alleged personal guarantee. And so what I'm trying to get you to do is -- I know you can't do it on the spot, which is why I'm asking you all to meet and confer some more and then provide a status report later, I think you're in the better position to determine how to best protect his sensitive information while still complying with the Court's direction here that this information is relevant.

Does that make sense?

MR. YOUNG: Absolutely, Your Honor. And I think, I mean, we've made some reference in our joint submission to submitting additional briefing, and certainly we don't want to prolong this or drag it out any more than we need to.

But the point of that additional briefing would be to sort of lay out the background details of why we believe the loan and the trust are, you know, -- sorry.

THE COURT: I hear you. Let's go to that one now before you get too far down that road, because I did see that you requested leave to file a motion -- or to respond, I guess, to a motion to compel that Ms. Goldman would file.

MR. YOUNG: Protective order.

THE COURT: But before we move on to that one -- for a protective order. Sure.

But before we move on to that one, I just want to make sure that we're all squared away on that third dispute related to RFP 19 and 20.

Do you all understand what the Court's direction is with respect to those?

MS. GOLDMAN: Yes, Your Honor.

MR. YOUNG: I believe so, Your Honor. Yes.

THE COURT: Do you believe so, Mr. Young, or do you know? I just want to make sure, because things get muddy really quickly.

MR. YOUNG: We're good at taking depositions once upon a time. Yes, I understand the Court's direction, and we will meet and confer to see if we can come to an arrangement.

THE COURT: Okay. All right. So with respect to that second category, RFPs number 3, 7, 9, and 18.

Ms. Goldman, can you just quickly summarize for me what's at issue there, why you think it's relevant, and why you need it?

MS. GOLDMAN: Sure. Your Honor, you actually touched on something when you were talking about the trust, that some of this information is already public. And it's almost like a teaser, like "you get to know this minimal

amount."

But now the trust of the Tellurian securities is at issue in our case, and it was personally guaranteed by the Defendant.

So all of his transactions and his --

[audio difficulties]

MS. GOLDMAN: -- of Tellurian are all relevant, as you've already recognized, and proportional to the needs of the Plaintiff to understand what were the Defendant's motives at various points in time, why was he selling the shares at certain points of time, the details of the loans and the pledges that are all -- the security for those loans is Tellurian shares.

So we need to know when -- what else is the loan package for that real estate, because it would make it that he would be, you know, able to perform the agreement, more likely to enter the agreement, if he's trying to keep Tellurian shares at a higher price and prevent our client from -- our clients from selling their shares.

So all of it is packaged together. Really all of them are very inter-related in that way, because the Defendant's trust held some of these Tellurian shares. It also held some of the shares tied up in the pledges for real estate transactions.

And in our search terms, we did try to stay as

narrow as we could, that the only hit -- we only hit on emails talking about these things in the context of Tellurian. And so that term --

[audio difficulties]

MS. GOLDMAN: -- just off the cuff if they don't mention Tellurian, then a lot of times we wouldn't even get those hits in the emails.

So, you know, I think that gives a broad overview of what we're looking for, and still willing to, you know, work on search terms. I put in our papers that the Defendant didn't counter-propose terms or give of hit reports.

And that's where I think burden and proportionality, you know, become very obvious if they've got, you know, all these missed hits or a ton of email that they have to go through that are not responsive at all.

So, you know, that's where I think we've kind of left the negotiations, just kind of stuck there.

THE COURT: Okay. If I'm understanding your position correctly, Ms. Goldman, you're arguing that this is all relevant for the same reason that his personal finances are -- or I guess that's too broadly stated.

The documents that are the subject of requests 19 and 20 are relevant, and that is because it goes to his motivations, it goes to his ability to satisfy the guarantee, and it goes to the circumstances surrounding the alleged

promise he made.

Is that right?

MS. GOLDMAN: Yes, Your Honor.

THE COURT: Okay. So, Mr. Young, I mean, you've already heard my thoughts with respect to the relevance of the other category, and it seems that this category is pretty similar.

And as I recall, when we were having a conference last time, the idea was that this information, or at least my idea, was that this information was relevant, but that the only thing that needed to happen was that the Plaintiff needed to really narrow their requests.

And my thought was that the best way to do that was through search terms.

So I see that that's happened. These search terms have happened. Are you taking issue with the breadth of it, or are you taking issue with sort of the root question around relevance?

MR. YOUNG: So, Your Honor, it's a little bit of both.

THE COURT: Okay.

MR. YOUNG: And let me explain that answer. The first is that Ms. Goldman said that she's only asking for these things in the context of Tellurian.

Well, I think what she means is that she's

including Tellurian as a limit, or as a search term, right? So if the document doesn't say Tellurian on it, it wouldn't show up.

Well, the problem is that, you know, clearly all of the documents within Mr. Souki's possession about the family trust and about his personal loan at least have the word Tellurian in them, right? And so if that's the limiter, then you're still going to get all of the information about his personal loan and all of the information about his family's trust, which we think implicates the same sort of privacy concerns that we were discussing when we were talking about the previous set of documents.

