# EXHIBIT 21

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
-------------------------------------------------------------------------X

CHARIF SOUKI, Individually,

Index No. _____/2023

Plaintiff,

v.

NINETEEN77 CAPITAL SOLUTIONS A LP,          **COMPLAINT**
BERMUDEZ MUTUARI, LTD, WILMINGTON
TRUST NATIONAL ASSOCIATION, and
UBS O'CONNOR LLC,

Defendants.
-------------------------------------------------------------------------X

Plaintiff Charif Souki, in his individual capacity, by and through his attorneys Yetter Coleman LLP and Harris St. Laurent & Wechsler LLP, respectfully alleges the following, based upon personal knowledge as to himself and his own actions and upon information and belief as to all other persons and events.

## I. INTRODUCTION

1. This dispute arises out of the unconscionable, bad faith conduct of lenders who have repeatedly violated their duties under loan agreements and under New York law, causing significant harm to their borrower, Plaintiff Charif Souki.

2. Defendants loaned approximately $90 million to Souki in 2017 and 2018. In exchange, Souki pledged 25 million shares of stock of the company he cofounded (Tellurian, Inc.), his Colorado ranch, and his prized sailboat. In 2019, Defendants loaned $60 million to Tellurian without disclosing the Souki loans to Tellurian. In 2020, when Tellurian was near bankruptcy, Defendants begged Souki to run Tellurian and ensure that Tellurian would repay its loan to

1

Defendants. In exchange, Defendants promised Souki they would be flexible in their approach to repayment of his loans and would not act in ways that materially disrupt Tellurian's stock price.

3. These were empty promises that Defendants had no intention of honoring. Almost immediately after Tellurian repaid its loan, Defendants demanded immediate cash payments from Souki, threatened to foreclose on his ranch, and pressured him to sell his Tellurian stock in ways that would likely violate securities laws. When Souki refused, Defendants began charging him a much higher interest rate, rejected Souki's proposals to use third-party financing and sales of his ranch properties to reduce his debt, and refused to sell any of the Tellurian stock when it was trading at a historically high price. Had they taken these steps in early 2022 when Souki made his proposals, Defendants would have eliminated Souki's debt entirely, he would still own nearly 11.5 million of his Tellurian shares, and his ranch and sailboat would no longer be subject to foreclosure under the loans. Instead, Defendants increased Souki's debt to nine figures using the higher interest rate, are selling his sailboat at a bargain basement price, and are now selling Souki's Tellurian stock so recklessly that it has driven the stock price down nearly 25%.

4. As a result of Defendants' misconduct and breaches of their obligations under the loan agreements and New York law, Souki has sustained millions of dollars in damages and is entitled to a declaration from this honorable Court that his loans have been effectively discharged and that Defendants are no longer entitled to exercise any remedies against any of the assets that were pledged as collateral under Souki's loans.

## II.     THE PARTIES

5. Plaintiff Charif Souki works and resides in Texas.

6. Upon information and belief, Defendant Nineteen77 Capital Solutions A LP is a limited partnership organized under the laws of the state of Delaware with a principal place of business in New York, New York. Defendant Nineteen77 Capital Solutions A LP may be served

2

at UBS Tower, One North Wacker Drive, Floor 32, Chicago, Illinois 60606 and via its registered agent Maples Fiduciary Services (Delaware Inc.) at 4001 Kennett Pike, Suite 302, Wilmington, Delaware, 19807.

7. Upon information and belief, Defendant Bermudez Mutuari, LTD is a corporation organized under the laws of the Cayman Islands, with a principal place of business in the Cayman Islands. Defendant Bermudez Mutuari, LTD may be served at UBS Tower, One North Wacker Drive, Floor 32, Chicago, Illinois 60606.

8. Upon information and belief, Defendant Wilmington Trust National Association is a financial institution organized under the laws of the state of Delaware, with a principal place of business in Delaware. Wilmington Trust National Association may be served at 50 South Sixth Street, Ste. 1290, Minneapolis, Minnesota 55402 and via its registered agent Corporation Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

9. Upon information and belief, Defendant UBS O'Connor LLC is a limited liability company organized under the laws of the state of Delaware, with a principal place of business in Chicago, Illinois. UBS O'Connor may be served via its registered agent Corporate Creations Network Inc. at 5444 Westheimer #1000, Houston, Texas 77056.

### III. JURISDICTION AND VENUE

10. Forum and venue are proper in this Court pursuant to New York General Obligations Law § 5-1401 and 1402.

11. The loan agreements between the parties specify that New York law applies. The parties have also agreed that judicial proceedings will be brought in Manhattan, New York, and that each party "accepts the exclusive jurisdiction of the aforesaid courts and irrevocably agrees to be bound by any judgment rendered thereby…and waives any objection to jurisdiction and venue

of any action instituted hereunder…and agrees not to assert any defense based on lack of jurisdiction, venue, convenience, or forum non conveniens."

