IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 22-cv-0165-WJM-MDB

CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

      Plaintiffs,

v.

CHARIF SOUKI,

      Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Before the Court is Defendant Charif Souki's Motion to Dismiss ("Motion to Dismiss"). (ECF No. 24.) Plaintiffs Christopher Parker ("Parker") and Red Mango Enterprises Ltd. ("Red Mango") (jointly, "Plaintiffs") filed a response (ECF No. 29), to which Defendant filed a reply (ECF No. 32). For the reasons explained below, the Motion to Dismiss is denied.

### I. BACKGROUND[1]

Defendant co-founded Tellurian, Inc., a liquefied natural gas export business, in 2016. (¶¶ 15–16.) Defendant was a major Tellurian shareholder, 48 million of which he (directly or through a family trust) pledged as collateral to secure loans for various investments. (¶ 32.)

---

[1] The Court assumes the allegations contained in the Amended Complaint (ECF No. 15) to be true for the purpose of deciding the Motion to Dismiss. *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). Citations to (¶ __), without more, are references to the Amended Complaint.

Defendant and Parker met in Aspen, Colorado in early 2017 to discuss the company. (¶ 20.) Plaintiffs ultimately acquired approximately 2% of the outstanding Tellurian shares. (¶ 21.) Shortly thereafter, Tellurian's share price began to fall, and continued to decline over the next approximately two years, leading Plaintiffs to decide to sell—a decision that Parker communicated to Defendant "as a courtesy." (¶¶ 23–24.)

Defendant allegedly did not want Plaintiffs to sell so that Defendant could save Tellurian's stock price from falling further. (¶ 25.) Defendant blamed the drop in share price on an aggressive short-selling campaign, which would be exacerbated by the sale of Plaintiffs' shares. (¶¶ 25, 27.) He also attempted to enlist Parker to artificially support Tellurian's share price, such as asking Parker to make a bid for a substantial block of Tellurian stock. (¶ 27.)

In text messages from August 2019, Defendant solicited information about how many shares Plaintiffs owned, asking Parker: "Chris, How much stock do you have and what is your [cost] basis?". (¶ 29.) In response, "Parker, who indicated he was 'not at [his] computer,' estimated that he and Red Mango owned '5.5m shares and [his] net is circa 8[.]30 now.'" (*Id.*) Defendant responded, "Ok. Please keep this text. I will guaranty [*sic*] your capital by dec 2020 [*sic*]. I'll make up any capital deficiency you have at that date. Thanks for your help and confidence." (¶ 30.) Based on Defendant's "guaranty," Parker agreed not to sell, telling Defendant: "Ok pal I got confidence in you, always here to lend an ear or advice if needed, let's catch up in sept [*sic*] for dinner." (¶¶ 31, 40.)

Over the next six months, Parker and Defendant checked in with each other about Tellurian, including meeting again in St. Tropez in October 2019 and in Los

Angeles in January and February 2020.  (¶ 34.)  In a text to Parker on or about March 1, 2020, Defendant confirmed news about the trust's sales, as well as substantial sales by the company's co-founder, Martin Houston, but reassured Parker, "I'm not selling."  (¶ 36.)  But Defendant allegedly had neither the intention nor the ability to fulfill his promise to Plaintiffs, including because millions of his own shares were tied up as collateral and the only way for Defendant to raise sufficient money to cover the guarantee (selling his own shares) would lead to further depression of the share price and losses to Defendant.  (¶ 41.)

When Parker confronted Defendant to pay out the guarantee, Defendant instead proposed entering into a "new agreement."  (¶ 46.)  Parker and Defendant met in Aspen in February 2021 to discuss the terms.  (¶ 48.)  At this meeting, Parker presented Defendant with a written agreement drafted as between Red Mango and Defendant, but Defendant said he could not sign it because he had not disclosed his liability to Plaintiffs to his bank—allegedly further indication that Defendant never intended to fulfill his promise to Plaintiffs.  (¶ 48.)  Defendant did, however, verbally agree to the new terms: namely, to indemnify Parker for all losses on his and Red Mango's Tellurian stock through December 31, 2021 and to pay interest.  (¶¶ 48–49.)  Parker and Defendant agreed that Parker would not sell his or Red Mango's shares in Tellurian throughout 2021 so that Defendant had more time to turn around the company's falling share price.  (¶ 50.)

