1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 22-cv-00165-WJM-MDB
_____

CHRISTOPHER PARKER, et al.,

Plaintiff,

v.

CHARIF SOUKI,

          Defendant.

_____

Proceedings before MARITZA DOMINGUEZ BRASWELL, United States

Magistrate Judge, for the District of Colorado,

commencing at 11:12 a.m. on January 8, 2024,

in the United States Courthouse, Denver, Colorado.

_____

WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE

HEREIN TYPOGRAPHICALLY TRANSCRIBED...

_____

APPEARANCES

          JEFFREY WALDRON, CRAIG WENNER, and MATTHEW

SCHWARTZ, Attorneys at Law, appearing on behalf of the

Plaintiff.

          BONNIE FRAASE, TIM MCCONN, and MARISSA RONK,

Attorneys at Law, appearing on behalf of the Defendant.

_____

DISCOVERY CONFERENCE

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com

2

P R O C E E D I N G S

(Indiscernibles due to poor audio quality of recording.)

THE COURT:  Calling case No. 22-165, in the Matter of Parker v. Souki.  I'll take appearance of counsel, starting with plaintiffs' counsel.

MR. WALDRON:  Good morning, Your Honor.  This is Jeffrey Waldron on behalf of the plaintiff (audio interference) my colleague Matt Schwartz (indiscernible) here before you with me at the end of August.  And Mr. Wenner has just joined the case.  Ms. Goldman, who you're familiar with, just left on maternity leave as of last week.

THE COURT:  Okay.

MR. WALDRON:  So Mr. Wenner will be stepping in to her place with this.

THE COURT:  Okay.  Yeah.  I was wondering because I -- I knew what case was coming up, but all these faces are brand-new to me, so thank you for that explanation.  You were cutting off a little bit as you were talking.  So as everybody else is entering their appearance, just check your mic.  All right.

For defendants?

MS. FRAASE:  Good morning, Your Honor.  I'm Bonnie Cantwell Fraase of Yetter Coleman on behalf of defendant

Charif Souki.  I'm joined by our co-counsel Marissa Ronk at Whe- -- Wheeler, Trigg, O'Donnell, I should say, and also Tim McConn of Yetter Coleman.  You're familiar with Tyler Young, my colleague here at Yetter Coleman, he is in a deposition today.

THE COURT:  Okay.  All right.  We are here because the parties have indicated to the Court that there is discovery dispute or a set of discovery disputes.  I've reviewed that.  I can tell you that I already have a view with respect to the first two issues, but I did want to hear from the parties on the third issue.

With respect to the first issues, I agreed with defendant:  The deposition dispute on how many days, I mean, I don't think one day is enough.  It -- this is a meaningful case.  You've got somebody who is going to be deposed, both as a fact witness and as a corporate representative, and I just don't think that one day is enough.  We can certainly talk about what limitations to put on it, but I -- I'm -- I'm agreeing with defendants on that one.

With respect to the second issue, I also agree with the defendants.  The deposition should be at defendant's counsel's office.  They are the ones that have to defend this deposition, and the defendant should be allowed to be in a setting where he is most comfortable. And I don't think it really inconveniences counsel, given

4

that you're traveling anyways and you're going to have to make arrangements to take information out of the state.

So any questions on that or anything you'd like to add, knowing how I view that?

MR. WALDRON:  If I -- if may, Your Honor, just on the -- on both of those.  Our -- our view on the 30(b)(6) deposition is that because Mr. Parker was the, you know, sole member, his knowledge is coextensive with the (indiscernible).

And in that case, we don't believe that it necessitates (indiscernible) two days of deposition time. We are fine with allowing, you know, defendants to go over the deposition time limit, but we don't believe that -- and we wouldn't stop them on one day, but we -- we don't believe that two days are necessary.

THE COURT:  I -- I understand your position.

MR. WALDRON:  (Indiscernible).

