**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 22-cv-0165-WJM-MDB

CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

 Plaintiffs,

v.

CHARIF SOUKI,

 Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART
CROSS MOTIONS FOR SUMMARY JUDGMENT**

---

Before the Court is Plaintiffs Christopher Parker and Red Mango Enterprises

Ltd.'s ("Red Mango") (jointly, "Plaintiffs") motion for partial summary judgment and

Defendant Charif Souki's motion for summary judgment.  (ECF Nos. 126, 127.)  The

motions are fully briefed.  (ECF Nos. 133, 134, 137, 138.)  For the following reasons,

the parties' cross motions are granted in part and denied in part.

## I. BACKGROUND AND PROCEDURAL HISTORY

The parties are familiar with the underlying facts of this case by way of the

Court's Order denying Souki's motion to dismiss.  (ECF No. 102.)  The Court

incorporates that background here and adds the following pertinent procedural history.

In February 2022, Souki moved to dismiss Plaintiffs' six claims for relief: (1)

breach of contract based on the August 2019 texts; (2) breach of contract based on the

February 2021 oral agreement; (3) fraudulent inducement; (4) promissory estoppel

based on the August 2019 texts; (5) promissory estoppel based on the February 2021 oral agreement; and (6) unjust enrichment.  (*See generally* ECF No. 24.)  In June 2023, the Court denied the motion, finding the essential terms of the August 2019 and February 2021 contracts to be sufficiently alleged at the dismissal stage.  (*Id.* at 6, 9.) The Court also declined to dismiss the breach of contract claims based on Souki's statute of frauds theory, explaining that Plaintiffs sufficiently alleged that the August 2019 contract complied with the statute of frauds pursuant to the partial performance exception.  (*Id.* at 8.)  Given this conclusion, the Court abstained from "analyz[ing] the legal sufficiency of [Souki's] signature" to the August 2019 contract.  (*Id.* at 8 n.2.)  The Court further concluded that the February 2019 oral contract was not subject to the statute of frauds because the contract "could be performed in less than a year."  (*See id.* at 10 (explaining that "the contract formed in February 2021 indemnified Plaintiffs through December 31, 2021 and could have been performed immediately thereafter").)

The Court denied Souki's motion to dismiss Plaintiffs' remaining claims as well. As to the fraudulent inducement claim, the Court found that Plaintiffs' allegations—that Souki "promised to indemnify Plaintiffs' losses when he in fact had no intention of doing so" and that Plaintiffs reasonably relied on this promise by not selling his shares— satisfied the heightened standards of Rule 9(b).  (*Id.* at 12.)  For these same reasons, the Court denied Souki's motion to dismiss Plaintiffs' promissory estoppel claims.  (*See id.* at 13 ("As explained above, [Plaintiffs] have alleged that Defendant promised to guarantee Plaintiffs' capital by the end of 2020 if they refrained from selling their Tellurian stock and then in February 2021 entered a new agreement to indemnify Plaintiffs by the end of 2021.  They have alleged that they did not sell the stock, much to

their financial detriment.").)

Finally, as to the unjust enrichment claim, the Court observed that Plaintiffs "sufficiently alleged they conferred a benefit on" Souki because, "had they sold their millions of Tellurian shares, the share price might have fallen even further than it did." (*Id.* at 14.)  The Court reasoned that "it would be unjust for Defendant to retain the financial benefit without paying Plaintiffs, as he agreed to do."  (*Id.*)

In August 2024, Souki moved for summary judgment on Plaintiffs' six claims, largely asserting the same arguments he did at the dismissal stage.  (*See generally* ECF No. 126.)  That same month, Plaintiffs moved for summary judgment on their August 2019 breach of contract claim and Souki's fraud and statute of frauds defenses. (*See generally* ECF No. 127.)

## II. APPLICABLE LAW

"Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law."  *Mountain Food, LLC v. Sentry Ins. a Mut. Co.*, 636 F. Supp. 3d 1307, 1309 (D. Colo. 2022) (citing Fed. R. Civ. P. 56(a)).  "The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party."  *Id.* at 1309–10 (citing *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006)).  "The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* at 1310 (quoting *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986)).  "Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present 'a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson*, 477 U.S.

at 251–52). "[Q]uestions of intent, which involve intangible factors including witness

creditability, are matters for consideration of the fact finder after a full trial." *Id.* (quoting

*Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980)).

"In order to establish breach of contract under Colorado law, Plaintiff[s] must

prove: '(i) the existence of a binding agreement; (ii) the plaintiff's performance of its

obligations (or some justification for its non-performance); (iii) the defendant's failure to

perform its obligations; and (iv) resulting damages.'" *Hottinger Excavating & Ready Mix,*

*LLC v. R.E. Crawford Constr., LLC*, 175 F. Supp. 3d 1269, 1277 (D. Colo. 2016)

(quoting *Xtreme Coil Drilling Corp. v. Encana Oil & Gas (USA), Inc.*, 958 F.Supp.2d

1238, 1243 (D.Colo.2013)).

### III. ANALYSIS

Souki moves for summary judgment on Plaintiffs' six claims for relief. (*See*

*generally* ECF No. 126.) Plaintiffs move for summary judgment on their August 2019

breach of contract claim and Souki's fraud and statute of frauds defenses. (*See*

*generally* ECF No. 127.) The Court grants in part and denies in part the parties' cross

motions for summary judgment.

### 1.    AUGUST 2019 BREACH OF CONTRACT

Both parties seek summary judgment on Plaintiffs' August 2019 breach of

contract claim. (*See generally* ECF Nos. 126, 127.) Souki argues that, because "Red

Mango was not a party to or even mentioned in the messages that are the basis of the

alleged agreement," it cannot "maintain a breach of contract claim against Souki." (ECF

No. 126 at 14.) He further argues that the alleged contract fails because of a "lack of

definiteness, failure of consideration, and the statute of frauds." (*Id.* at 15.) Plaintiffs

counter each of these points and contend that "[t]here is no genuine dispute of material fact that Souki is liable for breach of the 2019 Agreement."  (ECF No. 127 at 10.)

## A.  Red Mango

The Court begins by rejecting Souki's argument that Red Mango cannot enforce its August 2019 breach of contract claim because it was not a party to that alleged agreement.  At the dismissal stage, "the Court conclude[d] that Plaintiffs have sufficiently—though barely—alleged that Red Mango was party to the contracts."  The Court reasoned as follows:

> The Amended Complaint alleges that when Parker and Defendant met on June 13, 2019, they met to 'discuss [Parker] and Red Mango's investments in Tellurian,' and that in August 2019, Parker informed Defendant that he intended to sell 'his and Red Mango's shares in light of Tellurian's poor performance.'  (¶ 31.)  Further, the Amended Complaint alleges that at most Parker owned 3.3 million shares of Tellurian stock in his own name.  (¶ 13.)  Taking these allegations as true, the Court can reasonably infer that the 5.5 million shares referenced in the text exchange must have also included Red Mango's shares.  (¶ 29.)  Therefore, the Court will not dismiss Red Mango's claims at this stage of the litigation.

