**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 22-cv-0165-WJM-MDB

CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

     Plaintiffs,

v.

CHARIF SOUKI,

     Defendant.

---

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO PLAINTIFFS'
EQUITABLE PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT CLAIMS**

---

In January 2022, Plaintiffs Christopher Parker and Red Mango Enterprises, Ltd. (jointly, "Plaintiffs") sued Defendant Charif Souki, asserting six causes of action: two breach of contract claims; two promissory estoppel claims; fraudulent inducement; and unjust enrichment. In short, Plaintiffs' theory of the case is that Souki broke two alleged promises—the first in August 2019 and the second in February 2021—to guarantee any losses Plaintiffs sustained on stock they held in Tellurian Inc. ("Tellurian"), a liquified natural gas company founded and owned by Souki. As a result of these broken promises, Plaintiffs contend that they were damaged and Souki was unjustly enriched to the tune of tens of millions of dollars. Souki denies all claims against him.

On April 13, 2026, the case proceeded to a five-day jury trial. The jury returned binding verdicts on Plaintiffs' legal claims—breach of contract and fraudulent inducement—and advisory verdicts on Plaintiffs' equitable claims—promissory estoppel

1

and unjust enrichment.  More specifically, the jury found in Plaintiffs' favor on their 2019 breach of contract claim but in Souki's favor on Plaintiffs' claims for 2021 breach of contract; 2021 promissory estoppel; fraudulent inducement; and unjust enrichment.  (ECF No. 255.)  And because the jury found in Plaintiffs' favor on the 2019 breach of contract claim, it did not return a verdict on Plaintiffs' 2019 promissory estoppel claim.  (*Id.*)

After the trial, the parties submitted final proposed findings of fact and conclusions of law as to the remaining equitable claims on which the jury returned advisory verdicts. (ECF Nos. 266, 267.)  Having considered the arguments and evidence submitted on Plaintiffs' two promissory estoppel claims and single unjust enrichment claim, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure 52(a) and 65(d).

## I.      FINDINGS OF FACT[1] AND PROCEDURAL HISTORY

1.      Parker is a highly successful international entrepreneur whose business background includes wealth management services, internet startups, online gaming, and a period in British intelligence services.  (Tr. 383:25–384:8.)

2.      His net worth is estimated to be in the hundreds of millions of dollars.  (*Id.*)

3.      Red Mango is a British Virgin Islands company established by Parker, a U.K. citizen, for his personal wealth planning.  (Tr. 498:11–13, 502:7–18.)

4.      Souki is a businessman who founded Tellurian, Inc., a liquified natural gas ("LNG") business, in 2016.  (Tr. 654:16–17.)

---

[1] The parties include far more proposed findings of fact than necessary for the Court to resolve the only issues that remain pending: Plaintiffs' equitable claims.  The Court focuses on laying out only those facts that are necessary to resolve the outstanding equitable claims.

5.    He was the chairman of Tellurian's board of directors and later became the executive chairman of the company in 2020.  (Tr. 654:18–21; 661:6–8.)

6.    At the relevant portions of this action, Souki was also estimated to be a centimillionaire.  (P69 at 4.)

7.    Parker first learned of Tellurian through a friend in the summer of 2017. (Tr. 387:9–388:5.)

8.    After conducting his own independent research, Parker began investing in Tellurian because he believed in the mission and upside of the company.  (Tr. 388:15–389:11.)

9.    Prior to meeting Souki, Parker, through Red Mango, owned 2,395,373 shares of common stock in Tellurian.  (ECF No. 227.)

10.    From March 2018 through 2021, Parker and Souki developed a social relationship: The two met all over the world, including at Parker's home in Los Angeles, California, various locations in Aspen, Colorado, and in St. Tropez, France.  (Tr. 165:24–166:18.)

11.    Souki's net worth was highly dependent on the success of Tellurian's stock price.

12.    As of December 31, 2016, Souki held assets of $623,039,358, with "securities" at a value of $324,845,630.  (P68 at 4.)

13.    The only "securities" Souki owned at the time were "comprised of an investment in Tellurian Investments."  (P68 at 8.)

14.    As of August 4, 2017, Souki was a beneficial owner of approximately 54,900,613 shares of Tellurian common stock, representing approximately 26% of the common stock.  (P159 at 59.)

15.    As of December 31, 2017, Souki held assets of $577,299,387, with securities valued at $289,503,588—*i.e.*, approximately 50% of his total assets.  (P69 at 4.)

