IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No. 1:22-cv-00165-WJM-MDB


CHRISTOPHER PARKER, and
RED MANGO ENTERPRISES LTD.,

       Plaintiffs,

v.

CHARIF SOUKI,

       Defendant.

---

**DEFENDANT'S COMBINED RULE 50(B) RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW AND RULE 59 MOTION FOR A NEW
TRIAL**

---

The jury found for Plaintiffs and the Court entered judgment for them on a single claim: breach of the August 2019 Agreement. ECF No. 255 at 1; ECF No. 269. This claim fails as a matter of law, however, and Mr. Souki is entitled to judgment or, at a minimum, a new trial on it.

## LEGAL STANDARD

If a Rule 50(a) motion is denied, a defendant "may file a renewed motion for judgment as a matter of law" and alternatively request "a new trial under Rule 59." Fed. R. Civ. P. 50(b). The movant "is entitled to judgment as a matter of law only if the court concludes that all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (cleaned up).

## ARGUMENT

### I.    The Statute of Frauds Bars Plaintiffs' 2019 Agreement Claim.

The Court correctly held that the Statute of Frauds applies to the 2019 Agreement but left the judicial admission and partial performance exceptions for the jury. ECF No. 172 at 13–14, 17–22. The jury found that Plaintiffs proved one of those exceptions. ECF No. 255 at 1–2. This finding is erroneous on both the law and the evidence. Thus, Mr. Souki is entitled to judgment.

#### A.    The judicial admission exception does not apply as a matter of law.

The judicial admission exception does not apply for three reasons. *First*, there is no "clear guidance from the state's highest court" that it would adopt the exception. *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 948 (10th Cir. 2018) (cleaned up). Rather, many states have rejected the exception for a variety of compelling reasons. *See, e.g.*, *Key Design Inc. v. Moser*, 983 P.2d 653 (Wash. 1999). In these circumstances, "it is not a federal court's place to expand state law beyond the bounds set by the" state supreme court. *Amparan*, 882 F.3d at 948 (cleaned up).

- 1 -

*Second*, even if Colorado courts were to adopt the exception, there is no indication they would embrace the broad version of it from *Gruen Industries, Inc. v. Biller*, reflected in the jury instructions, which applies the exception even when an admission does "not expressly acknowledge the existence of a contract" so long as it "describe[s] conduct or circumstances from which the trier of fact can infer a contract." 608 F.2d 274, 278 (7th Cir. 1979); *see also* ECF No. 250 at 38. At most, the narrower view that the Tenth Circuit predicted Oklahoma would adopt applies. *See Gibson v. Arnold*, 288 F.3d 1242, 1247 (10th Cir. 2002). That view requires the defendant to "unequivocally admit[] under oath at the trial . . . that he agreed to all of the material terms of the [relevant] agreement." *Id.* There is insufficient evidence that Mr. Souki did so here. Quite the opposite, Mr. Souki consistently *denied* entering into *any* contract. *See, e.g.*, Tr. 735:4. This is the opposite of an unequivocal admission that Mr. Souki "agreed to all of the material terms of the [August 2019] [A]greement." *Gibson*, 288 F.3d at 1247.

*Third*, even under *Gruen*, the evidence is insufficient that Mr. Souki admitted to "conduct or circumstances from which the trier of fact can infer a contract." *Gruen*, 608 F.2d at 278. His admission that he sent the August 2019 text, for example, does not support an inference of the elements of contract formation, including "legal consideration, mutuality of agreement, and mutuality of obligations." *Denver Truck Exch. v. Perryman*, 307 P.2d 805, 810 (Colo. 1957); *see also French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022). Thus, even the *Gruen* exception does not apply.

**B.      The partial performance exception does not apply as a matter of law.**

The partial performance exception applies only if a plaintiff's performance is "required by, and fairly referable to no other theory besides that allegedly contained within the oral agreement."

*Nelson v. Elway*, 908 P.2d 102, 108 (Colo. 1995). This requirement is not met when a plaintiff's actions are "equally consistent" with *either* the existence of an unwritten contract or some other motivation. *Kapaun v. Weber*, 2023 WL 12057268, at \*5 (Colo. App. Dec. 14, 2023). Or, as the Court instructed the jury, "[p]erformance is fairly referable to no other theory besides that contained within the agreement if it is consistent with the terms of the contract, *and no other motivation can explain Plaintiffs' performance.*" ECF No. 250 at 39 (emphasis added). If there is any proof of another motivation, this exception does not apply. *See Nelson*, 908 P.2d at 108–09.