And I think that --

THE COURT: Well, let me make sure I understand that, at least with respect to the trust.

Are you suggesting that the only thing the trust holds in it is Tellurian stock? Is that -- I mean, you're saying if everything that has the word Tellurian is going to implicate everything related to his trust, does the trust exist solely for the purpose of holding Tellurian stock?

MR. YOUNG: No. That isn't what I was trying to say.

THE COURT: Okay.

MR. YOUNG: I'm sorry if that's the way it came across.

THE COURT: Okay.

MR. YOUNG: But the point is that the word Tellurian, as you can imagine, is used quite frequently in most of Mr. Souki's documents. And so I think that certainly with respect to the loans, to the extent it is, you know, collateralized or uses anything of Tellurian in it, all of the documents will have the name Tellurian in it.

And with respect to the family trust, I think the word Tellurian appears, you know, at least with respect to its holdings of Tellurian stock.

And I think what you've zeroed in on with Ms. Goldman before was key, and that is the reason that they want this discovery is the same reason that they wanted discovery into his personal finances with respect to net worth and liquidity. It's whether or not you have the ability to pay, and whether or not he could satisfy the guarantee that they allege that he made.

And we maintain that that can be done in a way that's much more proportional to the needs of this particular case.

And I guess with respect to two of the requests in particular, 7 and 9, you know, they're talking about one sale of Tellurian stock that occurred by the trust in March of 2020.

Well, March of 2020 isn't near in time to either

of the alleged agreements. The first was in August of 2019, and the second was in February of 2021.

So just as a matter of like when this occurred, it really wouldn't be relevant to whether the formation of any alleged agreement in this case.

And, moreover, Charif, like I said earlier, Mr. Souki, hasn't been a trustee of the family trust in quite some time.

And we would be happy to provide some limited briefing on this point, you know, that we could just use publicly available information to explain the relationship of the trust and, you know, and the loan to his personal finances.

But we don't see these categories as any different from the categories that are asking about his net worth and his liquidity. It's just another way of getting at whether or not he had the ability to pay.

And our position is that that can be handled as part of the discussion that we've already agreed to have with -- you know, with the discussion that we just concluded.

THE COURT: Okay. Well, I'm a little confused about your statement that this is essentially the same -- getting at the same information as the other two categories, because I've already decided that that's relevant.

And so it seems to me that you're implicitly

conceding that this is relevant, too, based on what I've already said about the category of information.

But I think what I'm hearing you say is that it wouldn't be relevant to the extent that there's information in there that doesn't concern at least the timing of this transaction, and information in there that could potentially relate to other Tellurian -- I'm confused about -- I'm stuck on one thing, which is you said the Tellurian identifier is going to essentially call up everything, but previously you're telling me that a lot of this is personal information.

I'm just confused. Is this more personal information, or is this all related to Tellurian?

And so my concern around personal finances and personal information isn't really a concern at all. I'm struggling a little bit. I feel like you're kind of unwinding some of what I was already thinking about the privacy interests, and implicitly conceding the relevance.

MR. YOUNG: That isn't my intention, Your Honor.

THE COURT: Okay.

MR. YOUNG: The point is that -- the Tellurian point was just that if Tellurian -- if what Mrs. Goldman was referring to as using Tellurian as a search term, and that word appears in documents in Mr. Souki's possession, then it will call up a large number of documents, including documents that are very personal.

And it wasn't my intention to suggest that those documents were not personal at all. In fact, his loan is a personal loan, and is not, you know, related to the business at all. And it implicates -- and for that reason, I think it implicates all of the same concerns with the categories that we were just discussing.

THE COURT: Well, so what I'm hearing is that Mr. Souki, then, was very personally involved in all things Tellurian. I mean, that's what I'm -- what I'm gathering from what you're saying is that Tellurian and Mr. Souki are essentially interchangeable in some respects, which, again, for me, gives me pause about being too concerned about personal and privacy interests.

It seems to me that, for better or for worse, Mr. Souki and Tellurian are essentially sort of one in the same.

Mr. McConn?

MR. MCCONN: Your Honor, if I may?

THE COURT: Sure.

MR. MCCONN: Yes, thank you. Tim McConn on behalf of the Defendant.

I do want to jump in here to just add some clarification, and maybe kind of reset things a little bit to help the Court understand. I know there's a lot of information, and we appreciate your time gong through all of this.

THE COURT: Okay.

MR. MCCONN: If I may. Tellurian is a publicly traded company based here in Houston. It's got, I don't know, hundreds if not thousands of employees.

Mr. Souki was one of the co-founders of the company. He is now the executive chairman of the company. So that's his role with the company. He has not been the executive chairman the entire time. I think he was chairman of the board at first. And that was his position with the company at the time of the events that we're talking about here.

THE COURT: Chairman? Chairman of the board was his position?

MR. MCCONN: Correct.

THE COURT: Okay.

MR. MCCONN: Chairman of the board.

THE COURT: Okay.

MR. MCCONN: And now is executive chairman. But at all times, he's been a public figure associated with the company, just given his stature within the industry.