12.     This dispute involves an obligation arising out of a transaction involving more than $1 million.

13.     This matter should be assigned to the Commercial Division because Plaintiff's claims include breach of contract, breach of the implied covenant of good faith and fair dealing, and business torts.  Plaintiff seeks equitable and declaratory relief.

## IV.     BACKGROUND

**A.     Defendants loan nearly $150 million to Souki and Tellurian and require Souki to pledge his Tellurian stock as collateral, without disclosing Souki's loans or stock pledge to Tellurian.**

14.     Charif Souki is largely recognized as the founder of the domestic liquefied natural gas ("LNG") industry. In 1996, he founded Cheniere Energy, Inc. ("Cheniere"), which, due to his vision and leadership, ultimately became the first United States-based company to build a domestic LNG liquefaction and export facility and to use that facility to manufacture and ship LNG to overseas markets. Today, multiple domestic companies have built and begun operating LNG liquefaction and export facilities, and the model that Souki developed while at Cheniere is the basis on which the current industry is built.

15.     In early 2016, after departing Cheniere, Souki co-founded Tellurian Inc. ("Tellurian") with his good friend and long-time LNG industry executive Martin Houston. Tellurian's plans included construction and operation of an LNG facility that would be roughly the same size as Cheniere's facility. It would require nearly $28 billion of financing to make this happen. This project is called Driftwood LNG ("Driftwood").

16.     When Souki co-founded Tellurian, he became the Chairman of the company's Board of Directors; this was a non-executive position that did not require him to be involved in

4

the day-to-day management or operations of the company. At the same time, Souki also invested millions of dollars of his own funds, in exchange for which Tellurian issued him 25 million shares of the company's stock. Souki's family trust also made a sizable investment and became a large shareholder. In light of his direct and indirect substantial investment, Souki was the largest beneficial owner of the company's stock. Moreover, given his stature in the industry and his position as Chairman of the Board, Souki was effectively the face of the company and the market would certainly take notice of any trading activity by Souki in Tellurian stock.

17. On April 27, 2017, Souki entered into a loan for $50 million ("2017 Loan"). Defendants Nineteen77 Capital Solutions A LP and Bermudez Mutuari, LTD (the "Lenders") and Defendant Wilmington Trust National Association (the "Agent") are signatories to the loan; Defendant UBS O'Connor LLC ("O'Connor") signed the 2017 Loan as investment adviser on behalf of the Lenders.

18. The loan was then paid down by approximately $30 million in January of 2018, leaving a balance of approximately $20 million. The parties then increased the loan by $70 million on March 30, 2018 ("2018 Loan"), bringing the total balance to approximately $90 million (collectively, the "Souki Loans"). Under the Loans, Souki pledged the following as collateral: 25 million shares of Tellurian stock ("Souki's Tellurian Shares"), his family ranch outside of Aspen, Colorado ("Ranch"), and his equity interest in two family-owned companies, Ajax Holdings, LLC and Ajax Cayman, LLC. This collateral package was more than sufficient to cover the value of the Loans. As amended in January of 2019, the Loan maturity date was March 30, 2020.

19. In May 2019, Defendants entered into a separate loan agreement with Tellurian ("Tellurian Loan") (together with the Souki Loans, the "Loans"). Other than making introductions, Souki was not involved in the negotiations of the Tellurian Loan. Defendants never disclosed to

5

Tellurian that (a) they were parties to substantial loan agreements with Tellurian's co-founder and Chairman of the Board, or (b) the Loan Agreements were secured in part by Souki's Tellurian Shares. This created an inherent conflict of interest for Defendants; as discussed herein, if Defendants ever had to foreclose on Souki's Tellurian Shares that were pledged as collateral under the Souki Loans, such action would have materially disrupted Tellurian and its stock. This is something Tellurian would have wanted to know, and protect against, before entering into the loan with Defendants.

**B.      Defendants plead with Souki to take on an executive role at Tellurian in exchange for promises regarding repayment of his loans.**

20.      In early 2020, Tellurian's stock was trading in the $7-$8 range. However, in late February 2020, trouble began to brew. Tellurian announced that one of its largest prospective customers, Petronet in India, had requested an extension of several weeks to finalize the parties' contract. This news was not well-received by the market, and Tellurian's stock price began to fall precipitously. Going into March 2020, the stock was trading at just over $2 per share.