Although Parker and Defendant discussed their agreement many times, Defendant never denied his promises or indicated any confusion about their terms— even when Parker's assistant sent Defendant information about Plaintiffs' holdings.  (¶¶

3

39, 53, 54, 55.) Yet Defendant has never fulfilled his promises, even as Plaintiffs have allegedly suffered tens of millions of dollars in losses. (¶¶ 55, 58.)

## II. LEGAL STANDARD

Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (internal quotation marks omitted).

The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk*, 493 F.3d at 1177. Thus, in ruling on a Motion to Dismiss under Rule 12(b)(6), the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). However, "[t]he burden is on the plaintiff to frame a 'complaint with enough factual

4

matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "[C]omplaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' . . . 'will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

### III. ANALYSIS

**A.     Red Mango**

Defendant argues throughout the briefing that Plaintiffs have failed to sufficiently allege that Red Mango was a party to the contracts at issue. (ECF No. 24 at 7; ECF No. 32 at 2.) Despite these contentions, the Court concludes that Plaintiffs have sufficiently—though barely—alleged that Red Mango was party to the contracts. The Amended Complaint alleges that when Parker and Defendant met on June 13, 2019, they met to "discuss [Parker] and Red Mango's investments in Tellurian," and that in August 2019, Parker informed Defendant that he intended to sell "his and Red Mango's shares in light of Tellurian's poor performance." (¶ 31.) Further, the Amended Complaint alleges that at most Parker owned 3.3 million shares of Tellurian stock in his own name. (¶ 13.) Taking these allegations as true, the Court can reasonably infer that the 5.5 million shares referenced in the text exchange must have also included Red Mango's shares. (¶ 29.) Therefore, the Court will not dismiss Red Mango's claims at this stage of the litigation.

**B.     Breach of Contract**

To state a claim for a breach of contract, a plaintiff must allege (1) the existence of a contract; (2) performance by the plaintiff or some justification for non-performance; (3) failure to perform the contract by the defendant; and (4) damages. *See W. Distrib.*

5

*Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

    1.    <u>August 2019 Agreement (Claim 1)</u>

        a.    *Enforceability*

Defendant argues that the August 2019 agreement fails to show the existence of a contract because the terms are not sufficiently definite and certain. (ECF No. 24 at 6.) According to Defendant, to be sufficiently definite and certain, the agreement must "specify the parties, the nature and extent of the obligation, the exact number of shares subject to the alleged agreement, and how the obligation would be satisfied." (*Id.*) Defendant also underscores that "the parties [did not] agree upon a method of payment or other means of satisfying the purported guarantee, a highly material term in an obligation that Plaintiffs claim involves tens of millions of dollars." (*Id.*)

Despite Defendant's arguments, the Court finds that at the dismissal stage, the August 2019 agreement is sufficiently definite to find a valid contract exists. Colorado law "only requires a contract to be sufficiently definite for a court to determine whether the parties performed." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (applying Colorado contract law). As long as there is a "semblance of an agreement," after giving plaintiff "all reasonable inferences," a contract is valid at the motion to dismiss stage. *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1224 (D. Colo. 2009) (concluding plaintiff stated a claim for breach based on a collection of documents, including e-mails, to allege contract formation).

The Court concludes that the Amended Complaint alleges that a sufficiently definite contract was formed between Plaintiffs and Defendant. Specifically, the following allegations demonstrate contract formation:

    29. Souki exchanged text messages with Parker on August

> 17, 2019, in which he asked Parker, "Chris, How much stock do you have and what is your [cost] basis?" Parker, who indicated he was "not at [his] computer," estimated that he and Red Mango owned "5.5m shares and [his] net is circa 8[.]30 now."
>
> 30. Souki replied: "Ok. Please keep this text. I will guaranty [sic] your capital by dec 2020 [sic]. I'll make up any capital deficiency you have at that date. Thanks for your help and confidence."
>
> 31. Parker believed what Souki had told him about Tellurian, and in reliance on Souki's offer to indemnify him for any losses, Parker agreed to refrain from selling any shares, telling Souki: "Ok pal I got confidence in you, always here to lend an ear or advice if needed, let's catch up in sept [sic] for dinner."