THE COURT:  But I -- but I also, as I mentioned before, I agree with the defendants that you've -- you've got him in two capacities, so I understand that the information that he's testifying to is coextensive and sort of overlaps with both.  But actually, that's the very argument they're making, right, is because there is some overlap, it can be confusing.

He's being deposed in two different capacities.

If they're doing it all on the same day, it can be very confusing. And I think you know, when you get to trial, that's when the confusion is sort of borne out because you don't know did he testify as the corporate representative or did he testify in his individual capacity as to what he remembered, rather than as to what he was prepared for?

So I -- I understand the argument that you're making, I still disagree. You can do it in two days. If you think you need some limitations on it because of that coextensiveness, I would be inclined to place some limitations on the day so that he's not sitting for two seven-hour days, but I do think it should happen on two different days.

Do you have requests for limitation with respect to the -- the time on the days?

MR. WALDRON: I -- I think that -- yes. I think that if (indiscernible) truncated (indiscernible), you know, two to three hours of --

THE COURT: Okay.

MR. WALDRON: -- actual time.

THE COURT: Okay. All right. Let me hear from defense counsel.

MS. FRAASE: Thank you, Your Honor.

And, obviously, we -- we do agree with your point, that the confusion and the opportunity for confusion when an

6

individual is sitting, both in an individual and a corporate representative capacity is profound.

Another thing that's a little bit unique here is we do not agree with plaintiffs' counsel that the knowledge of Red Mango is coextensive with that of Christopher Parker. The reason is because (indiscernible) corporate form and, of course, we're going to dive into it during the course of the deposition.

What we see from documents is it's actually Red Mango's director who uses the -- the corporation. He is the only person authorized to make agreements on behalf of the corporation. And what we have seen from the registry of directors that plaintiff produced is that Christopher Parker has not been a director since June '19.

Actually, in 2019, he functionally divorced himself from Plaintiff Red Mango by placing it in an off-shore trust and -- and removing some of the directorship. And since then, three different individuals have been the director.

And so we're going to need to (indiscernible) from the corporate representative all of the intentions, all of the motivations, communications, decisions, transactions that those three directors made since the time that Mr. Parker separated himself from Plaintiff Red Mango.

For that reason, we don't believe a truncated day

is going to be sufficient for us to get through the extensive lines of questioning that we anticipate.

Further, as plaintiffs themselves have noted, we have a lot of documents to get through.  And if they have a lot of documents for Mr. Souki, then we certainly have a lot of documents for the two plaintiffs that we're going to need to ask questions of.

So that would be the initial clarification of why we think that -- that there's -- there's more than just two to three hours.  I can offer the Court a few examples of the kinds of questions we plan to ask plaintiffs, if that would be helpful for explaining why we think it's going to be much more robust.

THE COURT:  So -- well, hold on a second.  I would not be inclined to truncate your 30(b)(6) deposition.  I think the 30(b)(6) deposition should be a full day.  But he's already -- if he's already sitting for a 30(b)(6) -- and I'm going to assume that you'll do the 30(b)(6) first.  So he's already sitting for a 30(b)(6), and some of the information that you are going to get from him relates to his involvement in this matter generally, I'm sure, why does he need to sit, him as an individual, so not the corporate representative, but him as an individual, why do you need another seven hours with him?

Because I -- I do agree with Mr. Waldron, there

are going to be some areas that overlap, and I hear your point, that there are directors that are responsible for Red Mango at some point in time, but -- but I can see a lot of this information being coextensive.

MS. FRAASE:  Thank you for asking, Your Honor.  If I may.

Mr. Parker's relationship with Mr. Souki goes back to 2018, and there are two different alleged agreements, if the Court will recall, that took place in two different years, which is --

THE COURT:  I know, but they're like --

MS. FRAASE:  -- extremely (indiscernible).

THE COURT:  -- they're like text messages, right? I mean, this isn't like some involved contract.  There are text messages, so I still don't see why another seven hours with him individually is necessary.

MS. FRAASE:  So it's the fraud.  It's the fraud that gets us to a much lengthier deposition, Your Honor.