(ECF No. 102 at 5.)

Souki does not point to any evidence unearthed from discovery that would undermine the applicability of this reasoning at the summary judgment stage.  Instead, he continues to rely on the plain language of the August 2019 texts, which undisputedly do not mention Red Mango by name.  (*See* ECF No. 126 at 14 ("As Parker admits, and the plain language of the August 2019 text messages clearly show, Red Mango was not a party to or even mentioned in the messages that are the basis of the alleged agreement.").)  But the Court had that information at the dismissal stage and found it

insufficient to foreclose Red Mango's breach of claim as a matter of law.  Presented

with little new evidence or argument, the Court's position has not changed.

Souki also insists that discovery shows he did not become aware of Red

Mango's existence until at least a year after August 2019, so he could not have

intended to contract with Red Mango at that time.  (*See id.* ("Even as late as August

2020—a year after the exchange of the August 2019 text messages—neither Parker nor

anyone on behalf of Red Mango had made Souki aware of its existence.").)  But when

and how Souki learned of Red Mango's existence continues to be a strongly disputed

fact issue.  (ECF No. 134 at 20.)  Moreover, Plaintiffs point to Souki's deposition

testimony in which he said he "assumed that Mr. Parker held his Tellurian shares in one

or more entities and this structure did not surprise him."  (*Id.*)  This creates an inference,

albeit a weak one, that Souki understood in August 2019 that he was not contracting

with just Parker in his personal capacity.  As a result, summary judgment is unwarranted

on this ground as well.

At bottom, while the Court continues to believe that Plaintiffs' allegations and the

record evidence "barely" demonstrate Red Mango's participation in the August 2019

agreement, that opinion goes to the weight of the evidence, not its sufficiency.  (ECF

No. 102 at 5.)  As it is required to do, the Court will continue to draw all reasonable

inferences in Plaintiffs' favor and allow a jury to decide this issue.  *See Wagner v. Bank

of Am. Corp.*, 2013 WL 3786643, at *8 (D. Colo. July 19, 2013) ("Courts do not resolve

fact disputes on motions for summary judgment.  Juries do that."), *aff'd*, 571 F. App'x

698 (10th Cir. 2014).

## B.    Definite Terms

Souki contends that the August 2019 texts do not establish the existence of an

6

enforceable contract because the purported agreement's essential terms—namely, the "date of performance"; "number of shares covered by the alleged agreement"; and the price of those shares—are too indefinite.  (ECF No 126 at 15–16.)  The Court disagrees.

The Colorado Supreme Court has held that, "[a]lthough generally, the question of whether a contract exists is a matter of fact to be determined by the jury, this is only the case where the evidence is conflicting or admits of more than one inference."  *N.Y. Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996) (internal quotation marks omitted) (citing *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986)).  Where the "parties do not dispute what happened" but rather disagree about "what legal significance, if any, can be attached to the relevant events," *id.* at 410, the Court can only rule as a matter of law—*i.e.*, grant summary judgment—if "contractual formation does not conflict or admit of more than one inference."  *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019); *see also Bartch v. Barch*, No. 2022 WL 4092689, at *3 (D. Colo. Sept. 7, 2022) ("A contract's existence is a question for the factfinder, particularly when 'the evidence is conflicting or admits of more than one inference.'") quoting *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1986))).

"Colorado law requires parties to agree on all essential terms to form a contract." *Id.* (citing *Fed. Lumber Co. v. Wheeler*, 643 P.2d 31, 36 (Colo. 1981)).  "Such terms 'must be sufficiently definite to enable the court to determine whether the contract has been performed or not.'"  *Id.* (quoting *Stice v. Peterson*, 144 Colo. 219, 355 P.2d 948, 952 (1960)). "[W]hen the language in a contract is too uncertain to gather from it what

the parties intended, the courts cannot enforce it." *Id.*

The record evidence plainly shows that Souki allegedly promised to "guarantee

[sic] [Plaintiffs'] capital by dec 2020." (ECF No. 127-2 at 13.) Yet Souki submits that "a

date of performance in the vague period of 'dec 2020' does not provide a basis to

determine whether the parties could have performed the alleged contract," especially

"given the volatility of Tellurian stock and the possibility of significant price swings." (*Id.*

at 15.)

Contrary to Souki's assertion, the Court concludes that a performance date of

December 2020 is sufficiently definite for a jury to reasonably infer the existence of a

contract and for a court to determine whether the parties performed their obligations.

Another district court in this Circuit has reached the same conclusion on similar facts:

> Defendants' second argument is that Firehole has failed to
> plead a claim because the maturity date is left undefined in
> the note, which Defendants claim is 'one of the most key
> terms in a convertible note agreement . . . .' Instead of
> noting a specific maturity date, the promissory note states
> that the maturity date shall be "on January ———, 2016.' *But
> while the exact day is left unspecified, the month of the
> maturity date is exact.* The maturity date could be read as
> 'no later than January 31st, 2016.' Unlike the cases in which
> Utah courts have found that a contract was missing an
> essential term, the contract in this case still includes definite
> language. The note specifies that the maturity date is to be
> January 2016, and drawing all reasonable inferences in the
> light most favorable to the plaintiff leads to the conclusion
> that the maturity date could have been no later than January
> 31st, 2016. *The lack of an exact day as a maturity date
> does not defeat Firehole's breach of contract claim.*

*Firehole River Cap., LLC v. Supurva Healthcare Grp., Inc.*, 2021 WL 4291087, at *6 (D.

Utah Sept. 21, 2021) (footnotes omitted) (emphases added). Here, Plaintiffs testified at

their depositions—albeit inconsistently—that the date of performance was December

31, 2020.  (ECF No. 126-3 at 145–149.)  The Court finds that this is sufficient to create a fact issue as to the sufficiency of the contract's date of performance.  *See Neher v. Neher*, 402 P.3d 1030, 1036 (Colo. App. 2015) (confirming that "whether the parties failed to agree on one or more material terms . . . would be a question of fact").