16.    Of the nearly 55 million shares of Tellurian that Souki beneficially owned, $26 million of those shares were held by the Souki Family 2016 Trust (the "Trust"), of which Souki was the trustee at the time.  (P159 at 61.)

17.    The Trust took out a series of loans collateralized solely with its shares of Tellurian, culminating in a $40 million loan from UBS (the "2019 UBS Loan").  (P85 at 1, 4.)

18.    That loan was used to pay down a prior loan provided by Raymond James, which in turn was used to pay down another earlier loan from UBS.  (TPD001 at 7–8.)

19.    Under the 2019 UBS Loan, the Trust would enter default if the share price of Tellurian fell below $6, or if the loan-to-value ("LTV") ratio exceeded 25%.  (P85 at 3, 8.)

20.     In the summer of 2019, Tellurian's stock price was volatile, so Souki began reaching out to dozens of friends, including Parker, to initiate what is often referred to in financial circles as a "short squeeze."  (Tr. 697:19–698:13.)[2]

---

[2] For the sake of brevity, the Court incorporates Plaintiffs' expert's testimony regarding what a short squeeze is by way of this footnote.  (Tr. 206: 3.)

21.    On August 7, 2019, Parker told Souki he was "looking to lend some more support to the cause," and Souki asked how much stock Parker had "picked up so far." (P1 at 11.)

22.    Parker responded that he had purchased "200 other day on top of the 5m I already have," and that he "will pick up 300 tomorrow."  (P1 at 12.)

23.    Souki responded, "Thanks for the help."  (P1 at 12; Tr. 430:20-24.)

24.    On August 17, 2019, Parker and Souki had the following text exchange, which constitutes the basis of the 2019 Agreement:



(P1 at 12–13.)

25.    Over the next several months, Tellurian's stock price continued to increasingly drop.

26.    In February 2020, for example, Tellurian's stock price sharply fell from approximately $7 to less than $2.  (P180 at 18–19.)

27.    This price drop yielded consequences with respect to Souki's various loans.

28.    On February 24, 2020, UBS delivered a written notice to the Trust notifying it that it was in breach pursuant to Section 9(a)(ii) of the credit agreement.

29.    The notice demanded delivery of a "Margin Call Amount" of $9,320,000 by February 26, 2020.  (P59 at 1.)

30.    Throughout the end of February 2020 and into the beginning of March 2020, UBS liquidated approximately $20 million shares of Tellurian (P166 at 3), causing the share price of Tellurian to sink even lower.  (Tr. 715:10–23.)

31.     In addition to the $40 million loan made to the Trust by UBS—secured solely by its 26 million Tellurian shares—Souki maintained substantial personal loans of his own, including a loan provided by UBS O'Connor in 2017 for $50 million (the "2017

Loan") and a second loan, also from UBS O'Connor, for $70 million (the "2018 Loan"). (P73 at 69; P78 at 82.)

32.    The collateral for the 2017 Loan included, among other things, Souki's interests in an 800-acre Aspen Valley Ranch valued at over $120 million; Ajax Holdings (an entity that he and the Trust shared ownership of); and 20 million Tellurian shares. (P73 at 1, 65; P69 at 8; TPD002 at 5; Tr. 238:9–15; Tr. 772:24–25.)

33.    The collateral for the 2018 Loan included the same collateral as pledged for the 2017 Loan but expanded to include a fleet of sailing vessels and an increased pledge of 25 million Tellurian shares.  (Tr. T239:8–15; Tr. 675:14–677:9; P78 at 77, 81.)

34.    The 2018 loan contained at least two financial covenants.

35.    The first was a debt-to-assets ("DTA") ratio covenant requiring that Souki's DTA ratio not exceed 45% at any measurement date, with a breach constituting an Event of Default.  (P78 at 47; TPD002 at 14–15.)

36.    The second was a total net worth covenant requiring that Souki's personal net worth, as calculated by the bank, not fall below $125 million, with a breach likewise constituting an Event of Default.  (P78 at 47. TPD002 at 14–15.)

37.    Following the dramatic decline of the share value of Tellurian in late February 2020 through early March 2020, Souki defaulted on the 2017 Loan and the 2018 Loan.  (*Id.*)

38.    UBS O'Connor entered into a forbearance agreement with Souki dated May 5, 2020.  (P100 at 2, 14.)

39.    The specified defaults under the personal UBS O'Connor loan included: (i) failure to comply with the DTA ratio covenant, with the DTA ratio having exceeded 45%;

7

and (ii) failure to comply with the total net worth covenant, with Souki's net worth having fallen below $125 million.  (P100 at 15.)