There is insufficient evidence here that Plaintiffs' retention of their shares was "fairly referable to no other theory" besides their alleged agreement with Mr. Souki because other motivations, like Plaintiffs' faith and confidence in Tellurian, are "equally consistent" with that conduct. *Kapaun*, 2023 WL 12057268, at \*5. Plaintiffs initially invested in Tellurian in 2017 before Mr. Parker ever met Mr. Souki. Tr. 524:9-12. Mr. Parker invested based on "conversations [he] had with Mr. Kessler," his "analysis of the stock in [the] energy sector," and advice from "advisers who were helping [him] figure this out." *Id.* 524:20–25:6. Based on these analyses and conversations, Mr. Parker came to believe the Tellurian stock "could probably go more" than "five times . . . the amount invested"—he "definitely felt it was possible to get a very good multiple." *Id.* 525:11-16. As early as December 2017, he was confirming in writing that he was "not selling down the stock," and "if it dips significantly, [he would] buy more." Ex. 28; Tr. 334:2-7.

In August 2019, Mr. Parker "still believed 1,000 percent in the Tellurian story"—that "Tellurian [had] great prospects[] and [could] actually get above [its current] price." Tr. 545:8-17. He was "not considering selling" and instead was "looking for gain." *Id.* 545:5-7; *see also id.* 545:21-23 (testifying he was "still in buying mode with respect to the Tellurian stock"). Mr. Parker

bought stock in early August 2019 when it was at a 52-week low, *id.* 542:24–43:16; Ex. B-40 at 14, and "did not reach out to any of [his] bankers . . . and instruct them to sell," Tr. 546:9-13; *see also id.* 547:1-7. After the August 2019 text, likewise, Mr. Parker continued buying Tellurian stock even when it was "tanking." Ex. A-002 at 1; *e.g.*, Tr. 586:16-24. Indeed, he did not even sell *non-guaranteed* shares when the price plummeted, Tr. 597:22–98:11, 599:24–600:5; Ex. B-40 at 18.

Given Mr. Parker's testimony regarding his faith and confidence in Tellurian and trading practices consistent with that positive attitude, Plaintiffs' retention of their Tellurian stock is not "fairly referable to no other theory besides that allegedly contained within the oral agreement." *Nelson*, 908 P.2d at 108. Instead, it is "equally consistent" with another motivation. *Kapaun*, 2023 WL 12057268, at *5. Consequently, the partial performance exception does not apply.

## II.    The Terms of the August 2019 Text Are Too Indefinite to Support a Valid Contract.

To prevail on their contract claim, Plaintiffs also had to prove that Mr. Souki's promise was "sufficiently specific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms." *Hoyt v. Target Stores, Div. of Dayton Hudson Corp.*, 981 P.2d 188, 194 (Colo. App. 1998). Plaintiffs did not and could not do so here.

By the terms of the August 2019 text and the trial evidence, there is insufficient proof of when Mr. Souki's obligation arises, when and how it is to be paid, and what its terms are, rendering it too indefinite to support Plaintiffs' August 2019 Agreement claim. *Stice v. Peterson*, 355 P.2d 948, 951–52 (Colo. 1960). Whether Mr. Parker had to tender his shares and the amount Mr. Souki was to pay were material terms of this alleged contract, but there is insufficient evidence of what that price was, a method to compute it, or what Mr. Parker's obligations were. *See Jorgensen v.*

- 4 -

*Colo. Rural Props., LLC*, 226 P.3d 1255, 1260 (Colo. App. 2010); *DiFrancesco v. Particle Interconnect Corp.*, 39 P.3d 1243, 1249–50 (Colo. App. 2001); 2 A.L.R.3d 701 §§ 2(a), 5.

*First*, to determine price, Plaintiffs needed to subtract the price of Tellurian stock on the maturity date of the guarantee from Mr. Parker's cost basis and multiply that by the number of shares guaranteed. Tr. 214:6–15:4. But there is insufficient evidence for a jury to determine the maturity date. As Mr. Selman conceded, the text "does not provide a specific day in December when . . . the guarantee [became] due." *Id.* 279:10-16. Nor does it provide a specific *time* the guarantee matures. Ex. 1 at 22–23; Tr. 297:5-8. An exact maturity date with an exact maturity time is an essential term of a stock guarantee contract. As Mr. Selman explained, "stock prices change every day," so for a guarantee of 5.5 million shares, "a small change in the stock price can actually result in a fairly large change in the overall value of the guarantee." Tr. 280:22–81:11.