THE COURT: Okay.

MR. MCCONN: And his network of contacts within the investment community.

So he has been out there working on behalf of the company, but they are two very different things. I mean, he

has a role with the company, a very significant role at that, but he is not one in the same with the company. So I wanted to make that point.

The second point is that Mr. Souki, because he is affiliated with the company, he's an insider, his stock trades, his trades of Tellurian stock, whether these are bought or sold or been given options to buy or sell Tellurian stock, that's all a matter of public record.

The company, because it's a publicly traded company, is compelled under SEC Regulations and Rules to disclose that information at or right around the time of those transactions.

And so every time Mr. Souki has bought or sold or acquired Tellurian stock, --

THE COURT: Sure.

MR. MCCONN: -- that has been disclosed by the company.

THE COURT: Sure.

MR. MCCONN: Not just the fact that he did it, but the amount at which -- the amount -- the quantity of stock, the amount that he paid, or I guess received, that's all a matter of public record.

This trust, and I'm sorry for the long and winding answer here, but the point is that he also has a family trust. And I will confess, I don't know many of the details

of the trust. It is a very private entity. And he is certainly, or has been, affiliated with it over the years. But it is a trust that is set up, as I appreciate it, for the benefit of his family, and particularly his children.

THE COURT: Okay.

MR. MCCONN: But back in 2020, so in early 2020, and this is just to kind of give you a time line here, August of 2019 is when the Plaintiffs allege the first agreement was made. Obviously we dispute that, but that's the date. August of 2019.

The second agreement allegedly was made in February of 2021. So those are the guardrails I'm working with here.

In the middle of that, so not at the time of either of those, but some time in between, in late February of 2020, there was a crash in the stock price of Tellurian. It went down hard and fast.

At the time that that happened, and, again, this is at a very limited moment in time, but right when that happened, the -- Tellurian, the company, disclosed that the family trust, not Mr. Souki, but the family trust had been forced to sell off -- I don't know what the quantity was, but it was a lot of the shares of Tellurian that were in the trust.

So, not shares owned by Mr. Souki personally.

Shares that had been acquired --

THE COURT: Yes.

MR. MCCONN: -- somehow by the trust. And it was those shares -- and, again, this is public information. It is those shares that had been used as, or pledged, as collateral against the loan.

And because the price went down, there was a margin call. Again, I think this is all based on public information. There was a margin call that required the trust, not Mr. Souki, but the trust, to sell off that stock.

Mr. Souki -- I think this is right. If I'm wrong, I will correct this for the Court, but my understanding is Mr. Souki has never sold a share of Tellurian stock. He has acquired stock over the years, and he's acquired options. He's been granted options over the years. But there is not a single public disclosure of a single sale of Tellurian stock by Mr. Souki.

And the only reason that the sales by the trust, the family trust that his kids are the trustees of, the only reason that those sales were disclosed by Tellurian in February of 2020 was because at that time Mr. Souki was also a trustee of the trust. Therefore, under SEC Rules, Tellurian was forced to disclose that, as well.

THE COURT: Okay.

MR. MCCONN: He is no longer a trustee of the

trust. He has no control over the trust, and hasn't for some time. And, again, I think that's a matter of public record.

But my point giving you kind of this factual recitation, I'm sorry it took so long, is that I wanted you to understand that this is not a matter of Mr. Souki telling them he's not going to sell, and the he hauls off and sells it. That's never happened.

And this trust, which is set up for the benefit of his family, they did sell at one time - one time - it was a series of trades or sells in a very limited period of days, and that was only because of this call on the loan, or the stock, and that's it.

And so this idea that somehow -- and, look, we respect the Court's guidance with respect to relevance. We truly do. But when it comes to this trust and what resides within it, and what it did in February or March of 2020, we do believe that has no relevance with respect to whether he was motivated to enter into an agreement in August of 2019, several months before, or whether he was motivated somehow to enter into an agreement nearly a year later in February of 2021.

We see no connection between this trust and those two events. And, again, I respect the Court's guidance. But that is why we're still talking about relevance.

But even if we're here to talk about

proportionality, even if the Court gets over this relevance hump, which we hope to kind of get you back over on the other side of, but even if we can't, with respect to proportionality, I mean, if they want information with respect to what the trust did with respect to that one series of trades in February or March of 2020, again, that is a matter of public record. That information is out there.

And so why they need to dig down into what the trust has by way of assets, what the trust may have done with respect to other investments, or anything else that they're seeking, that is absolutely not proportional to the needs of this case.

THE COURT: Okay. That's very helpful. I appreciate you walking through that. That's actually very helpful as I think through all of this.

I have some follow-up questions.

When the trust -- well, first of all, does that trust, does that family trust, hold more than just Tellurian stock? Are there other -- is there other stock? Are there other investments held by that trust?

MR. MCCONN: I honestly don't know, Your Honor. I suspect that there are other investments in there, but I don't know that for a fact, and I wouldn't have any details for you.

THE COURT: Okay. And at the time the Tellurian

stock was sold from the trust, did you say that Mr. Souki was the trustee? And if he was, was he making those decisions?