21.      Tellurian's troubles were severely compounded in early March 2020, when the lockdowns associated with COVID-19 eviscerated oil and gas demand and devastated the international oil and gas markets. As a result, Tellurian's stock price went into a further tailspin, quickly falling below $1 per share. In short, the company was in a liquidity crisis and on the verge of bankruptcy. Also, the drop in value of Souki's Tellurian Shares complicated efforts to repay the Souki Loans, which by that point had grown to $102,763,266 (inclusive of interest).

22.      As a result of these extraordinary developments, Defendants were extremely concerned about Tellurian's ability to repay its loan. To address these concerns, Defendants' principal, Baxter Wasson, reached out to Souki personally. Through a series of discussions that began in March 2020 and continued for several weeks, Wasson made it clear that Defendants

6

wanted Souki to focus on righting the ship at Tellurian, because absent him doing so, the stock price would likely continue to fall and the company would default on its loan.

23.     Also during these discussions, Wasson made it clear that if Souki re-engaged with the company in an effort to right the ship and pay off the Tellurian Loan, Defendants would be eminently flexible in their approach to the future repayment of the Souki Loans. Wasson represented that Defendants would approach the Tellurian Loan and the Souki Loans holistically, focus first on repayment of the Tellurian Loan, and then focus on the orderly repayment of the Souki Loans once repayment of the Tellurian Loan was complete.

24.     Finally, the parties understood and agreed that, in light of Tellurian's financial instability, once they focused on the Souki Loans, it would not be appropriate to dispose of Souki's Tellurian Shares until after the company was on secure financial footing. Otherwise, sales of Tellurian shares by Souki would materially disrupt the stock price. There was no question when that point in time would be – once Tellurian had sufficient financing in place for Driftwood, announced its Final Investment Decision ("FID"), and issued its Notice to Proceed ("NTP") to the Driftwood project's general contractor, Bechtel Corporation ("Bechtel"). The parties agreed that reaching these key milestones would be the point at which Tellurian would be on sufficiently secure financial footing and sales of Tellurian shares by Souki would likely not materially disrupt the stock price. Then, and only then, would it be commercially reasonable to sell the stock to help repay the Souki Loans. This was part of the flexibility that Wasson agreed to in the discussion described above.

25.     Consistent with these understandings, the parties moved forward on two key fronts. First, on May 5, 2020, Souki and the Lender Defendants entered into two Bridge Agreements – one related to the 2017 Loan and one related to the 2018 Loan. Under the Bridge Agreements, the

7

Lender Defendants agreed that they would forbear from exercising any of their remedies under the Loan Agreements during the Agreement Period, which would end on March 30, 2021 unless a Termination Event ended it sooner. This was consistent with Souki's and Wasson's understanding that, under the holistic approach they had discussed, Defendants would not take any action on Souki's Loans while he focused on repayment of the Tellurian Loan.

26. Also consistent with that understanding, and highly relevant to this dispute, the Bridge Agreements put in place a protocol for enforcement of the Lender Defendants' remedies after the Agreement Period expired. Under this protocol, captured in Section 4.3 of the Bridge Agreements, which was heavily negotiated by the parties, Defendants agreed that in the event they ever commenced disposing of Souki's Tellurian Shares, they would "use their commercially reasonable efforts to avoid any material disruption of Tellurian's stock price." All parties understood and agreed that this meant not selling Souki's Tellurian Shares until Tellurian had reached the FID and NTP milestones discussed above.

27. Next, with the Bridge Agreements in place and based on Wasson's assurances of a flexible and holistic approach to repayment of the Loans, Souki agreed to re-engage with Tellurian. On June 22, 2020, Souki became the Executive Chairman of Tellurian's Board of Directors. Unlike his prior non-executive position on the Board, this new role effectively put Souki in charge of the company and required him to interface with investors and lenders to secure the funding Tellurian so desperately needed. It would also put him in a position to assist the company in righting its financial ship and in repaying expensive debt, including the Tellurian Loan.

28. Based largely on Souki's efforts, as well as the efforts of many others on his team, Tellurian repaid the Tellurian Loan in full on March 12, 2021, more than a year before the maturity date. Shortly thereafter, on March 31, 2021, Tellurian fully repaid another significant loan that it

8

had taken out in the early days of the COVID-19 pandemic. This repayment, which was nearly two months before the loan's maturity date, was also part of what Defendants asked Souki to focus on when they pleaded with him to re-engage in an executive capacity at Tellurian. While these developments improved Tellurian's financial situation and the stock price had likewise improved, both remained quite fragile and uncertain and any sales of Souki's Tellurian Shares would almost certainly have had a devastating effect on Tellurian's stock and on Souki's efforts to convince customers to enter into agreements with Tellurian.