(¶¶ 29–31.)  The agreement is fairly straightforward: after asking Plaintiffs how much Tellurian stock they owned, Defendant agreed to indemnify them by December 2020. Moreover, Defendant allegedly instructed Plaintiffs to "keep this text," demonstrating his intent to be bound by his words.  Additionally, Plaintiffs allegedly accepted the offer to hold their stock until December 2020 through Parker's statement "Ok pal I got confidence in you."  (¶ 31.)  Plaintiffs allege that although they held their shares per the agreements and have demanded that Defendant make the payments he guaranteed, Defendant has failed to do so in breach of his agreement.  (¶ 55.)  At this stage of the litigation, these allegations are more than sufficient to allege a valid contract was formed between the parties.

      b.    *Statute of Frauds*

An agreement that cannot be performed within one year after its making is void under the statue of frauds, unless "such agreement or some note or memorandum thereof is in writing and subscribed by the party charged therewith."  C.R.S. § 38-10-112(1)(a).

Defendant argues that the August 2019 agreement is barred by the statute of frauds because it was to be performed in December 2020, more than one year after it was allegedly formed. (ECF No. 24 at 8.) Additionally, Defendant argues that the statute of frauds requires that the agreement be signed by him to be enforced against him, which it was not. (*Id.* at 9.)

However, Plaintiffs point out that Colorado law excuses compliance with the requirements of the statute of frauds if the party seeking to enforce the contract has substantially performed his end of the bargain, and such performance is "required by, and fairly referable to no other theory besides that allegedly contained within the [] agreement." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1225 (10th Cir. 2000) (enforcing oral agreement granting plaintiff an option to purchase securities because plaintiff had rendered substantial performance). In the Amended Complaint, Plaintiffs allege substantial performance in the form of holding their shares pursuant to the agreement with Defendant that he would indemnify them later. (¶¶ 40, 49–50, 53). At this stage of the litigation, the Court concludes these allegations are sufficient to excuse compliance with the statute of frauds.[2]

2.    February 2021 Agreement (Claim 2)

   a.    *Enforceability*

Defendant argues that the February 2021 agreement is a mere "extension" of the August 2019 agreement which provided that he would indemnify Plaintiffs on December 31, 2021 and pay interest. (ECF No. 24 at 7.) He contends that his refusal to sign the

---

[2] Because the Court finds that the statute of frauds does not apply, it need not analyze the legal sufficiency of Defendant's signature.

8

draft agreement that Parker brought to the meeting demonstrates that he did not assent to the proposed extension.  (*Id.* at 8.)  And the February 2021 agreement purportedly suffers from the same flaws as the August 2019 agreement concerning its failure to identify the parties, whose and how many shares are implicated, or the method of payment, among other failings.  (*Id.*)  Further, Defendant argues that the February 2021 agreement does not specify payment terms or a fixed date for performance.  (*Id.*)

However, for substantially the same reasons as explained above, the Court finds that Plaintiffs have alleged that an enforceable contract was formed via the February 2021 agreement.  The Amended Complaint contains the following pertinent allegations:

> 47. Parker was potentially interested in Souki's offer to enter into a *new agreement*, but told Souki he would only agree to it if Souki paid interest for the new period. Additionally, Parker wanted to execute the *new agreement* in writing.
>
> 48. Therefore, in February 2021, Parker and Souki met in person in Aspen, Colorado.  At the meeting, Parker first presented Souki with a written agreement drafted as between Red Mango and Souki, but Souki refused to sign the agreement.  He told Parker he could not execute an agreement in writing because he had taken bank loans and had not disclosed his liability to Parker and Red Mango to his bank—further indication, in hindsight, that Souki never intended to indemnify them for their losses and knew that such a promise was false when made.
>
> 49. Rather, Souki assured Parker that he was "good for the guarantee" and orally agreed to certain new terms: Souki agreed to indemnify Parker and Red Mango for their losses through December 31, 2021, and to pay interest.
>
> 50. Because Parker and Souki had a long history and Parker remained a believer in Tellurian's core business model, Parker accepted Souki's explanation.  As a result, Parker and Souki agreed that Parker would not sell his or Red Mango's shares in Tellurian throughout 2021 so that Souki had more time to turn around the company's sagging share price.