And as you previously found, the sorts of intentions and motivations and alleged conduct that go into fraud are, you know, obviously extremely serious and nuanced, as plaintiff has suggested in this matter, and it's going to require extensive questioning to fully appreciate why they're seeking (indiscernible) and breach of contract damages, plus punitive damages that could get us up to 100

million.

Plaintiffs themselves have identified 11 individuals with whom plaintiff had discussed the alleged agreements with Mr. Souki and Tellurian. And each of those 11 individuals are going require, you know, modules for us to get through with Mr. Parker in terms of the kinds of communications he had with them individual. And so that will take additional time.

It's an enormous case, and we're taking it very seriously. $100 million isn't a joke, and we think that it -- it just is going to require seven hours. If -- if at any point it becomes clear it takes less, we are not going to belabor the deposition; but this is a case of the magnitude that, you know, honestly, we expect the full two days allotted under the rules to be kind of (indiscernible) at the start.

THE COURT: Okay. All right. You've provided me with enough information to allow me to conclude that you do need the two da, and I agree, this is a big case.

And Mr. Waldron, your client has brought this case, and so he should expect to sit for deposition in his individual capacity for a full day as well.

All right. Issue No. 2 is the defendant's counsel's office. Mr. Waldron, you heard my decision on that. Anything to add there?

10

MR. WALDRON:  I would just like to add that I appreciate Your Honor's decision, but I would like to draw Your Honor's attention to the fact that defendant has yet to -- we've agreed on dates, but they have yet to notice topics for the 30(b)(6) deposition.  And we would need -- and at this point, we're going on about two weeks until the date that's been agreed upon.  We do need time to (indiscernible).

THE COURT:  You're cutting out a little bit.

MR. WALDRON:  Just to get everything --

THE COURT:  You're cutting out a little bit.  So the issue is that you want specific -- you have a date, but you need -- I'm sorry.  You -- you were cutting out, so I was having a hard time understanding what the ask is.

What are you asking for?

MR. WALDRON:  Sure.  I'm -- they have not -- defendant has not noticed the 30(b)(6) deposition yet.  We have not seen the 30(b)(6) topics.

THE COURT:  Got it, okay.

MR. WALDRON:  So (indiscernible) prepare for that.

THE COURT:  Sure.

MR. WALDRON:  And they have not --

THE COURT:  Got it.  You're looking for the topics so that you can prepare.  When is the deposition happening?

MR. WALDRON:  The 24th and 25th of January.

11

THE COURT:  Of January?  Okay.  Ms. Fraase?

MS. FRAASE:  And we're able to provide those topics.  I'm so sorry, Your Honor.

THE COURT:  Go ahead.

MS. FRAASE:  We're able to provide those topics today.

THE COURT:  Perfect.  All right.  All right.

So the issue -- the last issue is where I thought I needed to hear from the parties.  Plaintiffs are wanting to run search terms across defendant's text messages. Sounds like there was agreement on those search terms, then certain messages were produced.  But now plaintiffs want additional searches run because of their review of the initial set of text messages.

And it sounds like defendant is essentially making a burden argument in opposition to that subsequent search.

Is that right, Ms. Fraase?

MS. FRAASE:  That's correct, Your Honor, and I can expound upon that point.

So in the summer, plaintiffs provided us with search terms to be run across the Parker devices.  We had already done a substantial amount of email production at that point, and so (indiscernible) once we're back into the -- into the breach for the text messages, we went through an expansive conferral process.

12

So we agreed which application defendant would run the search terms across and how we would produce those text messages, including by agreeing to produce, like, whole days instead of individual text messages. And we ran the -- the search terms.

Over the weekend, we noticed our hit count on those search terms was actually close to 1,000 text messages. So it's (indiscernible) text messages. We reviewed the full day for each of the hits and were able to produce 188 days of text messages to plaintiff in October.

Based on their review of the -- the 180 text messages, plaintiffs came back to us with a request that we review almost 4,000 more days of text messages, which at this point is a considerable burden, not only because we've already gone through the hard work of reviewing the initial agreed-upon search terms, which as the Court had previously heard, we run search terms because it's an efficient wait of foreclosing these kinds of discovery disputes.