Whether the quantity and price of the shares Souki allegedly agreed to guarantee are sufficiently definite likewise present fact issues.  As to quantity, Souki asked, "How much stock do you have what is your basis," to which Parker replied, "5.5m shares and my net is circa 830 now."  (ECF No. 127-2 at 13.)  Parker then clearly disclosed that he was approximating: "I'm not at my computer so it's around that price."  (*Id.*)  But that caveat did not deter Souki.  His next message plainly demonstrates that he agreed to guarantee the price of roughly 5.5 million shares.  The price or cost basis of those 5.5 million shares is equally definite: Parker estimated in the same text, and Souki did not protest, that the shares were worth $8.30.  (*Id.*)

To the extent Souki maintains that these terms are nonetheless too indefinite to amount to a valid contract—given Parker's equivocations during his deposition, the differing share price figures produced through discovery, and the fact that Parker later tried to convince Souki "to sign a written agreement with all the bells-and-whistles"—he is free to try to expose such discrepancies at trial.  (ECF No. 126 at 16.)  But the Court cannot grant summary judgment on these bases, especially since a "'contract will not fail for indefiniteness if missing terms can be supplied by law, presumption or custom.'"  *Bill Barrett Corp.*, 918 F.3d at 766 (quoting *Winston Fin. Grp., Inc. v. Fults Mgmt., Inc.*, 872 P.2d 1356, 1358 (Colo. App. 1994)).  This principle appears to be particularly applicable in regards to opaque price terms.  *See In re Iron*, 2023 WL 8710653, at *4

9

(10th Cir. Dec. 18, 2023) ("[T]he parties need not agree on a contract price to support a claim."); *Interstate Restoration, LLC v. Zurich Am. Ins. Co.*, 2024 WL 943356, at *17 (D. Colo. Mar. 5, 2024) ("Colorado law does not require precise terms related to payment . . . .") (citation omitted); *Bartch*, 2022 WL 4092689, at *3 ("The parties need not discuss every material term for there to be a meeting of the minds if a party can show that both parties knew and agreed to the term."); *Regal Realsource LLC v. Enlaw LLC*, 554 P3.d 1112, 1122 (Utah Ct. App. 2024) ([C]ontracts are not per se unenforceable if the parties—rather than setting forth a specific price term or a specific description of the property covered by the contract—include in the contract a method by which that term will be computed or ascertained in the future.").

For all these reasons, the Court concludes that disputed fact issues regarding the definitiveness of the August 2019 contract's essential terms preclude summary judgment.

### C.    Consideration

Souki next contends that the alleged August 2019 contract "fails because the alleged agreement is not supported by contractual consideration."  (*Id.*)  In support, he points out that "Parker never asked for a guarantee from Souki" and, "[u]nder Parker's view, Souki would receive nothing if he paid the capital deficiency claimed by Parker— not even the shares themselves—which Parker would apparently retain while pocketing the amount paid by Souki."  (*Id.* at 17.)  In his response to Plaintiffs' partial summary judgment motion, Souki adds that "Parker owed Souki no obligation with respect to Parker's Tellurian shares; Parker could have sold his shares at any time."  (ECF No. 133 at 8.)

"Under Colorado law, an agreement not supported by consideration is

unenforceable." *In re Rolling Thunder Gas Gathering, L.L.C.*, 348 B.R. 803, 810 (Bankr. D. Kan. 2006).  "A party to a contract can provide consideration by suffering a detriment . . .; there is no requirement that the other party obtain a benefit."  *Devs. Sur. & Indem. Co. v. Barlow*, 628 F. App'x 980, 983 (10th Cir. 2015) (citing *Manwill v. Oyler*, 361 P.2d 177, 178 (1961) ("[I]n order for a contract to be valid and binding, each party must be bound to give some legal consideration to the other by conferring a benefit upon him or suffering a legal detriment at his request.")); *see also Trans–Western Petroleum, Inc. v. United States Gypsum Company*, 830 F.3d 1171 (10th Cir. 2016) ("The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.  Consideration sufficient to support the formation of a contract requires that a performance or a return promise must be bargained for.") (citation omitted).  "When evidence is introduced tending to prove lack of consideration, the issue of valid consideration becomes a question of fact."  *In re Rolling Thunder Gas Gathering, L.L.C.*, 348 B.R. at 810.

Here, there is ample evidence substantiating Plaintiffs' theory that they suffered a legal detriment, which inured to Souki's benefit.  Plaintiffs point to their conduct from August 2019 through December 2020, during which time they undisputedly retained a very large number of Tellurian shares to their financial detriment.  (ECF No. 134 at 20.) And while this detriment alone is sufficient to demonstrate legal consideration, *Barlow*, 628 F. App'x at 983, Plaintiffs also present evidence from which a jury could reasonably infer that Souki benefitted as a result.  Plaintiffs argue that their decision not to sell their shares "stabiliz[ed] Tellurian's share price during a short selling campaign, and avoiding, or at least delaying, defaulting on a $70 million loan Souki was using to fund

various real estate investments." (*Id.*)  Souki may attempt to refute this argument by citing Parker's testimony that he had other reasons not to sell his shares—namely, because he believed in Tellurian's "significant upside." (*See* ECF No. 133 at 4, 13 (pointing to Parker's deposition testimony that he "believed that LNG as a commodity was needed").)  But this is a dispute as to Parker's intent, which is clearly a fact issue to be decided by a jury.  *See Mountain Food, LLC*, 636 F. Supp. 3d at 1310 (intent is a fact issue).

The Court is not persuaded otherwise by Souki's argument that consideration was nonetheless lacking because "Parker could have sold his shares at any time," which demonstrates that the August 2019 agreement did not impose mutual obligations on the parties.  (ECF No. 133 at 8.)  While the parties' texts do not expressly confirm that Parker agreed not to sell his and Red Mango's stocks in exchange for the guarantee—indeed, the texts only expressly demonstrate a promise *by Souki* to confer a benefit on Plaintiffs—Souki's text thanking Parker for his "help and confidence" creates a reasonable (even strong) inference that Souki asked Parker to retain ownership of his shares in exchange for this promise.  (ECF No. 127-2 at 13.)  Parker's response, "OK pal I got confidence in you," further suggests that the parties understood that Souki expected Parker to refrain from selling his shares.  (*Id.* at 14.)  And Plaintiffs conduct thereafter, *i.e.*, not selling the shares covered by the alleged agreement, further bolsters the notion that Souki's promised guarantee was not mere charity—it was in exchange for Plaintiffs' performance.

Thus, the Court concludes that disputed fact issues preclude summary judgment for lack of consideration.