40.    By the end of 2020, Souki was in default on all of his debt, which was around $100 million.  (Tr. 715:24–716:8.)

41.    As a result of the defaults, Souki was forced to sell his ranch located in Aspen, Colorado, as well as his boats.  (Tr. 677: 4–19.)

42.    Additionally, Souki was forced to sell 25 million shares of Tellurian that he owned personally.  (Tr. 716:13–16.)

43.    Meanwhile, during the first half of 2020, Parker repeatedly brought up the existence of the guarantee to Souki.  (P1 at 26–34.)

44.    For example, on May 13, 2020, Parker texted Souki proposing a June meeting "to go over the company and the guarantee in place for the stock," and Souki responded that he was in Aspen with no travel plans and was "[h]appy to catch up and talk."  (P1 at 26.)

45.    According to Parker, during a November 20, 2020 phone call, the parties agreed to extend the payment date to January 2021.  (Tr. 477:17–478:19.)

46.    On November 21, 2020—the day after the call—Parker sent Souki the following text: "Good chatting yesterday, I confirm I'm in agreement to hold of the guarantee payment til first week jan when we can sit and discuss.  Let me know your movements jan 2–7 so we can schedule something."  (P1 at 32.)

47.    Between January 18, 2021 and January 19, 2021, Parker and Souki exchanged text messages concerning Souki's whereabouts and discussed Parker potentially making a trip to Aspen.  (P1 at 34.)

8

48.     As of close of market on December 31, 2020, Tellurian's share price was $1.28.  (P180 at 24.)

49.      On February 18, 2021, Parker confirmed he was "finally making it up to aspen fri to Sunday" and asked whether Souki was available to meet.  (P1 at 35.)

50.      That same day, Parker's counsel sent him a draft "Put Option Agreement" for Parker to use at the "Aspen meeting" with Souki.  (P10 at 1.)

51.     The Put Option Agreement, which was never signed, was drafted as between only Red Mango and Souki.  (P10 at 3.)

52.     It provided that, during an "Option Period" ending on December 31, 2021, Red Mango could make a written demand that Souki purchase up to 5,881,238 shares of Tellurian at a per-share purchase price of $8.3441.  (P10 at 3.)

53.     The Put Option Agreement also added, among other terms, an obligation that Souki pay interest at a rate of 0.167%.  (P10 at 3.)

54.     Red Mango undisputedly never made such a written demand.  (Tr. 617:12-16.)

55.     Parker sent Souki a draft copy of the Put Option Agreement in advance of the meeting.  (P10.)

56.     Parker and Souki met in Aspen, Colorado at the end of February 2021; Parker brought the draft Put Option Agreement with him to the meeting.  (Tr. 478:21– 479:2; 480:22–481:6; 733:15–734:4.)

57.     Souki undisputedly refused to sign the Put Option Agreement but, according to Parker, Souki orally agreed to extend the original guarantee through the

end of 2021 and to pay interest at the rate set forth in the draft agreement.  (Tr. 480:22–481:15.)

58.     Souki denies having made this oral agreement.

59.     After the meeting, Parker told his wife that the guarantee had allegedly been extended through the end of 2021 and that Souki had agreed to pay interest.  (Tr. 173:15–16, 174:2–12.)

60.     On March 12, 2021, Parker texted Souki: "Discussed our convo with the lawyers and basically I have an issue with it, in this world with everything going on I need protection in case one of us dies, I've been as accommodating as possible on this for a long time, we need to find a solution to this or the lawyers will.  I'm sure you can come up with a protection mechanism from a third party that will cover all our needs.  Will leave it with you a for a week."  (P1 at 37.)

61.     The parties conferred thereafter, but communications ultimately broke down in October 2021.

62.     On October 6, 2021, Parker texted Souki, "Need to fix a firm date to close out the guarantee, I've extended this on now past a year, going on your estimated numbers hitting 8.5 by Dec is achievable so I will fix jan 1st 2022 to make good the difference.  As always, your number one supporter but it can't keep going on."

63.     Not having received a response from Souki, on October 7, 2021, Parker texted Souki just two question marks: "??"  (P1 at 48.)