*Second*, the August 2019 text "is too uncertain to gather from it" whether Plaintiffs had to tender their stock in exchange for payment of the guarantee. *Bill Barrett*, 918 F.3d at 766. The text is silent on this point, Ex. 1 at 22–23, and Mr. Selman admitted "[t]he guarantee wasn't explicit on whether it was what we would call a physically settled guarantee or a cash settled guarantee," Tr. 266:18-24. As he testified, this "[a]bsolutely" created "some ambiguity" on Plaintiffs' obligations under the alleged contract. *Id.* 266:14–67:5.

Plaintiffs have presented insufficient evidence of any "custom" in the industry or between the parties that could clarify either term, nor have they identified any valid "law" or "presumption" to that effect. *Bill Barrett*, 918 F.3d at 766. On the maturity date, Mr. Selman testified that, in "a more standardized contract, [he] might have assumed" "by dec. 2020" meant "the third Friday of the month," but "in the informal context of this text message," he "read that very much as being

before the beginning of January 2021." Tr. 297:11-23. But by definition, that could mean any date in December 2020, and Mr. Selman provided no facts or data to establish December 31 as the maturity date, making that conclusion "bare *ipse dixit* [that] does not provide sufficient evidence to support a jury's verdict." *Tr. Dep't of First Nat'l Bank of Santa Fe v. Burton Corp.*, 2013 WL 4884483, at *5 (D. Colo. Sept. 11, 2013). But even if he had clarified a maturity date, Mr. Selman could not say whether "by dec 2020" meant "the end of the day, at the close of December 31st, 2020," "at the open of December 31st, 2020, or over the course of the day." Tr. 297:5-8.

    *Firehole River Cap., LLC v. Supurva Healthcare Group., Inc.*—cited in the orders denying Mr. Souki's summary judgment and Rule 50(a) motions, ECF No. 172 at 8; Tr. 904:10-13—does not cure this indefiniteness. 2021 WL 4291087, at *6 (D. Utah Sept. 21, 2021). That case involved a guarantee of a *set sum* ($32,500) by January 2016. *Id.* at *5. The court found, in that context— where price does not depend on the maturity date—that when a guarantee specifies a month but not day, "[t]he maturity date [can] be read as 'no later than [the last day of the month].'" *Id.* That logic does not apply here, where there is no set price, the price turns on the stock's value, that value fluctuates by the minute, and, with it, so does the guarantee price. *See* Tr. 280:22–81:11. Regardless, *Firehole*'s logic that a maturity date is "no later than" the last day of the month does not mean that day **is** the maturity date, and there is insufficient evidence to conclude as much here.

    As for Plaintiffs' obligation to tender their shares, Mr. Selman opined that "it would have been Mr. Parker's option" whether or not to do so. Tr. 280:2-5. Mr. Selman did not consider this an "important term" because, in his "experience," "options can be cash or physical settle at the option of the holder." *Id.* 280:11-16. Again, however, he cited no custom in the industry generally or among these parties specifically that could provide a reliable basis for this testimony. *See Bill*

*Barrett*, 918 F.3d at 766. His vague reference to his "experience" does not make up for this failure. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[A]n expert [must], whether basing testimony upon professional studies or personal experience, employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").[1]

## III.    Consideration Issues Require Judgment for Mr. Souki or a New Trial.

### A.  The evidence is insufficient to establish consideration.

To establish their claim for breach of the August 2019 Agreement, Plaintiffs had to adduce sufficient evidence of "the existence of a contract," among other elements. *Bd. of Governors of Colo. State Univ. v. Alderman*, 563 P.3d 1205, 1212–13 (Colo. 2025). The existence of a valid contract, in turn, requires sufficient evidence of consideration, meaning "something (such as an act, a forbearance, or a return promise) ***bargained for and received*** by a promisor from a promisee." *DeFranco v. Storage Tech. Corp.*, 622 F.3d 1296, 1306 (10th Cir. 2010) (emphasis added). In other words, "there must be an exchange of one party's promise or performance for the other party's promise or performance." *Stewart Title Guar. Co. v. Williams*, 2019 WL 13575193, at \*6 (Colo. App. Apr. 11, 2019). "A unilateral promise," by contrast, "is not sufficient consideration for creating an enforceable contract." *Id.*