MR. MCCONN: He was at least a trustee. I don't know if he was the trustee at that time, but he was a trustee, which is why the trust sales were -- had to be disclosed by Tellurian, given his relationship with Tellurian.

Whether he -- I don't believe he would have been the one making the decisions. I think -- I don't know there was a decision to be made. I think that whoever handled the loan that called on that stock to be sold was forced -- excuse me, they forced the sale.

And I think that's, again, a matter of public record, that this was a forced sale.

THE COURT: Okay.

MR. MCCONN: So, I mean, there's no decision --

THE COURT: What's this loan -- tell me a little bit about the loan that's at issue here.

MR. MCCONN: Yes, ma'am. And, again, I don't know all of the details because it's a very personal financial vehicle for Mr. Souki.

But as I understand it, and I hate to keep saying this, but this is also a matter of public record, he has a loan, a very significant loan, personally, that was guaranteed with -- guaranteed by, at least in part, with some

of the stock that he owns. And I think the trust guaranteed the loan, as well.

And so that's why when the stock price crashed in February of 2020, the first stock that they went after -- the bank, the lender went after, was the stock of the trust. And it was a forced sale of that trust stock.

THE COURT: Okay.

MR. MCCONN: I hope that makes sense.

THE COURT: It does. Okay, Ms. Goldman, I can -- that was very helpful. I feel like I have a little better context.

So can you just go back to your explanation as to what you're looking for with these search terms? I have the search terms in front of me. I understand what you would like them to query for. But what are you trying to get out of it? What are you trying to get that isn't already publicly available? You know the time that he sold -- you know, that this trust sold this stock. You know the value of that. I mean, you have a lot of information just based on what had to be disclosed pursuant to SEC Guidelines.

So what more do you need beyond that?

MS. GOLDMAN: I think what is important to point out is that these -- this was just one disclosure, the RFP is asking about something that was disclosed in March of 2020.

But the loan itself was disclosed also back in

their proxy statement in April of 2019. And it's not just a Souki Family Trust that holds the shares of Tellurian and has a pledge. Mr. Souki had pledged 25 million shares for himself of common stock related to loans.

And so all we know is that bit of information. We don't know when those loans were entered into, if they would have motivated the Defendant into entering into the first agreement in April of 2019.

I understand the Defendant is focused on this March of 2020 time frame, but there's reference to these loans in previous time periods.

We also think March of 2020 is relevant because everything that happened between then and February of 2021 would go to his intent to enter into the February 2021 agreement.

I will also note that they have requested very similar information from our client. And the Plaintiff has a trust, Plaintiff Parker. He has produced documents that show his holdings in the trust of Tellurian. We did meet and confer with the Defendant about this, and did narrow it to just a set of documents that show how Tellurian shares are held in his trust.

That is what we are asking for from the Defendant. And we're a private person. I mean, the fact that this whole conversation was about, you know, the intertwining of, you

know, Tellurian and Mr. Souki, and all of this stuff that's publicly available, you know, I think Your Honor has already seen it kind of tucked against the privacy interests of it, and the fact that every search term hit might hit on Tellurian shows that they might all be responsive.

And we went through the same thing in looking for Plaintiff's, you know, documents, to show his holdings of Tellurian in his trust that are relevant to this case. I think we talked about this in our last hearing that, you know, each side kind of has something similar going on, then they should be, you know, they should have to produce the same sorts of documents.

So, again, we'd be willing to work with the Defendant, but they keep going back to these relevance arguments. I think this is a red herring that it's March of 2020, because that's not really the time frame that is relevant. It's just one place where it was disclosed.

And we've actually served a supplemental RFP to make it very clear that we are looking at each time that they have mentioned in a filing these loans that are secured by Tellurian shares.

THE COURT: Okay. Mr. Young -- oh, go ahead, Mr. McConn.

MR. MCCONN: I'm sorry, I didn't mean to interrupt, Your Honor.

THE COURT: No, go ahead.

MR. MCCONN: Okay, thank you. Just a couple of points.

On this idea that I guess they're kind of saying what's good for the goose is good for the gander.

We absolutely did serve a request for production on them related to Mr. Parker's trust, because in the lawsuit that they filed, they claimed publicly that the Christopher Parker Irrevocable Trust was the owner of Red Mango Enterprises, which is the Plaintiff.

And we've actually since learned -- I don't think it was in the pleadings, but we've since learned through discovery that at some point early in this process the Red Mango Plaintiff in this case actually transferred its Tellurian shares to this Christopher Parker Irrevocable Trust, so the same shares that they're asking for damages on.

So, yeah, absolutely we have served discovery on the Plaintiff, who is seeking damages, so we can figure out when they bought the shares at issue, where those shares are, if they have since been sold. There's a whole lot of reasons why the Defendant would ask the Plaintiff for that stuff, which has nothing to do with why the Plaintiff would ask the Defendant. It's sort of the other way around, but I think you understand the point.