**C.      Throughout 2021, despite their earlier promises, Defendant pressure Souki to accelerate repayment of his loans but repeatedly reject his attempts to do so.**

29.     As soon as Tellurian repaid its loan to Defendants, however, Defendants began pressuring Souki to quickly repay his loan in full, despite Defendants' previous assurances that they would approach repayment in a flexible, holistic manner and despite Souki's extraordinary efforts to ensure Tellurian's full, and early, repayment of its loans. On March 22, 2021, just ten days after Tellurian had completed its repayment of the Tellurian Loan to Defendants, Defendants sent Souki a proposal that would have required Souki to make an immediate, upfront payment of $5 million and that would have required full repayment of his loan by October 30, 2021. Souki responded that the proposal was "unrealistic" in light of current circumstances, but that Defendants should take comfort in the fact that they were overcollateralized.

30.     The parties were well aware that Tellurian's financial condition and the need to avoid selling Souki's Tellurian Shares meant that any substantial pay down of his obligation to Defendants in the near term would require the sale of the Ranch properties. Efforts to sell the Ranch as a whole, however, proved challenging. To continue in his good faith efforts to pay down some or all of his debt, Souki pivoted to a strategy that included (a) marketing and selling the Ranch's houses and undeveloped lots as separate properties, and (b) renting out the houses in the

9

meantime in order to generate revenue that could be used to help cover the operating costs and potentially pay down some of the Loans. To execute this strategy, members of Souki's family, who had lived in the Ranch houses for five years, moved off the Ranch in early 2021 and Souki's broker began marketing the properties at market values.

31. For this strategy to work, Souki would need Defendants' cooperation. This was, in part, because Defendants' lien for the entirety of the Souki Loans encumbered the Ranch. Therefore, to close on a sale of any of the individual pieces of the Ranch, there would need to be agreement by Defendants on "release prices" – i.e., the prices at which Defendants would release their lien as to a particular house or lot for the amount of the sale. Defendants would also need to agree on how to allocate the proceeds of the sales between repayment of the Souki Loans and other obligations, including commission to the realtors. Defendants knew this when they submitted their March 22, 2021 proposal, because Souki and his team had raised it with them multiple times before then. Nevertheless, Defendants' proposal completely ignored this and other critical issues, thus making it extremely difficult to convince prospective buyers to enter into contracts to acquire any of the Ranch properties. As a result, Souki had no choice but to reject Defendants' proposal.

32. Defendants delivered their next proposal in May 2021. After discussions in which Souki once again reminded Defendants of the need to avoid any sales of his Tellurian Shares before Tellurian achieved FID and NTP, Defendants nevertheless proposed that Souki begin selling his Tellurian Shares by arbitrary dates in the near term, without regard for the milestones above. Defendants also attempted to insert short term, share price thresholds that would trigger a default if not reached, potentially terminating the agreement less than six weeks after its effective date. While the proposal finally contained lien release prices, there was no agreement to establish separate liens per property and the releases were contingent on numerous, other unreasonable

10

terms. For example, Defendants demanded that the Souki Family 2016 Trust, a third-party entity, continue to fund any operational shortfalls while also subordinating its repayment claims to Defendants' lien. Again, Souki had no choice but to reject Defendants' unreasonable proposal. Notably, Defendants also objected to reasonable attempts by Souki to obtain third-party financing that would have helped pay down a meaningful portion of the debt on reasonable terms.

33. In summer and fall of 2021, Souki's strategy and efforts began to pay off. He received offers to purchase three of the eleven Ranch properties and expressions of interest in other Ranch properties. Ultimately, Souki was able to reach agreement with a buyer on one of the properties and another buyer on two of the properties for a total of $46.5 million. The proceeds from these transactions would enable Souki to pay off a prior loan from Alpine Bank ("Alpine") of $30 million and to pay down more than $12.6 million of his debt to Defendants. To close on these transactions, however, Souki would need Defendants to agree that they would release their lien as to the subject properties and that they would allow an amendment to the Ranch's HOA bylaws that would require any lender who foreclosed on the remaining Ranch properties to continue funding the Ranch's operations and amenities at the same level as before foreclosure.

34. Souki asked for Defendants' cooperation in response to concerns specifically raised by prospective buyers whose due diligence revealed the lien against the Ranch as a whole. Not surprisingly, given the Defendants' history of unreasonable positions, before they would agree to release the liens and amend the HOA bylaws, the Defendants attempted to bully Souki into agreeing to additional, unfavorable terms, which he would not do. Only at the last minute and after extensive efforts by Souki did Defendants agree to these terms. Thankfully, the buyers had not walked away from the deals, so despite Defendants' intransigence and continued bad faith tactics, the transactions closed in August and November, respectively.