9

(¶¶ 49–50 (emphasis added).)

These allegations demonstrate that Parker contemplated that Red Mango would be included in both agreements and communicated such intentions to Defendant. Further, the Tenth Circuit has reiterated that Colorado law "does not require precise terms related to payment to prove the formation of a valid contract." *Bill Barrett*, 918 F.3d at 766. The allegations pertaining to the February 2021 agreement are sufficient to withstand the Motion to Dismiss.

        b.    *Statute of Frauds*

Defendant also argues that the February 2021 agreement is barred by the statute of frauds because it requires any subsequent modifications to be in writing. (ECF No. 24 at 9 (citing *Fitzpatrick v. Davidson*, 2007 WL 2871007, at *5 (D. Colo. Sept. 26, 2007) and C.R.S. § 38–10–108, *et seq*).) However, the Court concludes that the February 2021 contract is not subject to the statute of frauds because it could be performed in less than a year: the contract formed in February 2021 indemnified Plaintiffs through December 31, 2021 and could have been performed immediately thereafter. (ECF No. 29 at 12.)

Although Defendant characterizes the February 2021 agreement as an "extension" of the August 2019 agreement, the Amended Complaint specifically alleges a "new agreement" with "new terms" which would last "through the end of 2021." (¶¶ 46–50.) As Plaintiffs argue, because the August 2019 and February 2021 agreements were valid contracts and "virtually every contract term [was] altered," the Court concludes that the February 2021 contract was not a modification of the earlier one. *See Phoenix Power Partners, L.P. v. Colorado Pub. Utilities Comm'n*, 952 P.2d 359,

10

364–65 (Colo. 1998).  As alleged, the February 2021 agreement was a new contract that could be performed within one year, so the statute of frauds does not apply.

**C.      Fraudulent Inducement (Claim 3)**

Fraudulent inducement claims must be pleaded with heightened particularity. *See United States ex rel. Simpson v. Lepino Foods Dairy Prod. Co.*, 2018 WL 1375792, at *2 (D. Colo. Mar. 19, 2018).  Thus, to maintain a fraudulent inducement claim, a plaintiff must allege that: (1) the defendant made a "knowing misrepresentation of a material fact" and (2) the plaintiff justifiably relied on the misrepresentation.  *See Clancy Sys. Int'l, Inc. v. Image Sensing Sys., Inc.*, 2017 WL 3086624, at *4 (D. Colo. Jan. 30, 2017).

Defendant argues that Plaintiffs have failed to sufficiently plead both prongs with the heightened particularity that Federal Rule of Civil Procedure 9(b) requires.  (ECF No. 24 at 10–12.)  Defendant identifies two alleged misrepresentations: (1) "if Parker refrained from selling his and Red Mango's shares of Tellurian, Souki would indemnify him for his losses," and (2) Souki was "not selling" his own personal shares.  (¶¶ 71–72.)

Regarding the first element, knowing misrepresentation, Defendant argues that neither allegation constitutes a material misrepresentation.  (ECF No. 24 at 10.)  He states that the allegations do not reflect a request by Defendant that Parker refrain from selling his shares, nor do Plaintiffs sufficiently allege that Defendant "consciously harbored a present intention not to perform" at the time the first promise was made.  (*Id.* (citing *Frank v. Wells Fargo Bank, N.A.*, 2016 WL 6212524, *6 (D. Colo. Oct. 11, 2016).).)  Regarding the February 2021 agreement, Defendant argues that Plaintiffs' allegation that the failure to disclose the contract to his bank is insufficient to

11

demonstrate a fraudulent state of mind and that Plaintiffs never allege that the statement that Defendant was not selling his own shares was false. (*Id.* at 11.)

With respect to the second element, Defendant argues that Plaintiffs' alleged reliance was unjustified, "as there was never a meeting of the minds on all essential terms and therefore no enforceable promise on which to rely." (*Id.* at 12.)