But it's also a burden because we're looking at the (indiscernible) in the middle of February. We have the depositions (indiscernible), and it's not (indiscernible) ourselves back with a review document (indiscernible) using the documents we have in hand to further discovery through deposition.

(Indiscernible) for making this -- this burden on

13

hand, we think that the 180 text messages requested are a fulsome and complete search, and there's nothing more required at this point, (indiscernible) would be an undue burden if it were.

THE COURT: Okay. Mr. Waldron?

MR. WALDRON: Sure. Thank you, Your Honor.

When defendants produced Mr. Souki's text messages to us, defendant --

THE COURT: All right. Mr. Waldron, I am going to ask you to call in. So mute your computer and dial the call-in number because you're cutting off so much, and I feel like I'm not going to get to hear everything you -- you have to say, so why don't you call in real quick. You can stay on the camera, just mute.

UNIDENTIFIED SPEAKER: And, Your Honor, while we wait for Mr. Waldron to connect by phone, if that does not work, I can speak to the issue as best I can. Also, there is an IT issue through our office that we are working to resolve that it interferes with our ability to connect to the court system. We're working to make sure in the future that doesn't happen again.

THE COURT: Okay. We had a ton of tech issues this morning, so I'm very sympathetic. We were not able to connect to our first conference. I had to sign on through my laptop, and then we had two conferences going. So I know

-- I know tech issues.

While Mr. Waldron is connecting, I'm going to take a very brief like one-minute recess.  I just need to get a drink of water.  Give me a second.

(Recess from 11:27 a.m. to 11:28 a.m.)

THE COURT:  Okay.  All right, Mr. Waldron.

MR. WALDRON:  Thanks, Your Honor.  Can you hear me?

THE COURT:  Much better.

MR. WALDRON:  Great.  Sorry about that.

THE COURT:  It's okay.

MR. WALDRON:  So as -- as I was saying, when defendant produced text messages this fall, one of the terms that we did have defendant run at the time was Tell or T-e-l-l.  That is a Tellurian ticker symbol.  We know that Mr. Parker sometimes referred to Tellurian as "Tell," and that is why we asked them to run this in the first instance.

Because, obviously, tell is also a common verb used in some text messages that were, you know, not -- would not have otherwise been captured by the search terms that we had originally proposed, but it was clear from the messages that they were discussing Tellurian, right?

And the text messages that we do have prove to be a very rich source of information about Mr. Souki's financial position, the financial position of Tellurian.

15

Right around the same time that he was making the guarantee to our client, he was also asking other friends to buy Tellurian -- positions in Tellurian to combat the short-selling campaign that he -- he says was ongoing at the time.

Later that same year, he made a similar guarantee to another individual via text message.  That is not, you know, the exact same words as what he said to our clients, but substantial similar.  So because of that and because of all the information that we do see him communicating about Tellurian in the text messages, we proposed a more expansive, but still I think appropriately narrow search term that just adds a few more terms like "short" and "squeeze" to other terms that we have, you know, had previously asked that they run.

THE COURT:  Uh-huh.

MR. WALDRON:  And I don't think that -- because as you mentioned earlier, these are text messages.  These aren't, you know, very complicated financial agreements, documents, they don't need a review of the -- that is as time-consuming as documents like that.

So we don't think that burden argument holds water here.  I think we that the relevance to the case is of significant importance that we should be able to get these text messages, Your Honor.

16

THE COURT:  Okay.  All right.  Ms. Fraase, look, this is -- am I saying your name right?  Is it Fraase?

MS. FRAASE:  It is Fraase, thank you.

THE COURT:  Okay.  All right.  Ms. Fraase, I don't think this is a situation where, you know, they're proposing some terms and it's essentially a fishing expedition. They've already reviewed some text messages, they can see that this term is relevant.

It looks like they've taken the extra step of adding some additional limiting terms as best they can to keep the burden as minimal as possible.  So I am going to allow them to have these next search terms run and you produce the -- the documents after review.

But, Mr. Waldron, I will say I think Ms. Fraase's making a good point about you got to move on at some point and you've got start focusing on what you have and taking the depositions with the information you have.

So I'm not going to be giving you this kind of room to keep adding search terms after this.  I'm going to give you these search terms, you're going to take a look at these text messages, and that's it.  You're not going to come back and say, "Well, now I've reviewed, and I see these other search terms that are relevant as well."

Go ahead, Ms. Fraase.

MS. FRAASE:  Thank you, Your Honor.

If I may, if this is the world that we're in, and I have few disputes with the characterizations that opposing counsel has made.  But working with what Your Honor just said, I would urge the Court to only require that the search terms beginning with "tell" or "tell" with (indiscernible) be required to be run.

This search term, while I think it was overly broad, it does get to opposing counsel's point that there were fortuitous hits on tell, and they should be allowed to discovery more one that universe.

The alternative search terms that they have proposed begins with share or stock is completely overbroad and doesn't have any limiting factor with respect to the fax of this case, and that one hits on 2200 in text messages.

So in -- in the world that we're dealing with where the Court is inclined to allow more discovery and with the practical realities of depositions around the corner, I think that I would suggest that we run only the -- the terms beginning with tell or tell, which gets to my opposing counsel's argument about that being the -- the foothold for additional searching, and that one hits on 1600 text messages, which is a handsome feat.

I'll add to this, having been the person to review the first round of text messages and produced them, that process took me a week's worth of time, and under the

18

present circumstances, it -- it seems very -- it's proving
to be very difficult, if it feasible, to complete this text
message review by the close of fact discover.

THE COURT:  What took you a week's worth of time?

MS. FRAASE:  Reviewing the text messages and
repairing the production.

THE COURT:  For the 600 -- or for the 180?

MS. FRAASE:  Yeah.  It -- we listed the hit count
of the weekend, and it was 915 text messages.

THE COURT:  Okay.  So it was 9 -- so 915 text
messages took you by yourself a week?

MS. FRAASE:  To -- to complete through the --
through the production process.

THE COURT:  Oh, okay.  All right.  Mr. Waldron?

MR. WALDRON:  Yeah.  Thank you, Your Honor.

THE COURT:  On -- on -- just on this issue.  I
mean, I'm already going to give you the information, but
just on the issue of limiting it the way Ms. Fraase's
suggesting.

MR. WALDRON:  Sure, of course.  I think that of
the -- that second search term that we've requested of
"share" or "stock," I don't think that is correct that, as
Ms. Fraase said, there's no -- no limitation to facts of
this case.  We are -- the search terms that we have within
10 of "share" or "stock," so it's not just share or stock

generally.  There are limitations within that, include "short" and "squeeze" and "borrow," which we've seen in a lot of the text messages regarding the short selling campaign.

Mr. Souki often says there -- for purposes of the short selling, that there aren't sharing available to borrow.  That's something that we've seen quite often, so I don't think that's correct that there's no limitation here.

And as he is most intimately involved with Tellurian, his stocks and his shares that we will be talking about most often in his text messages are those of Tellurian.  So that is while we think that is --

THE COURT:  Okay.

MR. WALDRON:  -- a reasonable request.

THE COURT:  I've heard argument on this.  I'm going to give him the messages with the search terms that he's proposing, Ms. Fraase, so you've got a produce them.

I will say that in other cases, the more appropriate, and I think less burdensome way to do this is to just image the phone and let, you know, their experts take a lock at it with some limitations, and then, you know, either an AEI -- AEO provision or confidentiality provisionals that help protect private information.

So the fact that you're wanting to review these first before producing them, that's what I think creates the

20

burden here, and that's -- that's fine.  I mean, you've chosen to do it that way, but I'm not going to have that be a reason to preclude them from obtaining relevant information.

MS. FRAASE:  Your Honor, may I ask a responsive question?  The first round of text messages, we did reciprocal search terms.  Can we trust that these terms will also be run reciprocally across plaintiffs' devices?

THE COURT:  I -- that issue is not before me.  I don't know if you've even conferred on this.  Have you conferred on what is -- yeah.  I mean, you all need to confer on the -- that to me is a completely different set of discovery, right, and you'd have to articulate the relevance of that.

I mean, I'm hearing Mr. Waldron articulate the relevance as to the search on this device, but I would need to hear the relevance on the search of their devices and before I hear that dispute, you need to confer on it, so confer.  If you can't agree, you can come to me.

Though, I mean, Mr. Waldron, you know, if -- if you're wanting broad search terms, you can pretty much assume that I'm going to allow broad search terms for them as well, so keep that in mind as you're conferring over this issue.

All right.  Anything else?

21

MR. WALDRON:  Yes, Your Honor.  On -- on that last issue regarding the production of these texts, because we -- we haven't confirmed completely that the deposition will be on February 15th, but we would like to set a deadline for production of those text messages so we have sufficient time to review them in advance of Mr. Souki's deposition on February 15th.

THE COURT:  Okay.

MR. WALDRON:  If you could provide guidance.

THE COURT:  All right.  Ms. Fraase, what do you propose?

MS. FRAASE:  At this point, I have quite a considerable feasibility concerns about getting through the 4,000 days of text messages because it's not individual text messages; it's days.  And then the way our database is set up, it's really designed for emails and documents, so it's very cumbersome to review the text messages.

THE COURT:  Why are you guys doing days?  That seems odd to me.  I mean, it would seem to be conversation-based, right?  So if a hit hits on a particular string, it's that string that's relevant, not the entire day of text messages.

MS. FRAASE:  It was plaintiffs' proposal based on previous experience.

THE COURT:  Okay.  I -- I mean, I don't see -- Mr.

22

Waldron, is there a particular reason why you think a full day is necessary?  That seems to be a way to cut back on the number of hits if you're not -- or I guess the review time, right?  So the hits are the hits.  Bullet the review time, if you're not reviewing the entire day, which I don't think is necessary, could be a lot faster.

MR. WALDRON:  Well, Your Honor, maybe I -- perhaps I'm confused about what -- how Ms. Fraase is describing this, but I -- the way that we reviewed our text messages is that they would hit on -- the search terms would hit on a conversation, and we would review Mr. Parker's conversation with that specific person for that day.

So it wasn't all of his text messages for all of the days that had a hit in it, it was conversations that we suggested.  And we -- we reviewed about, I think it was between 2500 and 3000 text messages, and in my experience, that did not take --

THE COURT:  I agree.  I've done --

MR. WALDRON:  -- very long.

THE COURT:  I've done many reviews of text messages, and I -- Ms. Fraase's estimate of a week for 900 seems really, really high, so I -- I agree with that.  Okay. Look, I don't want to -- if the parties have already agreed to that, I don't want to confuse things or make things more difficult.

23

Ms. Fraase, I -- I think you can get document reviewers to go through this stuff.  I mean, you've already, with the experience that you have personally reviewed whatever it is, the 900, you can probably put together a very short protocol for document reviewers to get through this very quickly.  That's been my experience.

You can hire contract attorneys, you can outsource this in a way that makes this faster.  I don't think you need more than a few weeks to get through these text messages, so I'm giving you an opportunity to propose --

MS. FRAASE:  Okay.

THE COURT:  -- a date, but if you don't propose a date, I'll propose one that's a couple weeks out.

MS. FRAASE:  Sure.  I'd like February 9th, but February 2nd.

THE COURT:  Okay.  February -- so when did you say the deposition was, Mr. Waldron?  On February 15th?

MR. WALDRON:  Yes.

THE COURT:  All right.  So that would give you about a -- yeah.  Let's do January 31st, which is the Wednesday before that date that you've just proposed, Ms. Fraase.  So January 31st --

MS. FRAASE:  Thank you.

THE COURT:  -- for the production, and that gives plaintiffs well over a week to work with that.  All right.

24

MR. WALDRON:  Thank you.

THE COURT:  Anything else?

MR. WALDRON:  If Your Honor would like -- the fact discovery deadline is approaching.  If Your Honor would like a update on the -- on third-party discovery, I'm happy to give that at this time, so...

THE COURT:  Sure, yeah, that'd be great.  When is the February -- the discovery cutoff?

MR. WALDRON:  February 16th currently.

THE COURT:  Oh.  And that's the same date as the deposition?  You're doing the deposition on the same day?

MR. WALDRON:  February 15th is the deposition.

THE COURT:  And the discovery --

MR. WALDRON:  And the discovery cutoff is the 16th, yes, Your Honor.

THE COURT:  The 16th, got it.  Okay.  All right.  Yeah.  Go ahead and give me an update.

MR. WALDRON:  Sure.  The -- there are three -- there's discovery -- non-party discovery outstanding from three different parties, including UBS.  Our -- UBS has represented to us that their production of documents will be complete by the end of January.

We are still in discussions with counsel for the trust that Mr. Souki set up regarding the production of documents and a 30(b)(6) deposition, we are conferring with

them later today to resolve any disputes.  There's a chance that we may have to bring a dispute to the Court regarding that, we hope not to.  We are trying to work through that with counsel.  And then we also noticed a --

THE COURT:  What -- regarding which discovery?

MR. WALDRON:  The trust.

THE COURT:  The trust discovery.

MR. WALDRON:  Mr. Souki's trust.

THE COURT:  I mean, I feel like I've --

MR. WALDRON:  And then --

THE COURT:  -- addressed that -- that dispute multiple times now.  What else could you possibly be disputing there?

MR. WALDRON:  The -- the counsel of the trust is resisting discovery in, you know, similar ways that Mr. Souki himself has resisted discovery regarding the relevance, and we have expressed that to -- to counsel and that is what we will continue to express.  So that is the basis of the dispute currently.

THE COURT:  Okay.  What else?

MR. WALDRON:  And then, finally, there is an outstanding 30(b)(6) deposition of Tellurian that has been noticed.  Tellurian has moved to quash that, and it is currently being heard in the Southern District of Texas with an argument scheduled for the -- January 17th, so I believe

that's next Wednesday.

We obviously at the whim of -- of the Texas courts there, the resolution of that and the timing, and we are pushing to have all third-party discovery finished by the discovery cutoff of February 16th. And -- but I did want to flag that if, because of the 30(b)(6) deposition of Tellurian or the trust deposition and production, if that pleads over, we may need to approach the Court as at the -- at the end of the month for an extension just to finish third-party discovery, but we do not think that will necessitate extending expert discovery, and that can happen in parallel.

THE COURT: Okay. All right. Ms. Fraase, anything to add?

MS. FRAASE: No, Your Honor. Nothing to add from our perspective. We look forward to receiving the third-party discovery that plaintiff received and we'll proceed.

THE COURT: Okay. All right. I think that's it then. Thank you. Oh.

MS. FRAASE: I will -- I will offer -- in -- in the nature of a third-party discovery, we are pursuing third-party discovery of witnesses identified by plaintiff through subpoena means. One of those is a subpoena duces tecum, I should mention that. And so that is ongoing.

THE COURT:  Okay.  All right.  Anything else?

MR. WALDRON:  That's it.

MS. FRAASE:  I hope that's all.

THE COURT:  All right.  Good luck to you all.

MS. FRAASE:  Thank you.

MR. WALDRON:  Thank you, Your Honor.

THE COURT:  Court is in recess.

(Whereupon, the within proceedings concluded at 11:44 a.m.)

                    TRANSCRIBER'S CERTIFICATE

I certify that the forgoing is a correct transcript, to the

best of my knowledge and belief (pursuant to the quality of

the recording) from the record of proceeding in the

above-entitled matter.

/s/Brittany Payne                     March 7, 2024

Signature of Transcriber              Date