### D.    Statute of Frauds

Both parties move for summary judgment on Souki's statute of frauds defense. (*See generally* ECF Nos. 126, 127.)  Souki points out that "[t]he agreement was to be performed in December 2020, more than one year after it was allegedly formed."  (ECF No. 126 at 17.)  As a result, he says, the agreement is subject to the statute of frauds and must satisfy its signature requirement.  (*Id.*)  Souki posits that, contrary to the Court's ruling at the dismissal stage, the partial performance exception to the statute of frauds does not apply because discovery has revealed that Plaintiffs' forbearance is referrable "to other theories and causes unrelated to the alleged agreement."  (*Id.*)

Plaintiffs does not dispute that the August 2019 agreement falls under the statute of frauds but maintains that "[t]he 2019 Agreement satisfies the statute of frauds because it was reduced to writing in a series of text messages that are undisputably attributable to Souki."  (ECF No. 127 at 14.)  They also continue to rely on the partial performance exception.  (*Id.* at 14.)

"The Federal Rules of Civil Procedure recognize the application of the statute of frauds as an affirmative defense."  *Millennium Funding, Inc. v. Priv. Internet Access, Inc.*, 2022 WL 7560395, at *24 (D. Colo. Oct. 13, 2022) (citing Fed. R. Civ. P. 8(c)(1)).  Under Colorado law, "[e]very agreement that by the terms is not to be performed within one year after the making thereof" is void, "unless such agreement or some note or memorandum thereof is in writing and subscribed by the party charged therewith."  § 38-10-112(1)(a), C.R.S. (2024).  Colorado recognizes that electronic signatures carry legal effect.  *See* § 24-71.3-107(4), C.R.S. 2024 ("If a law requires a signature, an electronic signature satisfies the law.").  An "'electronic signature' means an electronic sound, symbol, or process attached to or logically associated with a record and executed or

adopted by a person with the intent to sign the record." § 24-71-101(1), C.R.S. 2024.

The August 2019 agreement was set to expire in December 2020, so it could not have been performed within one year of its making. Consequently, it is undisputedly subject to the statute of frauds and legally enforceable only if it was in writing and signed by Souki, or subject to an exception. § 38-10-112(1)(a).

The Court agrees with Souki that, although the August 2019 agreement is written, it nonetheless does not satisfy section 38-10-112(1)(a) because it was not signed by him. The agreement, which consists of a handful of text messages over the course of one morning, mentions only Parker's name, not Souki's. (ECF No. 127-2 at 13–14.) Hence, the alleged August 2019 contract plainly does not contain a signature, electronic or otherwise, as required under section 38-10-112(1)(a).

The caselaw cited by the parties and independently researched by the Court, although not interpreting Colorado's electronic signature statute,[1] coheres with the Court's conclusion. *See, e.g., Craig v. B. Riley FBR, Inc.*, 2020 WL 6889018, at *10 n.8 (N.D. Tex. Nov. 23, 2020) ("The court also notes that, although the text messages between Rosiak and Craig are a 'writing,' the messages are not 'signed' and do not contain all material terms of the alleged oral contract and, therefore, do not satisfy the Texas statute of frauds.")[2]; *Debellis v. Hollahan*, 2017 WL 2482865, at *3 (D.N.J. June

---

[1] The Court assumes the parties did not find any Colorado caselaw addressing under which circumstances unsigned text messages can satisfy Colorado's electronic signature statute because they do not cite to any. The Court has likewise not managed to locate any such Colorado authority.

[2] The Court takes Plaintiffs' point that the *Craig* court's analysis of the signature issue was confined to a conclusory footnote; still, its conclusion is at least minimally persuasive insofar as it demonstrates that text messages must be signed to satisfy the statute of frauds, even though electronic signatures are sufficient. Simply sending a text from a unique phone number does not alone suffice; the texts must still be signed by the party against whom

8, 2017) ("Plaintiff presents no written contract that indicates a sale between the parties
and bears Defendants' signature. Plaintiff's counterarguments fully miss the mark. The
text messages are not an adequate writing . . . ."); *Calderwood v. Rinsch*, 2022 WL
17251755, at *3 (E.D. Pa. Nov. 28, 2022) ("Written agreements that are not formally
memorialized—such as casual emails and text messages—can be just as facially
flawed."); *see id.* ("Rinsch's text did not include the price of the items to be purchased,
nor a signature."); *In re Smith*, 664 B.R. 740, 747 (Bankr. E.D. Tenn. 2024) (concluding
that the text message at issue "d[id] not qualify as a signed writing"); *Preston v. Nichols*,
216 A.D.3d 1398, 1399 (2023) ("Here, however, not one of the text messages or emails
submitted by plaintiff contains a signature block or other electronic signature of
defendant."); *Tayyib Bosque, Corp. v. Emily Realty, LLC*, 2019 WL 2502494, at *6
(S.D.N.Y. June 17, 2019) ("The Statute of Frauds requires Bosque to prove that
LaFrieda signed the text messages. An electronic record can be considered an
adequate writing *but only if it is signed*.") (emphasis added).

 And although some courts have determined that their states' similar electronic
signature statutes were satisfied by e-mail or text exchanges, almost[3] all of those
exchanges involved a signature of some sort.[4] *See, e.g., US Iron FLA, LLC v. GMA*

---

enforcement is sought.

 [3] *But see K Union Co. v. 2070 Beaver Ruin Ctr., LLC*, 2024 WL 1551224, at *4 (N.D. Ga.
Jan. 30, 2024) ("Because (1) the Parties expressed their intention to be bound—Plaintiff by
executing the 2023 Addendum; Defendant by providing the 2023 Lease Addendum to Plaintiff
for signature and representing that Defendant "will sign" once Plaintiff signed—and (2)
Defendant specified the terms of the new lease not only in the January 9, 2023 email but also in
the 2023 Addendum, the Court concludes that the 2007 Lease Addendum is valid and
enforceable *despite Defendant's lack of signature*.") (emphasis added).

 [4] The Court rejects Plaintiffs' suggestion that texts evincing an intent to be bound—such
as "Please keep this text"—obviates the need for a signature. While this kind of language is
surely relevant to the analysis, magic words cannot serve as an end run to section 38-10-

*Garnett (USA) Corp.*, 660 F. Supp. 3d 1212, 1224 (N.D. Fla. 2023) ("Here, the January

19 email in which Hanson conveyed the revised terms to Miller and asked him to send a

revised purchase order if the terms were agreeable closed with 'Best Regards, Brianna,'

which is sufficient to authenticate the email."); *BrewFab, LLC v. 3 Delta, Inc.*, 2022 WL

7214223 (11th Cir. Oct. 13, 2022) (affirming district court's order that the language "I

george Russo from 3 Delta" "satisfies the definition of an electronic signature, *i.e.*,

'letters, characters, or symbols' intended to 'authenticate a writing'") (citation omitted); *K

& K Dev., Inc. v. Andrews*, 219 N.E.3d 306, 318 (2023) ("The e-mail messages also

bear the necessary electronic signatures as they originated from Eugene's e-mail

account, *his signature appears in the exchange*, and he acknowledged at trial that he

sent the messages.") (emphasis added); *St. John's Holdings, LLC v. Two Elec., LLC*,

2016 WL 1460477, at *1 (Mass. Land Ct. Apr. 14, 2016) (finding a text message with all

the required terms *and a typed signature* at the conclusion of the message was a writing

that satisfied the statute of frauds).

Plaintiffs try to show that a signature of some sort was present in this case by

pointing to a signed text that Souki sent Parker in March 2018.  (ECF No. 127 at 13; *see

also* ECF No. 127-2 at 2 (signed March 2018 text from Souki inviting Parker to lunch).)

But Plaintiffs' effort fails.  While Colorado's signature requirement can be satisfied if the

signature—typed or otherwise—is found in the agreement "or some note or

memorandum thereof," the March 2018 text is not such a note or memorandum.  § 38-

10-112(1)(a).  That text is wholly unrelated to the August 2019 agreement, both

substantively and temporally.  *See* Restatement (Second) Contracts § 132 (providing

---

112(1)(a)'s signature requirement.

that several writings together can satisfy the statute of frauds if at least one of them is signed and they expressly reference each other).  Nor do the other texts between Souki and Parker over the course of several years, throughout which Parker repeatedly referred to Souki by his first name, satisfy the signature requirement.  (*See generally* ECF No. 127-2.)  Those references were all undisputedly authored by Parker, not Souki.  And again, they did not reference the alleged agreement.

Yet, despite the absence of a valid signature, summary judgment in Souki's favor is nevertheless not appropriate.  This is so for two reasons.

First, Plaintiffs point out that "Souki does not dispute that the text messages originated from his phone or that he sent the messages."  (ECF No. 127 at 13.)  Although not referred to expressly by name, Plaintiffs' argument clearly invokes the judicial admission exception.  That doctrine provides that the statute of frauds "does not bar an oral[5] agreement if the party against whom the agreement is sought to be enforced admits to the existence of the contract in pleadings or testimony."  *See Flight Sys., Inc. v. Elec. Data Sys. Corp.*, 112 F.3d 124, 127–28 (3d Cir.1997); *see also Packgen v. BP Exploration & Production, Inc.*, 957 F.Supp.2d 58, 91 (D. Me. 2013) ("[T]he judicial admission exception prevents a defendant from thumbing its nose at a plaintiff by admitting an oral agreement while at the same time raising a statute of frauds defense.").

---

[5] The Court recognizes that courts have seemed to apply the judicial admission exception to *oral contracts*.  But the Court has not located any cases declining to apply the exception to written contracts like the one at issue here.  The Court sees no reason why the rationales underlying the exception—to prevent parties from using rigid rules "to escape bargains they rue," *Gibson*, 288 F.3d at 1246—should not apply to written contracts just the same.

Notably, although it appears that the Tenth Circuit has not applied the judicial admission exception in a Colorado case, it has nonetheless recognized that "virtually every court that has addressed the issue during the last twenty-five years has held that judicial admissions are an exception to the statute of frauds." *Gibson v. Arnold*, 288 F.3d 1242, 1246 (10th Cir. 2002) (collecting cases). "Assuredly," the Tenth Circuit continued, "the rationale for the judicial admission exception is 'that the purpose of the statute of frauds is to shield persons with interests [covered by the statute] from being deprived of those interests by perjury, not to arm contracting parties with a sword they may use to escape bargains they rue.'" *Id.* at 1247 (quoting *Flight Sys.*, 112 F.3d at 128) (citations omitted). "If the defendant admits under oath that a contract was formed, the purposes of the statute of frauds are served, and the contract will be afforded full legal effect." *Id.* (citations omitted).

Here, Souki admitted the following in a request for admission: "Mr. Souki admits that he sent and received the text messages attached to the Requests as Exhibit A, many of which are not specifically referenced or described in the body of this Request, but he denies that the text messages somehow form an agreement between him and Parker or Red Mango (which is not referenced anywhere in the text messages)." (ECF No. 127-3 at 6.) Souki later "recognize[d]" during his deposition that the August 2019 messages are his "text messages with Chris Parker." (ECF No. 127-1 at 29.)

In the Court's view, these statements create a fact issue as to whether the judicial admission exception forecloses application of the statute of frauds. Significantly, while Souki "denie[d] that the text messages somehow form an agreement between him and Parker or Red Mango" in his response to the request for admission, "[t]he

admission need not be of a 'contract' or an 'agreement' per se; an admission of 'the
existence of the facts necessary to the formation of the oral agreement' is sufficient."
*Packgen*, 957 F.Supp.2d at 91 (quoting *Paris Utility Dist. v. A.C. Lawrence Leather Co.*,
665 F.Supp. 944, 957 (D. Me. 1987)).  The Seventh Circuit has similarly explained that

> an admission . . . need not expressly acknowledge the
> existence of a contract, nor need it describe all of its terms.
> *The admission need only describe conduct or circumstances
> from which the trier of fact can infer a contract.  Whether the
> defendants' statements admit the existence of a contract is a
> question of fact.*  Thus, summary judgment should not be
> granted if there is a genuine issue whether the statements
> admit the existence of a contract.

*Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 278 (7th Cir. 1979) (emphases added).

Souki disputes that he admitted to the existence of a contract, effectively creating
a fact dispute on this score.[6]  So the Court will permit Plaintiffs to present evidence of
Souki's judicial admissions to the jury in arguing that compliance with the signature
requirement of the statute of frauds should be excused.  *See In re Peter Peter
Cottontail, LLC*, 498 B.R. 242, 251 (2013) ("With Etchart's admission under oath that
there was in fact an agreement between the parties in the form of Allonge No. 2, it
would run counter to the purpose of the Statute of Frauds to hold that, because
Everkrisp did not sign the document, no agreement existed.  Therefore, his admission
provides an exception to the Statute of Frauds in this case.").

---

[6] Although Souki does not respond to Plaintiffs' argument that he admitted to the
existence of a contract in his response to the request for admission and deposition testimony,
the Court does not fully fault him because Plaintiffs did not clearly or thoroughly argue this point.
Again, Plaintiffs do not refer to the judicial admission exception by name or cite any law in
support of the issue.

Nevertheless, the Court believes the judicial admission exception is fairly in play in this
case since Plaintiffs repeatedly stress throughout their briefing that Souki admitted that he
authored the pertinent August 2019 texts.

Second, Plaintiffs continue to rely on the partial performance exception to the statute of frauds.  (ECF No. 134 at 19.)  The Court observed at the dismissal stage that the exception "excuses compliance with the requirements of the statute of frauds if the party seeking to enforce the contract has substantially performed his end of the bargain, and such performance is 'required by, and fairly referable to no other theory besides that allegedly contained within the [] agreement.'"  (ECF No. 102 at 8 (quoting *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1225 (10th Cir. 2000)).)  As noted, the Court found at "th[at] stage of the litigation" that Plaintiffs' allegations that they held "their shares pursuant to the agreement with Defendant that he would indemnify them later" was "sufficient to excuse compliance with the statute of frauds." (*Id.*)

But now, Souki says, "discovery has proven" that Plaintiffs' performance was not "fairly referable to no other theory besides that allegedly contained within the agreement."   (ECF No. 126 at 17.)  On the contrary, Souki continues, Parker "freely admitted" during his deposition "that he held his Tellurian stock for reasons wholly unrelated to a purported agreement with Souki."  (*Id.*)  According to Parker's deposition testimony, "he was in buying, not selling, mode because he 'believes in the LNG space' and saw significant upside in Tellurian stock."  (*Id.*)

While the Court agrees that this testimony fairly suggests that there were reasons unrelated to the August 2019 agreement for why Plaintiffs held on to their shares, the Court recognizes that Plaintiffs maintain that "[t]here is ample evidence that after receiving the guarantee, Plaintiffs retained their shares because of it."  (ECF No. 134 at 19.)  On this point, Plaintiffs argue:

> First, Plaintiffs declared that they refrained from selling the
> Tellurian shares covered by agreement in reliance on
> Souki's guarantees.  *See* First Parker Decl. ¶¶ 13, 15;
> Second Parker Decl. ¶ 15.  Second, not only is it undisputed
> that Plaintiffs did not sell the Tellurian shares governed by
> the 2019 Agreement, but it is also undisputed that they did
> sell Tellurian shares that were not covered by the guarantee.
> ADF ¶ 27.  Third, Mr. Parker represented to others that the
> declining share price did not influence his investment
> decisions for the tranche of shares at issue because of
> Souki's guarantee.  *See e.g.*, Ex. 20, PLAINTIFFS_00010049
> at -51.  And finally, Plaintiffs did not sell shares covered by
> the guarantee for a profit because of the agreement with
> Souki.  ADF ¶ 28.[7]

(*Id.*)

Given all this, whether Plaintiffs' "performance is fairly referable to no other

theory besides that allegedly contained within the agreement" remains a tightly

contested fact issue.  *See McCall v. Wagner Equipment Co.*, 2023 WL 5134007, at *7

(D.N.M. 2023) ("Having concluded that the doctrine of partial performance could apply

to this case, the Court further holds that Plaintiff has sufficiently raised a genuine issue

of material fact regarding whether it would be inequitable to deny enforcement of the

parties' alleged agreement.  For summary judgment purposes, Plaintiff has submitted

sufficient evidence of 'acts that make up the part of the performance.'") (citation

omitted); *see also Lobato v. Bleidt*, 54 F.3d 787, 1 (10th Cir. 1995) ("[W]hether part

performance . . . is substantial enough to take the contract out of the statute of frauds is

also a factual question."); *In re RJT Real Est. Holdings, LLC*, 2021 WL 1259692, at *16

(Bankr. D. Utah Apr. 1, 2021) ("Viewing the evidence in the light most favorable to RJT,

---

[7] Souki concedes that, if Plaintiffs "refrained from selling their shares based on [his]
guarantee," this "would satisfy the performance exception to the statute [of frauds]."  (ECF No.
133 at 1.)

the Court concludes that there is a genuine dispute of material fact on each of the
elements of RJT's asserted part performance exception and that this precludes granting
summary judgment to Davis on his statute of frauds defense."); *Midwest Grain Prods.,
Inc. v. Envirofuels Mktg., Inc.*, 1996 WL 445070, at *11 (D. Kan. July 12, 1996) ("We find
that the alleged full performance of Envirofuels creates a question of material fact as to
whether the alleged oral agreement is enforceable as an exception to the statute of
frauds.").

For all these reasons, the Court concludes that disputed fact issues preclude
summary judgment on Souki's statute of frauds defense.

### E.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on the August 2019 breach of contract claim
and Souki's statute of frauds defense.  (*See generally* ECF No. 127.)  But, as noted
throughout this analysis, it is evident that material fact disputes abound on Plaintiffs'
August 2019 breach of contract claim and Souki's statute of frauds defense as to that
claim.  Hence, the Court denies Plaintiffs' motion for partial summary judgment with
respect to those issues.

 The Court will grant, however, Plaintiffs' motion to the extent they seek judgment
on Souki's fraud defense.  (ECF No. 127 at 20.)  Souki does not appear to contest this
result in his briefing.  (*See* ECF No. 133 at 16 ("Souki acknowledges that his fraud
defense will not be presented at a potential trial.").)  The Court will also grant summary
judgment in Plaintiffs' favor insofar as Defendants continue to argue that the statute of
frauds precludes enforcement of the February 2021 oral contract.  As the Court
explained at the dismissal stage, that contract is not subject to the statute of frauds
because it could be performed within one year.  (*See* ECF No. 102 at 10 ("[T]he Court

concludes that the February 2021 contract is not subject to the statute of frauds because it could be performed in less than a year: the contract formed in February 2021 indemnified Plaintiffs through December 31, 2021 and could have been performed immediately thereafter.").)

## 2. FEBRUARY 2021 BREACH OF CONTRACT

Souki moves for summary judgment on Plaintiffs' February 2021 breach of contract claim. (ECF No. 126 at 18.) He argues that Parker "personally is not a party to that agreement, a fact that forecloses any claim by [him] in his individual capacity." (*Id.*) As to Red Mango, Souki argues that it could not be bound to the oral agreement because Parker lacked the authority to act on its behalf. (*Id.* at 19.) Moreover, Souki adds, even assuming Parker had the authority to bind Red Mango to the alleged agreement, Souki did not breach the agreement because Red Mango undisputedly did not tender a written demand that he purchase its shares by December 31, 2021, as required by the written draft agreement's express terms. (*See id.* ("Without a written demand by Red Mango, Souki was not obligated to purchase the shares. Souki did not breach and in fact can never breach since the option period has expired.").) Finally, Souki points out that the February 2021 written agreement contained an integration clause, whereby all previous agreements, including the alleged August 2019 contract, became void. (*Id.*)

The problem with most of Souki's arguments, however, is that they are premised on the disputed notion that the parties orally agreed to all of the terms listed in the written "Put Option Agreement," which Parker presented to Souki by e-mail and in person. (*See generally* ECF No. 126-11.) Plaintiffs dispute this premise, insisting

instead that the oral agreement included only the following terms: "Souki agreed to
indemnify Plaintiffs for their Tellurian losses through the end of 2021 and pay interest . .
. ."  (ECF No. 134 at 20.)  That is, Plaintiffs deny that (1) only Parker and Souki orally
agreed to certain terms listed in the Put Option Agreement, not Red Mango; (2) the
parties orally agreed that Red Mango was required to tender a written demand to trigger
Souki's performance; and (3) the parties orally agreed to an integration clause.  (*Id.* at
21.)

Souki responds that this is "a new theory" concocted by Plaintiffs after Parker's
deposition, which "should be disregarded because it is contracted by Parker's
deposition testimony."  (ECF No. 126 at 18 n.4.)  As to Parker's deposition testimony,
Souki elaborates: "As Red Mango's corporate representative, Parker testified that it was
Red Mango's contention that the February 2021 draft was 'the agreement between
[Souki] and Red Mango.'"  SUF ¶ 41.  The following day, testifying in his personal
capacity, Parker confirmed that testimony, agreeing that Souki 'agreed verbally in
February in the meeting to the terms of the put option agreement.'"  (*Id.*)

The Court disagrees that Plaintiffs' theory of the February 2021 oral agreement is
an "after-the-fact invention," as Souki asserts.  (*Id.*)  In its dismissal Order, the Court
concluded that "Plaintiffs have alleged that an enforceable contract was formed via the
February 2021 agreement," observing that Plaintiffs alleged that Souki "orally agreed to
certain new terms" from the draft Put Option Agreement, including the indemnity and
interest provisions.  (ECF No. 102 at 9.)  In other words, Plaintiffs have averred since
the beginning of this case that the parties did not orally agree to *all* of the terms listed in
the written draft agreement; instead, Plaintiffs maintain, the parties allegedly agreed to

"*certain* new terms."  (*Id.* (emphasis added).)

To the extent Souki argues that these "certain new terms" "are far too vague and

indefinite to form the basis of the contract," the Court is not convinced.  True, the oral

agreement Plaintiffs allege the parties agreed to—that "Souki agreed to indemnify

Parker and Red Mango for their losses through December 31, 2021, and to pay

interest"—does not expressly mention the quantity of shares, their price, or the interest

rate.  (ECF No. 134 at 21.)  In the Court's view, however, this lack of detail is not

dispositive at this stage.  It is reasonably inferable that the parties agreed that Souki

would guarantee the same shares referenced in the August 2019 agreement, but this

time with an interest rate as well.  Parker substantiated this view at his deposition,

attesting that Souki "*agreed to extend the guarantee out* and apply a daily interest . . . to

my loss of keeping the stock."  (*Id.* (emphasis added).)  He also confirmed that the

stocks allegedly covered by the August 2019 agreement "related to the same universe

of stock or shares that is" allegedly subject by the February 2021 agreement.  (ECF No.

168-2 at 180.)

While this is, again, very thin (and self-serving) evidence on which to base a

breach of contract claim, the Court cannot dispatch Plaintiffs' February 2021 breach of

contract claim where fact issues remain.  And while Plaintiffs do not appear to specify

an interest rate (although the draft agreement refers to one), Souki does not specifically

contend that this term is essential.  *See Martinez-Wechsler v. Safeco Ins. Co. of Am.*,

2012 WL 12892760, at *2 (D.N.M. Dec. 14, 2012) ("Non-material terms may be missing

or left to be agreed upon without affecting the enforceability of the contract.").  At any

rate, "[w]hether contracting parties have reached a meeting of the minds on all essential

terms is also a question of fact for the trier of fact." *Appliance Depot, Inc. v. Hinsz*, 2024 WL 4034752, at *2 (Colo. App. Mar. 21, 2024). Thus, the Court rejects Souki's arguments to the extent they are premised on the terms of the written Put Option Agreement that Parker insists the parties did not adopt. Whether the parties did so is a fact question. *Appliance Depot, Inc.*, 2024 WL 4034752, at *2 ("The existence of an oral contract, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact.") (citation omitted).

That leaves Souki's argument that Parker lacked the requisite authority to bind Red Mango to the oral agreement. (ECF No. 126 at 19.) Souki explains that, "[a]ccording to the Red Mango M&As, which control the governance and operations of Red Mango, its business 'shall be managed' by its directors." (*Id.*) But, Souki asserts, "Parker was not a director or even a shareholder" when the parties allegedly orally agreed to certain terms listed in the Put Option Agreement, so Parker could not bind Red Mango to that agreement. (*Id.*)

Plaintiffs counter that "Souki improperly invokes the legal doctrine of authority (while tellingly citing no case law), which is typically reserved for claimants seeking to enforce a contract against a party purportedly bound by the actions of its agent." (ECF No. 134 at 22.) In their view, Souki should not be able to invoke agency law defensively. (*See id.* ("Therefore, the Court should reject Souki's arguments and deny summary judgment on this issue.").) On the merits of the agency issue, Plaintiffs argue that Parker had the authority to bind Red Mango because, although he was not a director at that time, he was a business partner of Red Mango's then-director, Chi Kan Tang. (*Id.* at 23.) According to Plaintiffs, Red Mango's Memorandum and Articles of

Association provide that "[a]ny Director, *or* his firm, *partner* or company may act in a professional capacity for the Company."  (*Id.* (emphases added).)  Finally, Plaintiffs argue that "Parker had the authority to act on behalf of Red Mango through his role as the Protector of his Trust, which was the 100% indirect owner of Red Mango."

The Court is not persuaded by Plaintiffs' argument that Souki cannot invoke agency law to argue that Parker could not contract on Red Mango's behalf.  While Plaintiffs fault Souki for citing no law supporting his agency defense, Plaintiffs likewise cite no law suggesting that agency law cannot be used as a shield.

Nevertheless, the Court agrees with Plaintiffs that the Court cannot grant summary judgment on this agency dispute.  "The existence of an agency relationship is typically a question of fact for the jury."  *Brown v. No Double Dipping Inc.*, 2023 WL 12061349, at *3 (Colo. App. Nov. 9, 2023); *see also Stuhmer v. Girdner*, 2024 WL 3201639, at *3 (D. Colo. June 27, 2024) ("As to the agency jury instruction, the existence of an agency relationship is a question of fact.").  Plaintiffs have advanced two theories as to why Parker was authorized to contract on Red Mango's behalf.  Both foreclose summary judgment.

For all these reasons, the Court concludes that disputed fact issues preclude summary judgment on Plaintiffs' February 2021 breach of contract claim.

### 3. FRAUDULENT INDUCEMENT

Souki moves for summary judgment on Plaintiffs' fraudulent inducement claim, arguing that (1) "Plaintiffs cannot show any competent evidence that they relied on Souki's August 17 text" or that any reliance was justified; (2) Plaintiffs did not rely on Souki's representation that he was not selling his shares; and (3) Plaintiffs cannot

demonstrate fraud based on the February 2021 agreement for the same reasons that this breach of contract claim fails.  (ECF No. 126 at 21–24.)

To maintain a fraudulent inducement claim, a plaintiff must allege that (1) the defendant made a "knowing misrepresentation of a material fact" and (2) the plaintiff justifiably relied on the misrepresentation.  *Clancy Sys. Int'l, Inc. v. Image Sensing Sys., Inc.*, 2017 WL 3086624, at *4 (D. Colo. Jan. 30, 2017).

The Court concludes that competent evidence supports Plaintiffs' theory that he justifiably relied on Souki's alleged promises in the August 2019 and February 2021 agreements.  To reiterate, there is ample evidence substantiating Plaintiffs' theory that they suffered financial loss based in substantial part on Souki's alleged August 2019 and February 2021 promises to guarantee the cost basis price of their shares.  *See* Restatement (Second) of Torts § 546 (observing that a plaintiff's reliance on the defendant's representation need only be a "substantial factor in determining the course of conduct that results in his loss").

To the extent Souki argues that this reliance was not justified as a matter of law, the Court disagrees.  (*Id.* at 22.)  While Souki points to some evidence indicating that Plaintiffs doubted the sincerity of his alleged promises to guarantee the shares, it is a fact question whether Plaintiffs actually believed or knew these representations were false.  *See Hardy v. Flood*, 2019 WL 937708, at *5 (D. Colo. Feb. 26, 2019) (denying summary judgment and observing that whether a plaintiff justifiably relied on a misrepresentation is a question of fact); *Lexico Res. Int'l Corp. v. Lafayette Life Ins. Co.*, 2006 WL 1119038, at *10 (D. Colo. Apr. 27, 2006) ("Whether or not the asserted reliance was reasonable or justifiable is a question of fact."); *Kamboj v. Eli Lilly and Co.*,

2007 WL 178434, *14 (N.D.Ill. Jan.18, 2007) ("Normally, whether reliance is justifiable is a question of fact that is unsuited for resolution on summary judgment.").

The Court will grant summary judgment in Souki's favor, however, insofar as Plaintiffs aver that Souki's assertion that he was not selling his shares was a fraudulent misrepresentation.  The Court sees no evidence showing that Souki sold his Tellurian shares.  And Plaintiffs do not develop any argument in response to Souki's contention on this point.  (*See generally* ECF No. 134 at 24–26.)

Thus, Plaintiffs' fraudulent inducement claim may proceed to trial to the extent it is based on Souki's alleged August 2019 and February 2021 representations, but not to the extent it is based on Souki asserting that he was not selling his shares in February 2020.

### 4. PROMISSORY ESTOPPEL

Souki moves for summary judgment on Plaintiffs' two promissory estoppel claims based on the August 2019 and February 2021 agreements.  (ECF No. 126 at 24.)  In support, he largely rehashes the arguments he advanced with respect to the breach of contract issues, claiming that the terms of those contracts are too indefinite and that "reliance on th[o]se vague terms was also unreasonable."  (*Id.* at 25.)

For the same reasons discussed above, the Court rejects Souki's challenge that Plaintiffs cannot satisfy the elements of promissory estoppel.  *See Crews v. Sch. Dist. No. 1, in the City & Cnty. of Denver*, 2014 WL 12929402, at *13 (D. Colo. Apr. 7, 2014) (promissory estoppel requires "(1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and (3) the

existence of circumstances such that injustice can be avoided only by enforcement of

the promise.") (citation omitted).  As explained elsewhere, whether the terms of those

contracts are sufficiently definite is a disputed fact question, as is whether Plaintiffs

reasonably relied on Souki's alleged promises.  And as to injustice, the Court already

explained at the dismissal stage that "it would be unjust for Defendant to retain the

financial benefit without paying Plaintiffs, as he agreed to do."  (ECF No. 102 at 14.)

Thus, Plaintiffs' promissory estoppel claims may proceed to trial.

### 5. UNJUST ENRICHMENT

Lastly, Souki moves for summary judgment on Plaintiffs' unjust enrichment claim.

(ECF No. 126 at 26.)  Again, Souki repeats his arguments that his alleged

representations did not induce Plaintiffs' forbearance.  (*Id.* at 27.)  Souki further argues

there is no evidence that Plaintiffs' performance unjustly enriched him.  (*Id.*)

For the same reasons discussed above, the Court rejects Souki's challenge that

Plaintiffs cannot satisfy the elements of unjust enrichment.  *See Congo Works, LLC v.*

*Gray & Co., Inc.*, 2019 WL 13036098, at *4 (D. Colo. Oct. 17, 2019) ("To state a claim

for unjust enrichment under Colorado law, a plaintiff must allege: '(1) [t]he defendant

received a benefit (2) at the plaintiff's expense (3) under circumstances that would make

it unjust for the defendant to retain the benefit without commensurate compensation.'")

(citation omitted).  The Court has already found that Plaintiffs rely on competent

evidence demonstrating their decision not to sell their shares was induced by Souki's

alleged representations.  And to the extent Souki argues that Plaintiffs' performance did

not enrich Souki, the Court already rejected that argument as well.  As noted in its

analysis regarding consideration, Plaintiffs present evidence that their decision not to

sell their shares "stabiliz[ed] Tellurian's share price during a short selling campaign, and avoiding, or at least delaying, defaulting on a $70 million loan Souki was using to fund various real estate investments."  (ECF No. 134 at 20.)  This is sufficient to show a benefit conferred on Souki.

Thus, Plaintiffs' unjust enrichment claim may proceed to trial.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the parties' cross motions for summary judgment (ECF No. 126, 127) as follows:

1. Plaintiffs' partial summary judgment motion is GRANTED with respect to Souki's fraud defense and his statute of frauds defense to the February 2021 breach of contract claim.

2. Souki's summary judgment motion is GRANTED to the extent Plaintiffs seek to base their fraudulent inducement claim on his February 2020 text that he was not selling his shares.

3. The cross motions are DENIED in all other respects.

Dated this 9th day of May, 2025.

BY THE COURT:

William J. Martinez
Senior United States District Judge