64.     Later that same day, Parker sent a follow-up text: "The sheer lack of response has me concerned to the point that you don't wish to honour your guarantee, if

there's no response in the next 24 hours then I shall take it you wish to follow through with the legal[.]"  (P1 at 48.)

65.    Souki responded that day, "I am working very hard and have no time for this nonsense on a regular basis.  We talked in aspen.  I have no desire to repeat the same thing all the time.  I told you I would let you know as soon as I have some time.  I will." (P1 at 48.)

66.    By the end of 2021, Souki's net worth had fallen to $45,357,847.  (P72 at 2.)

67.    According to Souki, the "dramatic[]" reduction of his net worth from December 31, 2016—when it was estimated to be $623,039,358—was due "almost entirely" to the decline in the value of Tellurian stock.  (Tr. 677:25–678:8.)

Plaintiffs filed suit in January 2022.  (ECF No. 1.)  Plaintiffs' claims for breach of contract for the alleged 2019 and 2021 Agreements, promissory estoppel for the alleged 2019 and 2021 Agreements, fraudulent inducement, and unjust enrichment proceeded to a trial by jury from April 13–17, 2026.  Pursuant to Federal Rule of Civil Procedure 39(c)(1), the Court, on its own motion, empaneled an advisory jury to hear Plaintiffs' equitable claims for promissory estoppel and unjust enrichment.

At the conclusion of trial, the jury found by a preponderance of evidence that the August 17, 2019 text message exchange constituted an enforceable contract and that Souki was therefore liable to Plaintiffs for breach of that contract.  (ECF No. 255 at 1.) Based on that finding, the jury awarded approximately $2 million in damages to Parker and approximately $37 million in damages to Red Mango.  (*Id.* at 2.)  As instructed, the jury did not therefore return a verdict on Plaintiffs' promissory estoppel claim under the

2019 Agreement because it found Souki liable for breach of that contract. (ECF No. 255 at 4.)

The jury found in Souki's favor on all remaining legal and equitable claims. As to the remaining legal claims, the jury found that Souki was not liable for beach of the alleged 2021 Agreement or fraudulent inducement. (ECF No. 255 at 3, 5–9.) As to the remaining equitable claims, the jury returned advisory verdicts in Souki's favor on Plaintiffs claims for promissory estoppel based on the 2021 Agreement and unjust enrichment. (ECF No. 255 at 5–8.)

Pursuant to Rules 52(a) and 65(d), the Court now issues its legal conclusions on Plaintiffs' equitable promissory estoppel and unjust enrichment claims.

## II.    CONCLUSIONS OF LAW

As discussed, only three equitable claims remain outstanding for the Court's adjudication: promissory estoppel related to the 2019 Agreement; promissory estoppel related to the 2021 Agreement; and unjust enrichment. The Court addresses each claim in turn.

### A.  PROMISSORY ESTOPPEL: 2019 AGREEMENT

To prevail on a promissory estoppel claim, Plaintiffs must prove by a preponderance of the evidence that "(1) the promisor made a promise to the promisee; (2) the promisor should have reasonably expected that the promise would induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise to his or her detriment; and (4) the promise must be enforced to prevent injustice." *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006).

The Court need not adjudicate the merits of this 2019 promissory estoppel claim, however, because the jury found in Plaintiffs' favor on their 2019 breach of contract claim—and importantly, both claims are based on the theory that Souki promised to guarantee Plaintiffs' capital via the August 17, 2019 texts reproduced above.   (P1 at 12–13.)  "[P]romissory estoppel is applicable only in the absence of an otherwise enforceable contract."  *Scott Co. of California v. MK-Ferguson Co.*, 832 P.2d 1000, 1003 (Colo. App. 1991), *reversed on other grounds by Lewis v. Lewis*, 189 P.3d 1134 (Colo. 2008).

Given the jury's verdict in Plaintiffs' favor on the 2019 breach of contract claim, the Court concludes that Plaintiffs' promissory estoppel claim related to the 2019 Agreement necessarily fails.    *See Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, L.L.C.*, 176 P.3d 737, 741 (Colo. 2007) ("Recovery on a theory of promissory estoppel is incompatible with the existence of an enforceable contract.").

## B.  PROMISSORY ESTOPPEL: 2021 AGREEMENT

Plaintiffs contend that they have proven by a preponderance of the evidence their claim for promissory estoppel related to the 2021 Agreement.  That is, on this claim, Plaintiffs submit that they have proven that (1) Souki orally promised in February 2021 to extend the 2019 guarantee through the end of 2021, this time with interest; (2) Souki reasonably expected that his oral promise would induce Plaintiffs to continue holding on to their Tellurian shares; (3) Plaintiffs reasonably retained their shares to their financial detriment; and (4) injustice would result were the Court not to enforce the promise.

Based on its consideration of the evidence and review of the record, however, the Court finds—as a matter of fact—that Plaintiffs have failed to prove by a preponderance of the evidence the first element of this claim: that Souki orally promised

to extend the guarantee.  To be sure, both parties presented competent evidence supporting their theory as to this threshold element.  Parker testified that Souki orally promised to extend the guarantee through to the end of 2021, and with interest, at the February 2021 meeting in Aspen, Colorado.  Parker's wife testified that Parker told her about the oral agreement sometime thereafter.  And Plaintiffs relied on Parker's March 2021 text to Souki in which Parker alluded to the alleged promise from the month prior.  Souki, for his part, denied that he orally agreed to extend the guarantee.  (Tr. 481:11-15.)  Souki points out that he undisputedly did not sign the Put Option Agreement Parker presented to him at the Aspen meeting.  And Souki stresses that Parker and his wife are not disinterested witnesses, so their testimony should not be credited on this subject.

Consistent with the jury's apparent view of the evidence,[3] the Court finds that Souki did not orally promise to extend the guarantee at the February 2021 meeting.  The Court's reaches this factual finding for three primary reasons.  First, it is particularly notable to the Court that Souki undisputedly refused to sign the Put Option Agreement at the Aspen meeting.  On this point, Plaintiffs posit that Souki refused to do so because his "banks [would] not allow [him] to sign this [draft agreement]," presumably because Souki already owed tens of millions of dollars to his other creditors, and those loans included conditions that Souki's DTA be maintained above a certain threshold.  (Tr.

---

[3] To be clear, the Court does not defer to the jury's advisory verdicts.  Instead, the Court merely observes that its view of the evidence is apparently consistent with the jury's.  *See OCI Wyoming, L.P. v. PacifiCorp*, 479 F.3d 1199, 1205–06 (10th Cir. 2007) (reversing judgment where district court "essentially ceded its duty to conduct factfinding to the advisory jury" because "the advisory jury's decision is not binding on the district court and the district court has the ultimate responsibility for deciding the case's legal and factual issues") (quotation marks omitted).

481:2–12.)  But even taking Parker's explanation as true, that only bolsters the notion

that Souki did not orally agree to enter yet another formal legal agreement whereby he

stood to lose millions more dollars.  In other words, if Souki was consciously concerned

about his banks learning of this alleged agreement—as Plaintiffs theorize—then why

would he have agreed to exacerbate his financial exposure by extending the guarantee

in the first place?  In the Court's view, Souki's undisputed declination to sign the formal

agreement strongly supports the notion that he did not orally agree to incur further risk

and, ultimately, more debt.

Second, the Court notes that Parker's text to Souki regarding the alleged oral

agreement actually *undercuts* Parker's theory that there was such an agreement.

Recall that, on March 12, 2021, Parker texted Souki:

> Discussed our convo with the lawyers and basically I have
> an issue with it, in this world with everything going on I need
> protection in case one of us dies, I've been as
> accommodating as possible on this for a long time, we need
> to find a solution to this or the lawyers will.  I'm sure you can
> come up with a protection mechanism from a third party that
> will cover all our needs.  Will leave it with you a for a week.

(P1 at 37.)

Plaintiffs contend that Souki orally promised to extend the guarantee in February

2021, but this text suggests just the opposite: It suggests that Parker did *not* believe that

the parties had entered into a legitimate oral agreement at the Aspen meeting.  In the

Court's view, this text indicates that Parker left the Aspen meeting feeling insecure

*precisely because* the parties had not reached any sort of formal agreement as to the

status of the alleged extended guarantee.

15

Third and perhaps most decisively, the Court does not find Plaintiffs' theory of this claim to be particularly credible given that Plaintiffs pick and choose which terms Souki allegedly orally agreed to—and conveniently, those terms happen to favor only Plaintiffs. To reiterate, Plaintiffs' theory of this claim is that Souki orally agreed to extend the guarantee as reflected in the August 17, 2019 text exchange, but this time with an interest rate. Notably, however, Plaintiffs aver that the parties did not orally agree to any of the other terms included in the draft Put Option Agreement—the Put Option Agreement that *Plaintiffs' counsel prepared.*

The draft agreement contained several terms that would have proven problematic to Plaintiffs' position in this case, including terms (1) that Red Mango was required to tender a written demand that Souki purchase its shares by December 31, 2021 in order to obtain relief and (2) which included an integration clause, whereby all previous agreements, including the alleged August 2019 contract, became void. The written demand terms of the Put Option Agreement are reproduced below:

1.    **Put Option.** At any time between the Effective Date and December 31, 2021 (the "Option Period"), Holder may exercise a put option (the "Put Option") to Souki of all or any portion of the Put Shares, as determined by Holder in its sole discretion, up to a maximum of 5,881,238 shares, and Souki shall purchase those shares from Holder on the price and terms set forth herein.

2.    **Exercise of Put Option.** The Put Option shall be exercised by a written and dated notice (the "Written Notice") to Souki demanding that Souki purchase the Put Shares pursuant to the provisions of this Agreement. If the Put Option is exercised, the closing of the purchase and sale of the Put Shares shall occur within ten (10) business days of the date of the Written Notice.

3.    **Purchase Price.** The purchase price (the "Purchase Price") for Put Shares shall be $[8.3441] per Put Share, increasing by [one (1) month LIBOR plus 0.167%] per calendar month after the Effective Date, plus an amount to indemnify Holder for any taxes on the sale of the shares.

(ECF No. 126-11 at 4.)

The integration clause is also reproduced below:

> (d)    This Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.

(*Id.* at 3.)

Conveniently, Plaintiffs did not argue at trial that Souki agreed to these exacting terms.  Moreover, this trial theory conflicts with what Parker testified to at his deposition.  As Red Mango's corporate representative, Parker testified at deposition that the Put Option Agreement, as drafted by his lawyers, was "the agreement between [Souki] and Red Mango."  (ECF No. 126 at 18 n.4.)  Parker's testimony in his personal capacity mirrored this assertion, reiterating that Souki "agreed verbally in February in the meeting *to the terms of the put option agreement*."  (*Id.* (emphasis added).)  After these depositions, however, Plaintiffs changed their tune, averring that the oral agreement did not encompass all the terms included in the draft Put Option Agreement.  On their telling, Souki only orally agreed to those terms of the Put Option Agreement that happened to serve Plaintiffs and Plaintiffs only.  The Court is not convinced that this is what happened at the Aspen meeting.

Given these material facts, the Court concludes that Plaintiffs have failed to prove their 2021 promissory estoppel claim by a preponderance of the evidence.  In reaching this conclusion, the Court feels compelled to make the following very clear: The Court's factual finding as to the 2021 promissory estoppel claim is not based on the impression that Parker was generally less credible than Souki.  On the contrary, the Court broadly found Parker to generally be *more* credible than Souki, based on its

17

assessment of the parties' demeanor and the delivery[4] of their trial testimony.  But
Plaintiffs ultimately bear the burden of proof and persuasion in proving their claims.  And
here, in stark contrast to the 2019 Agreement—which was supported by far more
compelling physical evidence—Plaintiffs have simply fallen short of proving by a
preponderance of the evidence the first element of their 2021 promissory estoppel
claim.

For these reasons, the Court concludes that Plaintiffs' promissory estoppel claim
related to the 2021 Agreement fails.

## C.  UNJUST ENRICHMENT

Lastly, Plaintiffs contend that they have proven their unjust enrichment claim by a
preponderance of the evidence.  "To state a claim for unjust enrichment under Colorado
law, a plaintiff must prove: '(1) [t]he defendant received a benefit (2) at the plaintiff's
expense (3) under circumstances that would make it unjust for the defendant to retain
the benefit without commensurate compensation.'"  *See Congo Works, LLC v. Gray &
Co., Inc.*, 2019 WL 13036098, at *4 (D. Colo. Oct. 17, 2019) (citation omitted); Lewis v.
Lewis, 189 P.3d 1134, 1141 (Colo. 2008).

A "benefit" is any form of advantage, including the avoidance of an expense or
loss.  *Cablevision v. Breckenridge, Inc. v. Tanhauser Condo. Ass'n*, 649 P.2d 1097
(Colo. 1982).  Importantly, here, the benefit Souki allegedly received must have yielded

---

[4] For example, the Court noticed that Souki repeatedly seemed to have substantial difficulty
hearing Plaintiffs' counsel's questions when he was testifying on the stand.  In stark contrast,
Souki seemed to have almost no trouble hearing and understanding defense counsel's
questions.  In the undersigned's experience, this sort of stark disparity often indicates that a
witness may be attempting to take more time to think about their answers to challenging
questions on cross examination.

a *measurable* increase in his wealth. *Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 30 ("Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth.") (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d (2011)); *accord RTA Inc. v. AM King Constr. Co. LLC*, 2023 WL 12057203, at *4 (Colo. App. Mar. 30, 2023); *Northgauge Healthcare Advisors, LLC v. Constellation, Inc.*, 2024 WL 1807952, at *9 (D. Colo. Apr. 25, 2024); Restatement (Third) of Restitution and Unjust Enrichment § 49 (2011) ("Restitution in money, sometimes called 'restitution of value,' requires that unjust enrichment be measured."); *Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 830 (10th Cir. 2019) ("On the claim of unjust enrichment, [the plaintiff] had to prove the amount of [the defendant's] benefit stemming from his wrongful conduct.").

Applying these principles in light of the evidence presented at trial, the Court finds and concludes that Plaintiffs have failed to prove by a preponderance of the evidence the first element of their unjust enrichment claim: that Souki received a *measurable* increase in his wealth. To be sure, Plaintiffs presented ample evidence at trial suggesting that Plaintiffs' agreement not to sell their Tellurian shares *generally* helped stabilize Tellurian's share price, which in turn likely delayed or mitigated the losses Souki sustained from his various lenders. Thus, in a general sense, the Court is convinced that Plaintiffs' guarantee benefited Souki, to a certain extent, at their expense.

What the Court is not convinced of, however, is that Plaintiffs have proven by a preponderance of evidence that the benefit has been sufficiently *measured*. Instead, the Court's takeaway from the trial evidence is that Plaintiffs generally helped Souki by

19

retaining their shares of Tellurian.  For example, Souki asked for Plaintiffs' "help" in submitting a pre-market bid to "show some strength," and Parker obliged.  Souki confirmed that this benefited him when he said, "Thanks for the help."  And when Plaintiffs agreed to retain their shares in August 2019, Souki repeated this sentiment: "Thanks for your help and confidence."

But what amount of money did this "help" actually yield?  In their proposed findings and fact and conclusions of law, Plaintiffs supply only nebulous answers:

> Souki's finances and those of his family were inextricably connected to the value of Tellurian stock.  His children are the beneficiaries of the Souki Family 2016 Trust, which at the time of the 2019 Agreement held 26 million shares of Tellurian.  FOF ¶¶ 48–49.  Those shares were in turn used to collateralize a loan for $40 million dollars that was quickly unwound as a result of a steep decline in the value of Tellurian shares in February 2020.  FOF ¶ 50.
>
> Souki's financial documents also show that his holdings of Tellurian made up approximately 50% of his personal net worth as of December 2017.  FOF ¶ 47.  And, by his own admission, Souki's net worth declined "dramatically."  FOF ¶ 69.  That precipitous decline was due "almost entirely" to the loss of value in Tellurian stock.  FOF ¶ 69.

(ECF No. 267 at 43.)

Plaintiffs sum up their theory as follows:

> Plaintiffs held a very significant portion of the 'free float' of Tellurian shares, and a sell-off of Plaintiffs' shares would have caused a further, faster decline in the value of Tellurian.  FOF ¶¶ 157–58.  Although the share price of Tellurian eventually collapsed, Plaintiffs' retention of their shares delayed that crash by counteracting the initial shortselling campaign.  FOF ¶¶ 82, 157.  The fact that Plaintiffs held their shares also diminished the severity of the collapse in February 2020, when Plaintiffs did not sell because of the guarantee.  FOF ¶ 153.

(*Id.*)  And in the "damages"[5] section of their proposed findings—which is less than a page long (indeed, just five short paragraphs)—Plaintiffs merely point to the value of Souki's various leveraged debts, which Plaintiffs aver is worth "$90 million."  (*Id.* at 46.)

But again, this does not adequately quantify how much money Souki measurably saved as a result of Plaintiffs retaining their shares of the falling Tellurian stock price. Even their own expert conceded at trial that he did not know to what extent Tellurian stock price would have fallen had Plaintiffs sold their shares.  Specifically, the expert said he did not "do any sort of analysis about the degree to which the stock price would go down in Red Mango and Mr. Parker sold their 5.5 million shares."  (Tr. 257:5–9.)  He also acknowledged that "any given activity is specific and can have an . . . indeterminate impact" on the market.  (*Id.* at 275:13–14.)

This concession and lack of probative evidence is dispositive, in the Court's view. Simply put, the Court has no idea how Plaintiffs arrive at their staggering $90 million "damages" figure.  Merely pointing to the amounts Souki had borrowed from various banks, using Tellurian stock (among other assets) as collateral, does not establish the necessary link between the guarantee and the specific amounts Souki lost or avoided losing from his creditors.  Were the Court to order disgorgement pursuant to Plaintiffs' unjust enrichment claim, it would be doing so on little more than speculation with respect to the specific amounts Souki should be required to return.  That would be inconsistent with Tenth Circuit precedent, which puts the onus on the plaintiff "to prove

---

[5] The Court queries why Plaintiffs use the word "damages" with respect to their unjust enrichment claim, since the remedy for such a claim is usually disgorgement.  *See Wetzel v. Diestel Turkey Ranch*, 2023 WL 6391677, at *12 (D.N.M. Oct. 2, 2023) ("Unjust enrichment is an action in equity, the remedy for which is restitution.")

*the amount* of [the defendant's] benefit stemming from his wrongful conduct." *Advanced Recovery Sys.*, 923 F.3d at 830 (emphasis added).

Given this key evidentiary deficiency, the Court finds and concludes that Plaintiffs have failed to prove by a preponderance of the evidence that they conferred a benefit upon Souki that measurably increased his wealth.

## III.    COSTS

Whether Plaintiffs should recover costs in this case is a close question.  Federal Rule of Civil Procedure 54(d)(1) provides that costs "shall be allowed as of course to the prevailing party unless the court otherwise directs."  Applying this language, the Tenth Circuit has recognized that "[t]he allowance or disallowance of costs to a prevailing party is within the sound discretion of the district court." *Zeran v. Diamond Broad., Inc.*, 203 F.3d 714, 722 (10th Cir.2000) (citation omitted).  "However, this discretion is limited in two ways.  First, it is well established that Rule 54 creates a presumption that the district court will award costs to the prevailing party.  Second, the district court must provide a valid reason for not awarding costs."  *Id.*  (quotation and citation omitted).

Although the Court has the discretion to deny costs, such a denial is viewed as a "severe penalty" and must be supported by a justification for penalizing the prevailing party. *In re Williams Securities Litigation*, 558 F.3d 1144, 1147 (10th Cir. 2009).  The Tenth Circuit has recognized several grounds for denying costs to the prevailing party: when "the prevailing party was only partially successful, when damages were only nominal, when costs were unreasonably high or unnecessary, when recovery was insignificant, or when the issues were close or difficult."  *Id.* at 1150–51.

Here, the Court concludes that these factors partially favor Plaintiffs. Of the factors identified above, the circumstance that weighs most heavily by the Court's estimation is the significant amount of damages Plaintiffs won at trial. Moreover, the Court observes that the 2019 breach of contract claim was the foundational claim at issue in this case. Indeed, the 2021 breach of contract claim is based on the premise that the 2019 breach of contract existed in the first place.

On the other hand, however, the Court appreciates that Souki otherwise won on all other claims asserted by Plaintiffs. "The Court has the discretion to reduce the prevailing party's cost award under Rule 54(d)(1) to reflect partial success." *Wellons, Inc. v. Eagle Valley Clean Energy, LLC*, 2017 WL 3130930, at *7 (D. Colo. July 24, 2017) (citing *Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1224 (10th Cir. 2001)).

Accordingly, Plaintiffs shall have their costs in this case only to the extent they are reasonably attributable to the 2019 breach of contract claim. Plaintiffs shall exclude all other costs they incurred in their motion for costs.

## IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.      The Court FINDS and CONCLUDES in Defendant Charif Souki's favor on Plaintiffs Christopher Parker and Red Mango Enterprises, Ltd.'s equitable claims: 2019 promissory estoppel; 2021 promissory estoppel; and unjust enrichment;

2.      As the prevailing parties on their 2019 breach of contract claim, Plaintiffs shall have their costs reasonably incurred in pursuing such claim upon compliance with Local Rule 54.1; and

3.      The Clerk shall enter judgment on the jury's verdict and this Order, and shall terminate this action.


Dated this 29th day of June, 2026.

BY THE COURT:

_____
William J. Martinez
Senior United States District Judge