Here, not only is the evidence insufficient to establish "an exchange of one party's promise or performance for the other party's promise or performance," *id.*, the testimony *conclusively disproves* that element. *See Bill Barrett*, 918 F.3d at 766 (judgment for movant required when "the

---

[1] Mr. Selman alluded to the rule that contractual ambiguities are to be interpreted against the drafter. Tr. 267:3-5, 280:16-18. But this is a legal rule, not an industry custom, and it applies "only after a court determines that it cannot discern the intent of the parties." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 187 (2019). It cannot cure indefinite terms that prevent the formation of a valid contract in the first place. *Id.*; *Gates Corp. v. Bando Chem. Indus., Ltd.*, 4 F. App'x 676, 684–85 (10th Cir. 2001) (distinguishing between "definiteness, a contract formation question, [and] ambiguity, a contract interpretation question").

evidence conclusively favors [the movant] such that reasonable men could not arrive at a contrary verdict"); *Murray v. First Marine Ins. Co.*, 29 F. App'x 503, 507 (10th Cir. 2002) (similar).

As the Court recognized, the August 2019 "texts only expressly demonstrate a promise *by Souki* to confer a benefit on Plaintiffs." ECF No. 172 at 12; *see also* Ex. 1 at 22–23. "There is no promise by Mr. Parker" in those texts "that he will not sell his shares" in exchange for Mr. Souki's guarantee. Tr. 270:21–71:2. That promise thus had to come from somewhere else.

Critically, however, Mr. Parker admitted that he *never* promised Mr. Souki he would retain his stock in exchange for the alleged guarantee "in writing or verbally *or otherwise*":

> Q. [A]t no point in August of 2019 or any time thereafter did you call Mr. Souki and say, I promise not to sell my shares?
>
> A. *I did not*.
>
> Q. And at no point did you say to Mr. Souki *in writing or verbally or otherwise*, I promise to hold on to my stock?
>
> A. *I did not*.

Tr. 567:17-22 (emphases added). He conceded this point repeatedly at trial and never once testified to the contrary that he *did* promise Mr. Souki he would retain his Tellurian shares—or do anything else—in exchange for the guarantee. *See, e.g.*, *id.* 565:23–66:7, 568:1-3.

While the Court previously concluded that "Souki's text thanking Parker for his 'help and confidence'" and Mr. Parker's subsequent retention of his shares "create[d] a reasonable (even strong) inference that Souki asked Parker to retain ownership of his shares" and that "the parties understood Souki expected Parker to refrain from selling his shares," ECF No. 172 at 12; *see also* Tr. 901:4-902:2 (similar reasoning at Rule 50(a) stage), the trial evidence forecloses any such inference. Mr. Parker testified—and his discovery responses confirm—that he did not speak with

Mr. Souki in July or August 2019 in the lead up to the August 2019 text messages. Tr. 491:7–92:24, 552:25–53:17; Ex. B-14. That means there were no other communications in which Mr. Souki could have "asked Parker to retain ownership of his shares" aside from the texts themselves, ECF No. 172 at 12, which, as noted, contain no such request. *See also* Tr. 562:19-22 (Mr. Parker testifying the August 2019 texts were "the sum total of the agreement"); *id.* 268:22-24 (similar testimony from Mr. Selman).

More importantly, Mr. Parker's admissions that he never promised Mr. Souki anything in exchange for the guarantee precluded the jury from finding or inferring that he *did* make such a promise. ECF No. 172 at 12; *see also* Tr. 565:23–66:7, 567:17-22, 568:1-3. Mr. Parker's testimony on this point was unequivocal, unqualified, and absolute: He *never* promised to retain his shares. No reasonable jury could ignore it or reach a contrary finding that Mr. Parker *did* provide consideration. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."); *Koch v. City of Del City*, 660 F.3d 1228, 1240 (10th Cir. 2011) (applying "blatant contradiction" standard where fact asserted was "directly contradicted by [the plaintiff's] deposition testimony"). The evidence on consideration is therefore insufficient to support the verdict, and Mr. Souki is entitled to judgment. *See Bill Barrett*, 918 F.3d at 766; *Murray*, 29 F. App'x at 507.

## B. Instructional error on consideration requires a new trial.

In the alternative, the jury instruction on consideration requires a new trial limited to the August 2019 contract claim. Jury instructions must "fairly, adequately and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of

- 9 -

law and factual issues confronting them." *Bond v. Sheriff of Ottawa Cnty.*, 173 F.4th 1265, 1295 (10th Cir. 2026). "[T]hey may not serve to mislead the jury in any way," *Richardson v. Mo. Pac. R.R. Co.*, 186 F.3d 1273, 1279 (10th Cir. 1999), and even "technically accurate" instructions should not be given if they are "potentially confusing and misleading," *United States v. Valdez*, 225 F.3d 1137, 1141 (10th Cir. 2000). Jury instructions should not cause "the jury to believe that the district court was putting its imprimatur on [one side's] factual theory of the case," *United States v. Grissom*, 44 F.3d 1507, 1513 (10th Cir. 1995), "marshal facts supporting [a party's] version of the events," or "preclude the jury from finding" for the other party, *United States v. Davis*, 953 F.2d 1482, 1492 (10th Cir. 1992). Or as this Court put it, the instructions should

> draw a pretty clear line between the definitional elements of a claim [or] phrase that's not commonly used in the English language . . . [and] context . . . [that] repeats a party's theory of the case. . . . [T]hat's something that's up to . . . the parties and counsel to argue. That's obviously fair game for closing argument, but [should not be] include[d] as examples for instructions.

Tr. 925:25–26:12.

The consideration instruction did not satisfy these standards. Its last paragraph required the jury to "find that there was consideration" if it found "that Plaintiffs refrained from selling their Tellurian shares pursuant to . . . the 2019 Agreement":

> If you find that Plaintiffs refrained from selling their Tellurian shares pursuant to either the 2019 Agreement or the 2021 Agreement, then you must find that there was consideration for that agreement.[28]

ECF No. 250 at 26.

This instruction "incorrectly states the governing law." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012). As noted, because consideration requires each party's action or forbearance to be *bargained for* and *agreed to*, *DeFranco*, 622 F.3d at 1306, "a unilateral promise is not sufficient consideration for creating an enforceable contract. Instead, there must be an exchange of one party's promise or performance for the other party's promise or performance," *Stewart Title*, 2019 WL 13575193, at *6. In other words, "consideration requires more than the conferral of a benefit—there must be a bargained-for exchange." *Scarlett v. Air Methods Corp.*, 538 F. Supp. 3d 1205, 1221 (D. Colo. 2021).

The consideration instruction, however, not only allowed but *compelled* the jury to find consideration if it concluded that Plaintiffs "conferred a benefit"—the retention of their shares—irrespective of whether "any bargained-for exchange took place." *Id.* It thus instructed the jury, contrary to Colorado law, that "a unilateral [action] [*was*] sufficient consideration for creating an enforceable contract." *Stewart Title*, 2019 WL 13575193, at *6. Given that Plaintiffs' retention of their shares was largely undisputed, moreover, the instruction also effectively "preclude[d] the jury from finding" for Mr. Souki on consideration, *Davis*, 953 F.2d at 1492, put an "imprimatur on [Plaintiffs'] factual theory of the case," *Grissom*, 44 F.3d at 1513, and improperly lessened Plaintiffs' burden by requiring them to prove less than the law requires for consideration, *see Lederman*, 685 F.3d at 1155 (requiring new trial where instruction altered burden). Because "the jury might have based its verdict on [this] erroneously given instruction," a new trial is required. *Wilson v. Schlumberger Tech. Corp.*, 80 F.4th 1170, 1174 (10th Cir. 2023).

**IV.    The Evidence Is Insufficient to Establish Mutuality of Assent or Obligation.**

A breach of contract claim also requires evidence of mutual assent and mutuality of obligation. *Univ. of Denver v. Doe*, 547 P.3d 1129, 1139 (Colo. 2024) (assent), *Mestas v. Martini*, 155 P.2d 161, 167 (Colo. 1944) (obligation). "Mutual assent" is not met if the parties "never reached an understanding which could be the basis of a binding [agreement]." *H.W. Houston Constr. Co. v. Dist. Ct. of Tenth Jud. Dist.*, 632 P.2d 563, 565 (Colo. 1981). Mutuality of obligation is missing "[i]f one party to an executory contract has no legally enforceable obligations or an unlimited right to determine the nature and extent of his performance." *Hauser v. Rose Health Care Sys.*, 857 P.2d 524, 528 (Colo. App. 1993).

Here, the parties "never reached an understanding which could be the basis of a binding [agreement]," *H.W. Houston*, 632 P.2d at 565, as their understandings of the communications differed. Even assuming Plaintiffs believed they were promising to retain their shares in exchange for a guarantee, Mr. Souki did not share that understanding. He believed they were arranging a structured financial product and conditioned any guarantees on the deposit of the relevant shares into escrow. *See* Tr. 748:12–52:13. There is insufficient evidence that he understood he was providing a blanket guarantee in exchange for Mr. Parker's pledge not to sell his shares, *id.* 651:25–52:6, 735:2-4, a promise Mr. Parker concedes he never made, *id.* 567:10-22, and which is not contained in the texts, Ex. 1 at 22-23; Tr. 270:21–71:2.

Even if there were sufficient evidence of a counter-promise by Plaintiffs to hold their shares, the purported 2019 Agreement lacks mutuality of obligation because Plaintiffs have "no legally enforceable obligations" but instead "an unlimited right to determine the nature and extent of [their] performance." *Hauser*, 857 P.2d at 528; *see also Mark II Elecs., Inc. v. Dotson*, 430 P.2d

- 12 -

82, 82–83 (Colo. 1967); *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1209 (10th Cir. 2016). Mr. Selman testified it was entirely left to Plaintiffs' discretion whether to hold their shares or to tender them to Mr. Souki when the guarantee matured. Tr. 280:2-10. This "unlimited right to determine the nature and extent of [their] performance" renders the contract illusory and unenforceable. *Hauser*, 857 P.2d at 528.

**V.    The Evidence Is Insufficient to Prove Red Mango Was a Party to the Agreement.**

Finally, Red Mango's 2019 contract claim independently fails for lack of a "meeting of the minds," a necessary component of mutual assent. *Univ. of Denver*, 547 P.3d at 1139. This element cannot be met "[i]f a party is not aware of an essential term," *Bojorquez v. Am. Bankers Ins. Co. of Fla.*, 2024 WL 4277910, at *5 (D. Colo. Sept. 24, 2024), because "[a] party assuredly [can] not assent to terms about which [it has] no knowledge and which were never disclosed to [it]," *French*, 509 P.3d at 450.

Here, there is insufficient "evidence in the record indicat[ing] that [Souki] even knew of [Red Mango's] existence." *Id.* As Mr. Parker agreed, "when sophisticated businesspeople like [himself] enter into contracts, they typically identify the party that they're contracting with" because a contracting party "need[s] to know exactly who [he's] dealing with." Tr. 574:7-10, 21-23. That was the case for the contracts Mr. Parker historically executed for Red Mango. *Id.* 574:11-15. But "Red Mango is not Chris Parker," "Red Mango is nowhere to be found in [the August 2019] text message," nor is there any "reference to any separate entity through which [Mr. Parker] owned [his] shares." *Id.* 575:10-21. Indeed, Mr. Parker is "not aware of anybody from Red Mango revealing to Mr. Souki the existence of Red Mango before this text message." *Id.* 575:22-25.

- 13 -

Because Red Mango "was not referenced in any way—even obliquely—in any of the" parties' 2019 communications, "no evidence in the record shows that [Mr. Souki] ever assented to" Red Mango's inclusion in the alleged guarantee, "much less clearly and knowingly assented to such terms." *French*, 509 P.3d at 450. This dearth of proof entitles Mr. Souki to judgment on Red Mango's claim for breach of the 2019 Agreement.

## CONCLUSION

For these reasons, judgment should be entered for Mr. Souki on Plaintiffs' claim for breach of the August 2019 Agreement or a new trial should be ordered on that claim.

Dated: July 28, 2026

*/s/ Timothy S. McConn*

Timothy S. McConn
R. Paul Yetter
Tyler P. Young
Daniel N. Nightingale
Bonnie C. Fraase
Ayla S. Syed
YETTER COLEMAN LLP
600 Travis Street, Suite 5400
Houston, TX 77002
713.632.8000
tmcconn@yettercoleman.com
pyetter@yettercoleman.com
tyoung@yettercoleman.com
dnightingale@yettercoleman.com
bfraase@yettercoleman.com
asyed@yettercoleman.com

and

Michael L. O'Donnell
Marissa S. Ronk
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone:    303.244.1800
Facsimile:    303.244.1879
Email: odonnell@wtotrial.com
        ronk@wtotrial.com

ATTORNEYS FOR DEFENDANT CHARIF SOUKI

## CERTIFICATE OF SERVICE

I certify that on July 28, 2026, a true and correct copy of the foregoing has been electronically served on all counsel of record.

*/s/ Timothy S. McConn*

Timothy S. McConn

- 15 -