The second point I wanted to make in response to

what Ms. Goldman said was -- in fact, I think she kind of proved the point for us. She said "well, this loan was disclosed all the way back in April of 2019." Exactly.

I mean, it has been disclosed at all points along the way. Because Mr. Souki was an insider of Tellurian, Tellurian had to disclose the existence of that loan, and had to disclose publicly for all the world to see that that loan contained a pledge of all of Mr. Souki's shares of Tellurian stock. So that's all out there.

So by the time that this alleged agreement was entered into in August of 2019, based on what Ms. Goldman just said, this information was publicly available about the loan, about its existence, about the fact that Tellurian shares were pledged as collateral under the loan. That's all out there. They know that.

And so anything more about the loan would be -- just like with his liquidity and his net worth, it's getting into his personal financial information to get at more details that they've already proven kind of the general point of those details by somehow reinforce or prove. They know all of the information.

And this idea that, well, because the loan is disclosed publicly, that somehow tucks against the privacy interests, is just simply not true. There is nothing in the public record about who the loan is with. There is nothing

in the public record about some of those people who are involved. But there is very private information in there.

But what they need, and what is I guess important to this motivation or ability to pay argument, or theory that they have of the case, that information is public. And so there's no further reason to dig into the private personal sets of information to get what they already have.

THE COURT: Ms. Goldman, what are the claims in this case? What are you -- what are the actual counts? Breach of contract, what else?

MS. GOLDMAN: Promissory estoppel, fraud, fraudulent inducement, which I think is the one that we have to keep reminding -- has different relevancy to it.

THE COURT: Right.

MS. GOLDMAN: And unjust enrichment, as well.

THE COURT: Right. So, Mr. McConn, I thought you had a -- my assumption was that you had a fraudulent inducement in there, which is why I do think that, you know, his personal finances potentially are relevant here.

And what I'm wanting to do is make sure that the Plaintiff gets enough information that, you know, she's -- or they are able to put together whatever case they need to put together without overly compromising personal interests.

So that's -- and we've already treaded that ground. I'm not going to retread that.

With respect to the loan, the reason I view that as relevant, and the information with respect to the loan, the selling of stock, potentially the trust, as well, that, to me, goes to the motivations around Tellurian, right?

So that's sort of separate from Mr. Souki and all about what was happening with Tellurian at the time, and whether Mr. Souki, or anybody else, might have been potentially feeling pressure to do whatever they could to keep those stock prices up.

And so for different reasons, I find this information also relevant. I think to different claims and to different issues, but nevertheless relevant.

MR. MCCONN: Understood, Your Honor. And, you know, while we may respectfully disagree about the relevancy, I think the point here is that even if we concede that it's relevant, the information that they need is already out there.

The fact that they might get more, and stuff that is actually very personal and sensitive, is really, I guess, the issue that we're talking about now.

I mean, what they need is: Did Mr. Souki have a loan that may cause him to want to -- that may keep him from being able to pay off this loan -- this guarantee to the Plaintiff that's alleged here? Did he have that loan? Yes. I mean, it's publicly disclosed that he had this loan.

Did he sell stock, or did the trust sell stock, at a time when he was representing that he wouldn't sell stock? That information is out there. It's publicly disclosed.

THE COURT: Yeah. No, I tend to agree with you. So let me hear from Ms. Goldman on that.

Ms. Goldman, I think I've asked you now a couple of times what exactly you need this information for, and I just -- I don't know that I've heard it.

I'm over the relevancy hump. I agree both of these categories are relevant, and I do believe that you're entitled to information concerning these topics.

What I am not hearing from you is: What more do you need? What is it that you're trying to get at with these search terms that you don't already have from what's publicly available?

MS. GOLDMAN: Sure. So, with regard to especially requests 3, 7, and 9, the trust almost is a little bit separate.

But I think what's missing is that while the facts of the loan we may know, while the fact of the sale we may know, we don't know the communications he's having with his bankers or his advisors that he's talking about why he's doing these things.

We don't have information, as Mr. McConn said, about, you know, who issued the loans? We might need to ask

them some questions in discovery.

We don't know what types of real estate are tied up in this discovery.

We don't know the value or the total pledge. We know 20-some million shares of Tellurian are part of a collateral package. It's not defined in the SEC filings.

There's just a lot more information. Again, it's hard as the Plaintiff. We don't know what's there.

But the fact of it allowed us to create a theory of our case, and that is how we, you know, we'll survive a motion to dismiss. But now we're entitled to get discovery on those pieces of facts that were public so that we can understand the underlying, you know, reasons and motivations that the Defendant may have had to do certain things.

THE COURT: All right. I appreciate that. That's helpful.

MS. GOLDMAN: Thank you.

THE COURT: And I will tell you, Mr. McConn and Mr. Young, that, to me, doesn't seem disproportionate as long as you're using search terms that are really targeted and aren't catching information beyond that.

But communications about the loan, particularly communications about the loan, seem reasonable and proportionate to this case.

And I think it's particularly proportionate and

reasonable and relevant here because there's obviously a dispute as to whether an agreement even occurred. And so the motivations of the parties seem to be particularly relevant when you're disputing whether or not there was a meeting of the minds on a particular agreement.

And so I do find that that's relevant.

I can't tell from what's been submitted to the Court as to whether the specific search terms are appropriate under the circumstances. And so, Mr. McConn and Mr. Young, I'm going to ask you whether you would like some additional time to confer with opposing counsel about those search terms.

But you can tell where I'm going here. The topic is relevant. I just want to make sure that it's not disproportionate based on the search terms that you use.

MR. MCCONN: Thank you, Your Honor. And, yes, I mean, we would like time to confer.

And I guess a couple of points:

One is -- maybe questions. But one is, we're talking about search terms, and we're happy to talk with Ms. Goldman about search terms.

I would think that another factor or component of that conversation would absolutely need to be the time period, because if Your Honor has identified the reasons that this information might be relevant as his motivation for

entering into the contracts, well, the contracts were entered into in two very specific moments in time.

And so it would seem to me, at least, that it makes sense, talking about the proportionality and needs of the case, that this discovery would be limited to very specific moments in time as it relates to the loan and how it may or may not have impacted his decision to enter into these alleged agreements. I guess that's point one.

Point two is that -- and, again, I don't mean to retread the relevancy grounds too much either, but I guess I would also -- I guess it would be helpful to have guidance from the Court on this as we prep for the meet and confer process.

Ms. Goldman said two or three things that they said that they need as it relates to this kind of category of information. One was communications with lenders about why he's doing these things.

I don't know what "these things" are that they think they need communications about.

But if the loan was entered into well before, and I believe it was, well before this first alleged agreement in August of 2019, I mean, I'm not sure, and I really have no sense from the Court, and I don't mean that disrespectfully, I just -- I don't understand at this point what it would be with respect to the loan that was formed some time many

months before, I believe, that would somehow be relevant to whether or not he was motivated in August of 2019 to enter into an alleged agreement.

And, by the way, I don't mean to press the motion to dismiss too much here, but one key point of our motion to dismiss that's currently pending before the District Court is that you don't need any external documentation or evidence to determine whether or not a contract was formed here.

There are text messages that are in their pleadings that serve as -- that's either the agreement, or there's not an agreement.

And so this idea that we need to decide what emails and text messages to see if the parties entered into an agreement in August of 2019, the fact of the matter is their own pleadings have put the text messages into the record and into the pleadings, and they have said "this is the agreement."

And so it's going to be up to the District Court, I think, to decide whether or not that series of text messages, as a matter of law, constitute the binding and enforceable agreement.

And so, again, this kind of goes to the proportionality of the discovery. Why are we digging into all of this -- these details about loans that happened many months before if at the end of the day all we're looking at

is a series of text messages to decide whether or not that constitutes an agreement.

But even if they are somehow relevant on that point, it would seem to me that there has to be some very strict limitation on what exactly it is and when exactly it is that we would look for as it relates to that loan and Mr. Souki's alleged motivation to enter into an agreement over these text messages with Mr. Parker.

THE COURT: So, a couple of things come to mind.

One is: Have the parties filed a motion to stay discovery in this case?

MR. MCCONN: No, Your Honor. We have not. We would be very much open to doing that. Maybe it's my fault. I was under the understanding that in the District of Colorado that discovery just would move forward.

THE COURT: It typically does. And I -- frankly, it sort of depends on each of the Magistrate Judges. I'm typically somebody who does not stay discovery while a motion to dismiss is pending.

But I am starting to get a little bit concerned about what rulings I'm going to make with respect to discovery, and how those rulings could be impacted depending on the motion to dismiss.

What did you argue in your motion to dismiss?

MR. MCCONN: Sure, Your Honor. It was somewhat

lengthy. I think we reached the maximum pages of 20 or 25 pages.

THE COURT: But just generally what did you say? Is it just a 12(b)(6) motion, or did you have other arguments in there?

MR. MCCONN: I believe it's a 12(b)(6) motion. It might be a Rule 9 on the fraud claim. I don't remember. But it's probably just a 12(b)(6).

But, in effect, it's arguing that with respect to both of these alleged agreements, there are statute of frauds problems.

One is because the first agreement was by this series of text messages, and we don't think it satisfies the statute of frauds.

The second, which is this February 2021 agreement, it's based on a draft agreement that they admit we never signed.

And so we think there are serious statute of frauds problems for both of those.

We also think that there is a lack of material term, certainly on the first one, because if you examine in the pleadings these text messages, there is nothing in there about key things, like the amount, the date, it wasn't signed. I've already made that point.

So there are very fundamental issues and problems

that we've raised with the Court about fraud.

THE COURT: Yes.

MR. MCCONN: And fraud, too. I mean, the fraud claims will rise and fall largely on those same arguments, because the fraud claims are fraudulent concealment -- sorry, fraud in the inducement.

So the allegation is we induced them into entering into these contracts. Well, you can't have fraud in the inducement if there's no binding enforceable agreement that the parties entered into based on that fraud.

THE COURT: Right. Right.

MR. MCCONN: So all of this is going to get argued or decided by the District Court.

THE COURT: Right. Well, and here's --

MS. GOLDMAN: Your Honor?

THE COURT: Let me just get this thought out so that you can respond to this, as well, Ms. Goldman.

MS. GOLDMAN: All right.

THE COURT: But I am going to give you an opportunity to respond, because I want to hear if there's any prejudice to your client, to the extent that I consider a potential stay here.

I am concerned that a lot of the discovery, in my mind, is relevant because there's potentially a question as to meeting of the minds.

But that will depend on how Judge Martinez views what's at issue here. Is there potentially a contract that's ambiguous? The intent of the parties is ambiguous, and there needs to be some discovery into what was meant by the text messages?

I also, as I've already expressed earlier in this conference, am concerned about potential over-broad discovery that unfairly implicates the Defendant's personal interests or privacy interests.

But, obviously I'm struggling with it, because I think generally it is relevant to the issues in this case.

And so although I am typically not inclined to stay discovery while a motion to dismiss is pending, this may be -- and I can't say for sure. I think I would have to have the parties brief this issue. This may be a case where the Court might make an exception.

So, Ms. Goldman, knowing that, knowing just my thoughts on that, go ahead and respond to Mr. McConn and to what I've just said.

MS. GOLDMAN: Sure. Thank you, Your Honor. I think that to your point about meeting of the minds and ambiguous intent, that is going to be likely an issue here.

And I don't think it matters, frankly, if the breach of contract claims survive, because the promissory estoppel claim is exactly the back stop to if a contract is

not formed.

And so we feel very confident that some promise was made here. People don't text each other and say please keep this text, I'm going to guarantee you basis between this date and this date, if they don't mean to do something.

So I think that the texts at issue are going to need more than just the words of the texts. And so I think that this discovery is critical in this case. That is why we, you know, decided to proceed.

And we certainly were not going to request a stay of discovery. I know we had a different Magistrate Judge at the start, and so I think that's maybe why none of the parties had contemplated this before.

You know, if Your Honor was inclined to go that direction, we would welcome the opportunity to think about it and confer with the other side, and either file motions on it, or not.

But I do think that the issues here are going to come down to, you know, piece of discovery. And I don't think that waiting for the motion to dismiss is necessary.

Of course, we're the Plaintiffs, we feel confident in our opposition brief. But I think part of that is because of the other claims that are here besides just pure breach of contracts.

THE COURT: Yes. I also am just thinking in terms

of fairness and prejudice to the Defendant. I mean, this is really implicating his entire personal finances.

As I said, I do believe his personal finances are at issue here, given the alleged personal guarantee. It sounds like even his family trust is intertwined with Tellurian stock, and so there's obviously that, you know, angle, as well.

And to the extent that these claims are ultimately dismissed, it seems unfair to subject him to that breadth of discovery when ultimately the claims get dismissed, if that's the route. Obviously, I have no idea how Judge Martinez will rule.

So, with that, I would like the parties to confer.

Mr. McConn and Mr. Young, I would invite you to consider a motion to stay.

And I think I'm going to hold off on any additional rulings on this until I have a chance to look at that motion to stay and get the position of Plaintiffs on that issue, because, Ms. Goldman, I do want to know whether that would prejudice your client in any way if we were to stay this, and, you know, you don't get a motion to dismiss ruling for a while, what consequences might that have for your client.

MS. GOLDMAN: I mean, I think we'll be prepared to put it better in writing when we have the opportunity. But,

you know, at first blush, our clients have, you know, entered into these agreements and have, you know, tried to collect on what they believe they're entitled to certain monies. So the longer that they're without it, then that's their main prejudice.

THE COURT: Sure.

MS. GOLDMAN: And, of course, preparing our case, and we don't know how long it will take, of course, for the Judge to rule on the motion to dismiss, and then how long it will take to get ramped back up with discovery.

You know, even though we've asked for extensions, and Your Honor has granted them, the parties have been moving forward.

And, you know, I think the main prejudice just comes from how much the Plaintiff has produced at this point. We've actually moved forward quite fulsomely and produced thousands of pages of documents, responded to interrogatories, and so I think at this point a lot of the Plaintiffs' information is out there for the Defendant to just kind of sit with, and that is probably the only thing that we would really be concerned with, as well, at this point.

THE COURT: Okay. That makes sense. Well, for that reason, I'm not going to reverse on anything I've said previously in this conference. I still expect the parties to

meet and confer and come to some agreement with respect to production related to RFP 19 and 20.

But, again, I do invite Mr. McConn and Mr. Young to file a motion to stay. And perhaps you all can come to some agreement on what might be produced before the Court rules on that motion to stay.

But I do want to think through that issue a little bit, because I am, as I said, I'm inclined to agree with Ms. Goldman. To the extent these claims survive, Mr. Souki's personal finances are at issue. All things Tellurian seem to be at issue.

And if these claims survive, I think I'm going to be less hesitant on sort of the personal and privacy interests. Again, it's a meeting of the minds issue, and he has put his personal finances at issue by allegedly making a personal guarantee.

So, I don't think I'm going to be as hesitant to order broader discovery post a decision on a motion to dismiss.

MR. MCCONN: Your Honor, we appreciate that, and respect that. And I think that actually drives home the point of why a motion to stay is probably appropriate here, to stay discovery. All of the information at this point we're talking about is not only largely, or very significantly, personal and sensitive, but whether or not it

gets produced turns on whether or not these claims exist and go forward. And, therefore, the motivations of Mr. Souki are at play.

I mean, if these claims get dismissed, there is no reason for this information to ever get produced in this case.

And we're happy to brief that further.

I think the good thing here is that discovery has moved forward quite a bit. I think we're happy to produce whatever searches we've agreed to do and documents we've agreed to produce. We're happy to get that going and get those produced. That's not an issue.

And so they will have the benefit of that information like we have the benefit of theirs. We've been very fulsome in many of our interrogatory answers, and they've got that information.

And the good thing is this motion has been pending for several months now, so I would like to think that a motion to stay, or an order staying discovery, would not have to stay in place for all that long if the District Court rules on our motion. Hopefully one way or the other that gets decided relatively quickly.

THE COURT: Okay.

MR. MCCONN: But, again, we're happy to talk with Ms. Goldman off-line about whether or not the parties can

come to an agreement on an order staying discovery. And, if not, we're happy to get that briefed for you as quickly as possible, and welcome your guidance as to when you would like us to file that if we can't come to an agreement.

THE COURT: Ms. Goldman, I will say this might be to your benefit, as well. Obviously, you'll need to confer with your client and confer with opposing counsel here.

But you may decide that you want to join a motion to stay, because you can see I'm struggling with the personal and privacy interests in light of the fact that certain claims might be dismissed.

And so I think I would be less likely to hesitate on giving you what you are looking for, because I'm in agreement on your relevancy points. It's the sort of proportionality, but in light of the pending motion to dismiss that I think is holding me back more than anything else.

And so you might benefit from a stay, as well, so that we have clarity on what the claims are going forward, and I can make decisions with respect to what's relevant on what survives.

MS. GOLDMAN: Understood, Your Honor. We'll definitely consider that and talk to our clients and to opposing counsel.

I think the only thing I would like some clarity

on is the scheduling. I know what feels like a long time ago, an hour ago, I think, you had asked for a status report on -- with regard to RFPs 19 and 20, which have, you know, Mr. McConn and Mr. Young raise a lot of the privacy interests to those.

So would you prefer for that to be pushed out so that we can deal with this stay issue?

THE COURT: Yes. I appreciate that. And you can tell I'm thinking out loud here, so bear with me a little bit.

MS. GOLDMAN: We all are.

THE COURT: You know, I did say a minute ago that I wanted that to move forward, in part, because I want to be fair to you. You've mentioned that you've produced a lot of discovery, and it hasn't been reciprocated yet because of some of these issues.

But that is sort of squarely within that area of concern for me around personal interests, and I think I might be curtailing it more than I need to necessarily because of the pending motion.

And so I think it would make the most sense to put a pin in that, as well, not have you all confer on RFP 19 and 29, but instead, have Mr. McConn and Mr. Young move forward with the production, as Mr. McConn stated that they're already planning to make, the things that they've already

agreed to produce, produce them.

With respect to everything that's in dispute here, however, the parties should not continue to confer or do anything else. Instead, confer on a potential motion to stay, get something filed with this Court, if that's the route you go, by the end of next week. Actually, I don't even think you need that long, but I'm going to give you until the end of next week, and then we'll go from there.

I will say, though, that on the production range, I can't imagine changing my mind on that regardless of the outcome. And so my ruling on the fact that you don't get anything post original complaint stands.

MS. GOLDMAN: Yes, understood, Your Honor.

THE COURT: Okay. Is that enough clarity? We've gone back and forth a lot. I've gone back and forth a lot on this conference. So do you all have clarity on what you should do?

MR. YOUNG: Yes, Your Honor. I just have one quick question. The format of the filing. Would you like us to just file a joint something a week from Friday?

THE COURT: If the Plaintiffs agree that there should be a stay, file a joint motion to stay. If they do not agree, after -- I want to give Ms. Goldman an opportunity to talk with her client about it.

So if they are not in agreement on the stay, then

file a motion as you normally would, an opposed motion, obviously certifying that you've conferred, and then Ms. Goldman can have an opportunity to respond to it.

MR. YOUNG:  Understood.  Thank you, Your Honor.

THE COURT:  Okay.

MS. GOLDMAN:  We will do that.  Thank you very much, Your Honor, for all of your time today.

THE COURT:  I appreciate you all bearing with me and walking me through it.  This was helpful.

I look forward to hearing from you again.

Thanks.

MR. YOUNG:  Thank you.

MR. MCCONN:  Thank you, Your Honor.

MS. GOLDMAN:  Thank you.

MR. MCCONN:  Have a good day.

(Time noted:  3:02 p.m.)

* * * * *

CERTIFICATE

I, RANDEL RAISON, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.

_____          January 26, 2023

Randel Raison