11

35.     Another example of Defendants' inconsistent and confusing behavior revolves around the sale proceeds from the transactions described above. Although Alpine was entitled to 100% of the net proceeds of all sales until its loan was paid down, Souki offered to negotiate with Alpine to accept partial prepayment so that Defendants could begin receiving proceeds from the very first transaction. Wasson's initial response was that this arrangement would bode very well for Souki's situation and that he should endeavor to negotiate such an arrangement. With no small effort, Souki was able secure an agreement in principle from Alpine that would have allocated $6 million in proceeds from each home sold and $3 million from each lot sold to Defendants. Souki then communicated this development to Defendants on multiple occasions, but Defendants failed to respond and ultimately chose to reverse their course and reject the arrangement altogether. Based on the three transactions that ultimately occurred, this would have resulted in an additional repayment to Defendants of $15 million; however, Defendants stated that they preferred more of the proceeds to go to the first lienholder, disposing of the first lien entirely and giving Defendants priority over Souki's assets going forward.

**D.     Defendants refuse to take commercially reasonable steps to eliminate the debt in its entirety, instead preferring to keep Souki's loans in place and increasing the interest rate they charge him.**

36.     In late 2021, after both transactions had closed, Souki once again approached Defendants with a plan to discharge his obligation. His proposal contemplated lien releases for each of the remaining properties, the ability for Souki to arrange third-party financing, as contemplated in the Bridge Agreement, and a plan to sell a sufficient number of his Tellurian Shares to discharge his obligation by June 2023 in an organized program. Defendants rejected Souki's plan and pressured him to sell his Tellurian Shares, which he was restricted from doing at that time under applicable securities rules and regulations and due to restrictions placed on Souki by Tellurian's Board of Directors. They also pressured him to amend the HOA budget so as to

12

diminish the level of services to which they previously agreed, something Defendants could no longer do themselves in a foreclosure scenario.

37.     When Defendants were pressuring Souki to sell his Shares in early April 2022, the stock was trading at more than $6 per share. If Defendants had sold the Shares then in a commercially reasonable manner (either along the lines that Souki later suggested in February 2023 or in an organized method as Souki had previously proposed) and had they agreed to move forward with one or more of the available financing options on the Ranch (including the arrangement with Alpine described above or a $25 million financing offered by another bank), *Souki's entire obligation would have been discharged by the middle or end of April 2022 and he would still have had owned approximately 11.5 million of his Tellurian Shares*. But rather than pursuing this course and allowing Souki to eliminate his debt, Defendants pursued a bad faith course of conduct – they prevented Souki from taking steps to pay down his debt, they started charging him the 15% default interest rate, and they manipulated his position so that he would be unable to reduce his debt and would continue to accrue interest at an exorbitantly high rate until whenever Defendants decide they have exacted their pound of flesh from Souki.

38.     In mid-2022, Defendants notified Souki that they had initiated foreclosure proceedings in Colorado related to the Ranch. As it turned out, this was nothing more than a veiled threat to induce Souki to sell his Tellurian Shares (which he was restricted from doing) and Defendants had no intention of ever moving forward with foreclosure. This was because Defendants knew that under Colorado law, they (as the secured parties) would need to submit a credit bid at or near fair market value and that fair market value of the Ranch was substantial. In fact, the release prices that Defendants previously suggested, the Ranch sales described above, and third-party appraisals, taken together, supported a fair market value of $100 million, if not more.

13

Submitting a credit bid in this amount would almost certainly mean that Defendants would acquire the Ranch for that amount. This would largely wipe out Souki's debt but leave Defendants with a substantial asset that they would need to try to sell in order to recoup what they had loaned Souki. Defendants also knew that upon foreclosure, they would take on the substantial financial obligations associated with the operations and amenities of the Ranch. Not surprisingly, Defendants never moved forward with foreclosure.

39.     In sum, despite Souki's efforts in connection with repayment of the Tellurian Loan and the holistic, flexible approach agreed to by Wasson, Defendants spent two years refusing to work with Souki in good faith to reduce the amount owed under his personal loans and pressuring him to take steps that he could not take and/or that would destroy the value of the collateral. In the meantime, interest owed continued to accrue and the outstanding balance ballooned to nine figures.

**E.     Apparently satisfied with the additionally accrued interest, Defendants begin seizing and selling Souki's assets in a wildly reckless and commercially unreasonable manner.**

40.     In late 2022, Defendants added unreasonableness and incompetence on top of their interference and lack of good faith. On December 22, 2022, Defendants notified Souki that they were seizing his sailboat, the Tango. While the Loan Agreements allow Defendants to foreclose on the Tango, they are obligated under New York law to do so in a commercially reasonable manner. To date, however, the manner in which Defendants have proceeded with marketing and selling the Tango has been nothing short of negligent and incompetent. At the time Defendants seized Tango, it was in a yard in Europe awaiting substantial repairs. Investing a modest sum in completing those repairs before making the boat available to prospective buyers would have resulted in a substantial increase in sale price possibilities.

41.     Defendants did not do this, however, and instead put the sailboat on the market in an "as is, where is" condition. Defendants also failed (a) to conduct a comprehensive marketing

14

campaign that is typical for a sale of this type of sailboat, (b) to identify several prospective buyers who would have been interested in submitting bids to acquire the Tango, and (c) to seek Souki's counsel on prospective buyers or steps that should be taken to market the Tango, despite his vast knowledge of the market. Defendants ultimately entered into an agreement that provided the buyer several months of exclusivity, after which the buyer has no obligation to close on the transaction. Instead of entering into such a commercially unreasonable agreement, Defendants should be repairing the Tango, engaging in an extensive marketing campaign, and showing the then-repaired boat to a multitude of prospective buyers.

42. Defendants' incompetence and unreasonableness turned into sheer recklessness in early February 2023. On February 6 and 7, Defendants forced a transfer of Souki's Tellurian Shares from Souki's account to theirs. By effecting a transfer of ownership, Defendants triggered an obligation for Souki to file a Form 13-D with the Securities Exchange Commission ("SEC"), yet Defendants failed to inform Souki of this critical development; instead, he learned of it through a contact at his bank.

43. On February 8, again with no notice to Souki, Defendants began selling his Tellurian Shares. When the market opened that morning, the stock was trading at $2.05, still nowhere near where it had been during most of 2022. Also at that time, Defendants were well aware that Tellurian still had not reached FID and that Bechtel had not issued the NTP. Finally, Defendants were in possession of material nonpublic information ("MNPI") – unlike the general investing public, Defendants were fully aware that Souki, the largest shareholder of the company and its Executive Chairman, no longer controlled his Tellurian Shares. Securities laws prohibit a party from trading in securities for which it was aware of MNPI, but that's exactly what Defendants did. That day, Defendants dumped nearly two million of Souki's Tellurian Shares on the market.

15

This constituted a nearly 20% increase over the average daily volume of Tellurian stock sold in the prior ten days. Plus, the vast majority of Defendants' sales occurred within the first two hours of trading. Any sophisticated investor would know that such actions with respect to the stock of a company that is on uncertain financial footing is the opposite of taking commercially reasonable steps to avoid material disruption of the stock price. And the proof is in the results – as a result of Defendants' recklessness, Tellurian's stock price fell almost 10%, closing at $1.89 on February 8. But, this was just the beginning of the recklessness and willful misconduct by Defendants.

44. That evening, Souki, a seasoned investor, informed Defendants that their conduct was wholly unreasonable and pleaded with them to use an industry-accepted methodology if they were going to continue selling his shares. The methodology that Souki proposed would have called for Defendants to use an algorithm to ensure they did not sell more than 3% of the daily volume of Tellurian shares sold. The goal of using this methodology, of course, was to avoid any further material disruption in the stock price and to capture any gains that occur over the next several weeks, particularly if Tellurian were to make any announcements about financing, FID, and NTP.

45. That same evening, Souki advised Defendants that he would need to file a Form 13-D with the Securities Exchange Commission ("SEC") as a result of the transfer and the sales of his Shares but that he would not be able to file it until later the next day. In the meantime, Defendants should not sell his Shares because they were still in possession of MNPI.

46. Defendants took Souki's advice and threw it in the trash. The next morning, Defendants continued recklessly selling millions of Souki's Tellurian Shares. This continued every business day for the next five days. By the end of these first six business days, Defendants had sold 8,837,798 shares for $15,431,502 and the price had dropped by more than 25% to $1.50 per share on February 15, a low point in the share price not seen since January of 2021.

16

47. By the end of the first six days of trading, Defendants realized the error of their ways and that Souki's advice had been correct. They pivoted to selling a much smaller percentage of the daily volume of Tellurian stock sold. Over the last several days before Souki filed this suit, Defendants sold roughly 4.75% of the daily volume, essentially what Souki had recommended on February 8 if Defendants were going to continue selling his Tellurian Shares. Defendants recognized that what they had done before was imprudent and had materially disrupted the Tellurian stock price. Everything the parties had discussed and agreed to in 2020 about the need to wait on selling the Tellurian shares until after FID and NTP had occurred had come to pass.

48. In light of these recent developments, it is clear that Defendants either believe no agreement to wait for FID and NTP existed or they simply don't care about any such agreement or about what is commercially reasonable. Either way, if Defendants now contend it was appropriate to sell Souki's Tellurian Shares before these milestones occurred, it is unconscionable that Defendants chose February 2023 (when the stock was trading at $2 per share), rather than April 2022 (when the stock was trading at more than $6 per share), to do so.

49. Defendants' bad faith and willful misconduct has caused, and continues to cause, Souki to suffer significant damages and has deprived him of millions of Tellurian Shares that he would otherwise still own. Specifically, the parties agreed that the commercially reasonable time to sell Souki's Tellurian Shares would be after Tellurian had achieved FID and had issued its NTP at Driftwood; those milestones, however, have not yet occurred. The parties' expectation was always that the Tellurian stock price would increase significantly upon those milestones, which means that sales of Souki's Tellurian Shares at the agreed-upon time would have resulted in Souki's debt to Defendants being repaid by selling only a fraction of his Shares, thereby leaving him with the majority of his 25 million shares at the post-milestone stock price. Defendants,

17

however, have reneged on that agreement, apparently deciding they do not need to wait until after Tellurian has achieved those critical milestones before selling Souki's Tellurian Shares. Even if it were permissible for Defendants to sell Souki's Tellurian Shares before the agreed-upon milestones, however, they sold them at a time and in a manner that indisputably is not commercially reasonable. Had Defendants conducted the sales along the lines suggested by Souki on February 8, and had Defendants done so in April 2022 when the stock was price was materially higher and the company was on stronger footing, Souki's Loans would have been fully repaid, Souki would still have millions of his Shares, and the rest of his collateral would not be subject to foreclosure.

**CAUSES OF ACTION**

**Cause of Action One – Breach of Duty of Good Faith and Fair Dealing**
**(Against the Lenders and Agent)**

50.    Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-49 above.

51.    As parties to the Agreements, the Lenders and the Agent have a duty to Souki to act in good faith and not to engage in unfair dealing. This includes a duty not to deprive Souki of the fundamental benefits of the Agreements and not to undermine Souki's reasonable economic expectations under the Agreements.

52.    In wanton violation of these duties, the Lenders and the Agent have routinely and unreasonably interfered with and hindered Souki's attempts to repay his debt and to reduce or eliminate additional interest owed under the Agreements. This interference, including objecting to prospective buyers, objecting that list prices were too high and then later complaining they were too low, refusing to engage in discussions about release prices, and reneging on assurances made

18

about how the Ranch would be operated so as to give comfort to prospective buyers, was clearly not done in good faith.

53. Additionally, the Lenders and the Agent have sold Souki's Tellurian Shares in a wholly unreasonable and reckless manner and for bargain basement prices, thus exposing the remainder of Souki's collateral to possible foreclosure, which should never have been necessary if the Lenders and the Agent complied with their duty of good faith and fair dealing. This is inconsistent with the fundamental benefits to which Souki is entitled and his reasonable expectations under the Agreements, as it is wholly inappropriate to use more collateral than is reasonably necessary to ensure full repayment of the Loans.

54. O'Connor's conduct described herein was malicious and fraudulent.

55. Souki has been and will continue to be damaged as a result of the Lenders' and Agent's misconduct in an amount not less than tens of millions of dollars.

## Cause of Action Two – Breach of Contract
### (Against the Lenders and Agent)

56. Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-55 above.

57. The Loan Agreements and the Bridge Agreements are valid and enforceable agreements.

58. Under the Loan Agreements, which are governed by New York law and therefore incorporate New York's version of the Uniform Commercial Code, Defendants have a duty to dispose of Souki's collateral, if at all, in a commercially reasonable manner. Whether a lender disposed of assets in a commercially reasonable manner depends, in part, on the methodology used and the time at which the sale occurred.

19

59. Additionally, Section 4.3 of the Bridge Agreements expressly provides that the "the Lenders will use commercially reasonable efforts to avoid any material disruption of Tellurian's stock price during such process."

60. As demonstrated above, Defendants wholly failed to comply with these duties and obligations. The manner in which they sold Souki's Tellurian Shares – including the time at which Defendants sold the shares and the number of shares they sold on a daily basis – was not commercially reasonable and materially disrupted the stock price.

61. Souki has been and will continue to be damaged as a result of Defendants' misconduct in an amount not less than tens of millions of dollars.

### Cause of Action Three – Aiding and Abetting
#### (Against O'Connor)

62. Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-61 above.

63. As demonstrated above, the Lenders and the Agent breached express and implied obligations in the Loan Agreements and the Bridge Agreements. O'Connor representatives had actual knowledge of the Lenders' and the Agent's misconduct and knowingly intended to aid and abet the Lenders' and the Agent's breaches of the Agreements. Those actions constitute substantial assistance to the Lenders' and the Agent's breaches of the Agreements.

64. Souki has been and will continue to be damaged as a result of Defendants' misconduct in an amount not less than tens of millions of dollars.

### Cause of Action Four – Tortious Interference with Contract
#### (Against O'Connor)

65. Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-64 above.

20

66. As demonstrated above, the Lenders and the Agent breached express and implied obligations in the Loan Agreements and the Bridge Agreements. O'Connor knew at all relevant times of the existence of the Agreements and Souki's rights thereunder. Nevertheless, O'Connor improperly and intentionally assisted in, induced, and procured the Lenders' and the Agent's breaches of the Agreements by causing the Lenders and the Agents to engage in the misconduct described herein. O'Connor's interference was improper.

67. Souki has been and will continue to be damaged as a result of Defendants' misconduct in an amount not less than tens of millions of dollars.

## Cause of Action Five—Fraud
### (Against O'Connor)

68. Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-67 above.

69. O'Connor, acting through Wasson, made material misrepresentations to induce Souki to facilitate the repayment of the Tellurian Loan. Specifically, Wasson promised Souki that Defendants would be eminently flexible in their approach to repayment of the Souki Loans and would not act in ways that materially disrupt Tellurian's stock price. Those representations were false when Wasson made them, and he knew they were false. He made these misrepresentations to induce Souki to devote his time and attention to repayment of the Tellurian Loan. Souki justifiably relied on Wasson's misrepresentations and did not focus on efforts (including marketing his Ranch properties) to repay his personal Loan.

70. After Souki justifiably relied on Wasson's misrepresentations and successfully assisted Tellurian in repaying its loan to Defendants more than a year before the maturity date, O'Connor used that reliance against him, causing the Lenders to throw Souki into default under

21

the Loans, charge him a significantly higher default interest rate, and then make it extremely difficult to reduce the outstanding debt while interest continued to accrue at that higher rate.

71.     As a result of O'Connor's fraud, Souki has been and will continue to be damaged in the form of millions of dollars in additional interest that has accrued.

### Cause of Action Six—Conspiracy to Commit Fraud
**(Against the Lenders and the Agent)**

72.     Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-71 above.

73.     As discussed above, O'Connor, the Lenders and the Agent entered into a scheme whereby O'Connor committed the fraud described above. The Lenders and the Agent undertook overt and material acts in intentional furtherance of the scheme, including by placing Souki into default under the Loans, charging him a significantly higher default interest rate, and then making it extremely difficult to reduce the outstanding debt while interest continued to accrue at that higher rate.

74.     As a result of O'Connor's fraud, Souki has been and will continue to be damaged in the form of millions of dollars in additional interest that has accrued.

### Cause of Action Seven—Declaratory Judgment
**(Against All Defendants)**

75.     Plaintiff repeats and realleges the allegations set forth above in Paragraph 1-74 above.

76.     The conduct described herein constitutes breaches of the Lenders' and the Agent's express and implied obligations under the Loan Agreements. By way of those breaches, Defendants disposed of collateral for values far less than would have been achieved if the dispositions had occurred in commercially reasonable manners. Had Defendants complied with

22

their duties to dispose of the collateral in a commercially reasonable manner, Souki's debt would have been paid in full, he would owe no further debt to the Lenders, and the Lenders and the Agent would have no further right to exercise remedies under the Loan Agreements.

77. Based on the foregoing, Souki seeks a declaration from this honorable Court that the Souki Loans have effectively been repaid in full, no further debt is owed by Souki, and the Lenders and the Agent have no further right to exercise remedies under the Loan Agreements.

## PRAYER AND RELIEF

Wherefore, Plaintiff Charif Souki demands that judgment be entered against Defendants Nineteen77 Capital Solutions A LP, Bermudez Mutuari, LTD, Wilmington Trust National Association and UBS O'Connor LLC as follows:

1. Awarding Souki compensatory and exemplary damages in an amount to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

2. Awarding Souki shares of Tellurian stock in an amount to be determined at trial;

3. Entering declaratory relief that as a result of the conduct described above, the Souki Loans have effectively been repaid in full, no further debt is owed by Souki, and the Lenders and the Agent have no further right to exercise remedies under the Loan Agreements; and

4. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

23

Dated: March 6, 2023
New York, New York

HARRIS, ST. LAURENT & WECHSLER LLP

By: _____
Yonaton Aronoff
Megan Dubatowka
40 Wall Street, 53rd Floor
New York, New York 10005
(212) 397-3370

YETTER COLEMAN LLP
R. Paul Yetter
Timothy S. McConn
Autry Ross
Jamie Aycock
Amy C. Farish
David Gutierrez
(*Pro Hac Vice* applications forthcoming)
811 Main Street, Suite 4100
Houston, TX 77002
(713) 632-8000

*Attorneys for Plaintiff*

24