In the Amended Complaint, Plaintiffs allege that in August 2019 and February 2021, Defendant "promised to indemnify Plaintiffs' losses when he in fact had no intention of doing so." (ECF No. 29 at 14 (citing ¶¶ 30, 49, 74).) Further, Plaintiffs explain that Defendant "placated Parker's concerns about Tellurian's declining share price by assuring him via text message that Souki himself was 'not selling,' despite the fact that he had sold millions of shares at or around the same time in early March 2020." (*Id.* (citing ¶¶ 36, 72).) The Court finds that these allegations satisfy Rule 9(b). Additionally, the Court concludes that Plaintiffs have sufficiently alleged that they justifiably relied on Defendant's misrepresentations—they refrained from selling their shares with the expectation that Defendant would indemnify them as he represented. Thus, Plaintiffs have adequately pleaded a fraudulent inducement claim.

D.  **Promissory Estoppel (Claims 4 and 5)**

To state a claim for promissory estoppel, a plaintiff must establish: (1) a promise; (2) that the promisor should have reasonably expected would induce action or forbearance by the promisee or the third party; (3) on which the promisee or third party reasonably and detrimentally relied; (4) and that must be enforced to prevent injustice. *Pinnacol Assurance v. Hoff*, 375 P.3d 1214, 1221 (Colo. 2016). A "promise" for purposes of the promissory estoppel doctrine must be "clear and unambiguous." *Hansen v. GAB Bus. Servs., Inc.*, 876 P.2d 112, 114 (Colo. App. 1994). "It must also be

sufficiently definite to allow a court to understand the nature of the obligation." *G&A Land, LLC v. Cnty. of Brighton*, 233 P.3d 701, 704 (Colo. App. 2010).

Defendant argues that the alleged promises fail to identify the parties, the precise number or owner of shares involved, or how the obligation was to be satisfied. (ECF No. 24 at 13.)  Therefore, he argues that these alleged promises are "'not sufficiently specific to be enforced' by way of promissory estoppel." (*Id.* (citing *Butler v. Int'l Bank*, 2021 WL 1700850, at *4 (D. Colo. Apr. 8, 2021) (granting motion to dismiss promissory estoppel claim, finding statements that plaintiff "would receive annual bonuses of stock" were not actionable because they did not "specify the amount of stock that would be provided in bonuses" or "how or when such stock would be issued"), *report and recommendation adopted* 2021 WL 1697514 (D. Colo. Apr. 29, 2021)).) Defendant also contends that Plaintiffs cannot show that they "reasonably" relied on a purported "promise" that was not sufficiently specific.  (ECF No. 24 at 13.)

Nevertheless, the Court finds that Plaintiffs have pleaded claims for promissory estoppel.  As explained above, they have alleged that Defendant promised to guarantee Plaintiffs' capital by the end of 2020 if they refrained from selling their Tellurian stock and then in February 2021 entered a new agreement to indemnify Plaintiffs by the end of 2021.  They have alleged that they did not sell the stock, much to their financial detriment.  Therefore, Plaintiffs have stated claims for promissory estoppel.

**E.     Unjust Enrichment (Claim 6)**

Unjust enrichment is "an equitable remedy" that "does not depend on any contract" and "does not require any promise or privity between the parties." *Salzman v. Bachrach*, 996 P.2d 1263, 1265–66 (Colo. 2000).  Plaintiffs must allege that (1) "defendant received a benefit," (2) "at plaintiff's expense," (3) "under circumstances that

would make it unjust for defendant to retain the benefit without paying." *Id.*

Plaintiffs allege that had they sold their millions of Tellurian shares, the share price might have fallen even further than it did. (¶¶ 25, 27, 46.) Therefore, Plaintiffs have sufficiently alleged that they conferred a benefit on Defendant, who owned millions of Tellurian shares. (¶ 35.) And the Court finds that because Plaintiffs have alleged that they retained their shares instead of selling them prior to further price drops, they conferred this benefit on Defendant at their own expense. Finally, it would be unjust for Defendant to retain the financial benefit without paying Plaintiffs, as he agreed to do.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that Defendant's Motion to Dismiss (ECF No. 24) is DENIED.

Dated this 23rd day of June, 2023.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge